# Exhibit 1

TABLE OF CONTENTS

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

———————————

# SCHEDULE 14A

———————————

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐  Preliminary Proxy Statement

☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒  Definitive Proxy Statement

☐  Definitive Additional Materials

☐  Soliciting Material under §240.14a-12

# USERTESTING, INC.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check all boxes that apply):

☐  No fee required.

☒  Fee paid previously with preliminary materials.

☐  Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

TABLE OF CONTENTS



**UserTesting, Inc.**
**144 Townsend Street**
**San Francisco, California 94107**
**(888) 877-1882**

Dear UserTesting Stockholder:

You are cordially invited to attend a special meeting (including any adjournments or postponements thereof, the "Special Meeting") of holders of common stock, par value $0.0001 per share, of UserTesting, Inc. ("UserTesting common stock" or "our common stock," and the holders thereof "UserTesting stockholders" or "our stockholders"), a Delaware corporation ("UserTesting," "we," "our," "us," or the "Company"), to be held on January 10, 2023, at 10:00 a.m., Pacific Time. We will hold the Special Meeting virtually via the Internet at www.virtualshareholdermeeting.com/USER2023SM. You will not be able to attend the Special Meeting physically in person. For purposes of attendance at the Special Meeting, all references in this proxy statement to "present in person" or "in person" shall mean virtually present at the Special Meeting.

At the Special Meeting, you will be asked to consider and vote on (i) a proposal to adopt the Agreement and Plan of Merger, dated as of October 26, 2022 (the "Merger Agreement"), by and among UserTesting, Thunder Holdings, LLC, a Delaware limited liability company ("Parent") and Thunder Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub"), and (ii) a proposal to adjourn the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting. Parent and Merger Sub are entities that are affiliated with Thoma Bravo, L.P., a private equity investment firm. All references herein to "Thoma Bravo" include Thoma Bravo, L.P. and its affiliated funds thereof and all references to "Sunstone Partners" include Sunstone Partners Management, LLC and its affiliated funds. Pursuant to the terms of the Merger Agreement, Merger Sub will merge with and into UserTesting and the separate corporate existence of Merger Sub will cease, with UserTesting continuing as the surviving corporation and a wholly owned subsidiary of Parent (the "Merger").

If the Merger is completed, you will cease to be a UserTesting stockholder and you will be entitled to receive $7.50 in cash, less any applicable withholding taxes, for each share of UserTesting common stock that you own, unless you have properly exercised your appraisal rights. If the Merger is completed, our common stock will no longer be publicly traded and will be delisted from the New York Stock Exchange.

The Board of Directors of UserTesting (the "Board of Directors" or the "Board"), after considering the factors more fully described in the enclosed proxy statement, has unanimously: (i) determined that it is in the best interests of UserTesting and our stockholders, and declared it advisable, to enter into the Merger Agreement; (ii) approved the execution, delivery and performance of the Merger Agreement and the consummation of the transactions contemplated thereby; and (iii) resolved to recommend that our stockholders adopt the Merger Agreement. The Board of Directors unanimously recommends that you vote: (1) "FOR" the adoption of the Merger Agreement and (2) "FOR" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

The enclosed proxy statement provides detailed information about the Special Meeting, the Merger Agreement and the Merger. A copy of the Merger Agreement is attached as Annex A to the proxy statement.

The proxy statement also describes the actions and determinations of the Board of Directors in connection with its evaluation of the Merger Agreement and the Merger. You should carefully read and consider the entire enclosed proxy statement and its annexes, including, but not limited to, the Merger Agreement, as they contain important information about, among other things, the Merger and how it affects you.

Whether or not you plan to attend the Special Meeting in person, please sign, date and return, as promptly as possible, the enclosed proxy card in the accompanying prepaid reply envelope or grant your proxy electronically over the Internet or by telephone (using the instructions provided in the enclosed proxy

TABLE OF CONTENTS

card). If you attend the Special Meeting and vote in person by virtual ballot, your vote will revoke any proxy that you have previously submitted.

If you hold your shares in "street name," you should instruct your bank, broker or other nominee how to vote your shares in accordance with the voting instruction form that you will receive from your bank, broker or other nominee. Your bank, broker or other nominee cannot vote on any of the proposals, including the proposal to adopt the Merger Agreement, without your instructions.

**Your vote is very important, regardless of the number of shares that you own. We cannot complete the Merger unless the proposal to adopt the Merger Agreement is approved by the affirmative vote of the holders of at least a majority of the outstanding shares of our common stock entitled to vote at the Special Meeting.**

If you have any questions or need assistance voting your shares, please contact our proxy solicitor:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Toll-free: 1-800-322-2885
Email: proxy@mackenziepartners.com

On behalf of the Board of Directors, I thank you for your support and appreciate your consideration of these matters.

Sincerely,

Andy MacMillan
*President, Chief Executive Officer and Chairperson*

The accompanying proxy statement is dated December 6, 2022 and, together with the enclosed form of proxy card, is first being mailed on or about December 6, 2022.

TABLE OF CONTENTS



**UserTesting, Inc.**
**144 Townsend Street**
**San Francisco, California 94107**
**(888) 877-1882**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**
**TO BE HELD VIRTUALLY VIA THE INTERNET ON JANUARY 10, 2023**

Notice is hereby given that a special meeting (including any adjournments or postponements thereof, the "Special Meeting") of holders of common stock, par value $0.0001 per share, of UserTesting, Inc. ("UserTesting common stock" or "our common stock," and the holders thereof "UserTesting stockholders" or "our stockholders"), a Delaware corporation ("UserTesting," "we," our," "us," or the "Company"), will be held on January 10, 2023, at 10:00 a.m., Pacific Time. We will hold the Special Meeting virtually via the Internet at www.virtualshareholdermeeting.com/USER2023SM. You will not be able to attend the Special Meeting physically in person. For purposes of attendance at the Special Meeting, all references in this proxy statement to "present in person" or "in person" shall mean virtually present at the Special Meeting. The Special Meeting is being held for the following purposes:

1. To consider and vote on the proposal to adopt the Agreement and Plan of Merger, dated as of October 26, 2022 (the "Merger Agreement"), by and among UserTesting, Thunder Holdings, LLC, a Delaware limited liability company ("Parent") and Thunder Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub"). Pursuant to the terms of the Merger Agreement, Merger Sub will merge with and into UserTesting and the separate corporate existence of Merger Sub will cease, with UserTesting continuing as the surviving corporation and a wholly owned subsidiary of Parent (the "Merger"); and

2. To consider and vote on any proposal to adjourn the Special Meeting to a later date or dates if necessary or appropriate to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

Only UserTesting stockholders of record as of the close of business on December 2, 2022, are entitled to notice of the Special Meeting and to vote at the Special Meeting or any adjournment, postponement or other delay thereof.

The Board of Directors unanimously recommends that you vote: (1) "FOR" the adoption of the Merger Agreement and (2) "FOR" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

UserTesting stockholders who do not vote in favor of adopting the Merger Agreement will have the right to seek appraisal of the "fair value" of their shares of UserTesting common stock, as determined in accordance with Section 262 of the General Corporation Law of the State of Delaware (the "DGCL"), if they deliver a demand for appraisal before the vote is taken on the proposal to adopt the Merger Agreement and comply with all the requirements of Delaware law, including Section 262 of the DGCL, which are summarized in the accompanying proxy statement. Section 262 of the DGCL is reproduced in its entirety in Annex C to the accompanying proxy statement and is incorporated therein by reference.

Whether or not you plan to attend the Special Meeting in person, please sign, date and return, as promptly as possible, the enclosed proxy card in the accompanying prepaid reply envelope or grant your proxy electronically over the Internet or by telephone (using the instructions provided in the enclosed proxy card). If you attend the Special Meeting and vote in person by virtual ballot, your vote will revoke any proxy that you have previously submitted. If you hold your shares in "street name," you should instruct

TABLE OF CONTENTS

your bank, broker or other nominee how to vote your shares in accordance with the voting instruction form that you will receive from your bank, broker or other nominee. Your bank, broker or other nominee cannot vote on any of the proposals, including the proposal to adopt the Merger Agreement, without your instructions. **If you sign, date and mail your proxy card without indicating how you wish to vote, your proxy will be counted as a vote "FOR" the adoption of the Merger Agreement and "FOR" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.**

By Order of the Board of Directors,

Andy MacMillan
*President, Chief Executive Officer and Chairperson*

Dated: December 6, 2022

TABLE OF CONTENTS

**YOUR VOTE IS IMPORTANT**

**WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING IN PERSON, WE ENCOURAGE YOU TO SUBMIT YOUR PROXY AS PROMPTLY AS POSSIBLE: (1) BY TELEPHONE; (2) THROUGH THE INTERNET; OR (3) BY SIGNING AND DATING THE ENCLOSED PROXY CARD AND RETURNING IT IN THE POSTAGE-PAID ENVELOPE PROVIDED.** You may revoke your proxy or change your vote at any time before it is voted at the Special Meeting.

If you hold your shares in "street name," you should instruct your bank, broker or other nominee how to vote your shares in accordance with the voting instruction form that you will receive from your bank, broker or other nominee. Your broker or other agent cannot vote on any of the proposals, including the proposal to adopt the Merger Agreement, without your instructions.

If you are a UserTesting stockholder of record, voting in person by virtual ballot at the Special Meeting will revoke any proxy that you previously submitted. If you hold your shares through a bank, broker or other nominee, you must obtain a "legal proxy" in order to vote in person at the Special Meeting.

If you fail to (1) return your proxy card, (2) grant your proxy electronically over the Internet or by telephone, or (3) vote by virtual ballot in person at the Special Meeting, your shares will not be counted for purposes of determining whether a quorum is present at the Special Meeting and, if a quorum is present, will have the same effect as a vote "**AGAINST**" the proposal to adopt the Merger Agreement but will have no effect on the adjournment proposal.

You should carefully read and consider the entire accompanying proxy statement and its annexes, including, but not limited to, the Merger Agreement, along with all of the documents incorporated by reference into the accompanying proxy statement, as they contain important information about, among other things, the Merger and how it affects you. If you have any questions concerning the Merger Agreement, the Merger, the Special Meeting or the accompanying proxy statement, would like additional copies of the accompanying proxy statement or need help voting your shares of UserTesting common stock, please contact our proxy solicitor:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Toll-free: 1-800-322-2885
Email: proxy@mackenziepartners.com

**Table of Contents**

|  | Page |
|---|---|
| SUMMARY | 1 |
| Parties Involved in the Merger | 1 |
| The Merger | 2 |
| Merger Consideration | 2 |
| U.S. Federal Income Tax Consequences of the Merger | 4 |
| Appraisal Rights | 4 |
| Litigation Related to the Merger | 5 |
| Regulatory Approvals Required for the Merger | 5 |
| Closing Conditions | 5 |
| Financing of the Merger | 6 |
| Required Stockholder Approval | 7 |
| The Special Meeting | 7 |
| Recommendation of the UserTesting Board of Directors | 8 |
| Opinion of Morgan Stanley & Co. LLC | 8 |
| Interests of Our Executive Officers and Directors in the Merger | 9 |
| Alternative Acquisition Proposals | 9 |
| Termination of the Merger Agreement | 11 |
| Effect on UserTesting if the Merger Is Not Completed | 11 |
| QUESTIONS AND ANSWERS | 12 |
| FORWARD-LOOKING STATEMENTS | 20 |
| THE SPECIAL MEETING | 22 |
| Date, Time and Place | 22 |
| Purpose of the Special Meeting | 22 |
| Record Date; Shares Entitled to Vote; Quorum | 22 |
| Vote Required; Abstentions and Broker Non-Votes | 22 |
| Stock Ownership and Interests of Certain Persons | 23 |
| Voting of Proxies | 23 |
| Revocability of Proxies | 23 |
| Board of Directors' Recommendation | 24 |
| Solicitation of Proxies | 24 |
| Anticipated Date of Completion of the Merger | 24 |
| Appraisal Rights | 24 |
| Delisting and Deregistration of UserTesting Common Stock | 25 |
| Other Matters | 25 |
| Householding of Special Meeting Materials | 25 |
| Questions and Additional Information | 26 |
| THE MERGER | 27 |
| Parties Involved in the Merger | 27 |
| Effect of the Merger | 28 |
| Effect on UserTesting If the Merger Is Not Completed | 28 |
| Merger Consideration | 29 |

i

TABLE OF CONTENTS

| | Page |
|---|---|
| Background of the Merger | 30 |
| Recommendation of the Board of Directors and Reasons for the Merger | 39 |
| Opinion of Morgan Stanley & Co. LLC | 42 |
| Management Projections | 51 |
| Interests of Our Executive Officers and Directors in the Merger | 53 |
| Financing of the Merger | 57 |
| Closing and Effective Time | 58 |
| Appraisal Rights | 59 |
| Litigation Related to the Merger | 65 |
| Accounting Treatment | 65 |
| U.S. Federal Income Tax Consequences of the Merger | 65 |
| Regulatory Approvals Required for the Merger | 67 |
| PROPOSAL 1: ADOPTION OF THE MERGER AGREEMENT | 69 |
| Effects of the Merger; Directors and Officers; Certificate of Incorporation; Bylaws | 69 |
| Closing and Effective Time | 70 |
| Merger Consideration | 70 |
| Exchange and Payment Procedures | 71 |
| Representations and Warranties | 72 |
| Conduct of Business Pending the Merger | 75 |
| The Go-Shop Period - Solicitation of Other Offers | 77 |
| The No-Shop Period - No Solicitation of Other Offers | 78 |
| The Board of Directors' Recommendation; Change of Recommendation | 80 |
| Employee Benefits | 82 |
| Efforts to Close the Merger | 84 |
| Cooperation with Debt Financing | 84 |
| Indemnification and Insurance | 86 |
| Other Covenants | 87 |
| Conditions to the Closing of the Merger | 88 |
| Termination of the Merger Agreement | 89 |
| Termination Fee | 91 |
| Specific Performance | 91 |
| Limitations of Liability | 92 |
| Fees and Expenses | 93 |
| Amendment | 93 |
| Governing Law | 93 |
| Vote Required and Board of Directors Recommendation | 93 |
| PROPOSAL 2: ADJOURNMENT OF THE SPECIAL MEETING | 94 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 95 |
| FUTURE STOCKHOLDER PROPOSALS | 98 |
| WHERE YOU CAN FIND MORE INFORMATION | 99 |
| MISCELLANEOUS | 100 |

ii

TABLE OF CONTENTS

# SUMMARY

*This summary highlights selected information from this proxy statement related to the merger of Thunder Merger Sub, Inc. with and into UserTesting, Inc. (the "Merger") and may not contain all of the information that is important to you. To understand the Merger more fully and for a more complete description of the legal terms of the Merger, you should carefully read and consider this entire proxy statement and the annexes to this proxy statement, including, but not limited to, the Merger Agreement (as defined below), along with all of the documents to which we refer in this proxy statement, as they contain important information about, among other things, the Merger and how it affects you. You may obtain the information incorporated by reference in this proxy statement without charge by following the instructions under the caption "Where You Can Find More Information." The Merger Agreement is attached as Annex A to this proxy statement. You should carefully read and consider the entire Merger Agreement, which is the legal document that governs the Merger.*

*Except as otherwise specifically noted in this proxy statement, "UserTesting," "we," "our," "us," the "Company" and similar words refer to UserTesting, Inc. Throughout this proxy statement, we refer to Thunder Holdings, LLC as "Parent" and Thunder Merger Sub, Inc. as "Merger Sub." In addition, throughout this proxy statement, we refer to the Agreement and Plan of Merger, dated October 26, 2022, by and among Parent, Merger Sub and UserTesting as the "Merger Agreement," our common stock, par value $0.0001 per share, as "UserTesting common stock" or "our common stock," and the holders of UserTesting common stock as "UserTesting stockholders" or "our stockholders." Unless indicated otherwise, any other capitalized term used herein but not otherwise defined herein has the meaning assigned to such term in the Merger Agreement.*

## Parties Involved in the Merger

### UserTesting, Inc.

UserTesting has fundamentally changed the way organizations get insights from customers with fast, opt-in feedback and experience capture technology. We have pioneered a video-first, enterprise-grade software-as-a-service platform that enables organizations to see and hear the experiences of real people as they engage with products, designs, apps, processes, concepts, or brands. Our platform captures authentic, credible, and highly contextualized customer perspectives from targeted audiences who have opted in to share their thoughts, whether for digital, real-world, or omnichannel experiences. Using machine learning, our platform analyzes these perspectives and surfaces key moments of insight rapidly and at scale. This helps organizations to free up time and resources and make better customer experience decisions faster using the power of video to drive alignment and action. We are headquartered in San Francisco, California. Our common stock is listed on the New York Stock Exchange ("NYSE") under the symbol "USER."

### Thunder Holdings, LLC

Parent was formed on October 24, 2022, solely for the purpose of engaging in the transactions contemplated by the Merger Agreement, and has not engaged in any business activities other than in connection with the transactions contemplated by the Merger Agreement and arranging of the equity financing and potential debt financing in connection with the Merger.

### Thunder Merger Sub, Inc.

Merger Sub is a wholly owned subsidiary of Parent and was formed on October 12, 2022, solely for the purpose of engaging in the transactions contemplated by the Merger Agreement, and has not engaged in any business activities other than in connection with the transactions contemplated by the Merger Agreement and arranging of the equity financing and potential debt financing in connection with the Merger.

Parent and Merger Sub are affiliated with Thoma Bravo Discover Fund III, L.P., Thoma Bravo Discover Fund IV, L.P. (together, the "Thoma Bravo Funds") and are managed by Thoma Bravo, L.P. UserZoom Technologies, Inc. ("UserZoom"), Parent and Merger Sub and the Thoma Bravo Funds are each affiliated with Thoma Bravo, L.P. UserZoom is owned by the Thoma Bravo Funds and funds affiliated with Sunstone Partners. Thoma Bravo and Sunstone Partners are leading private equity firms focused on the software and technology-enabled services sectors. At the Effective Time (as defined in the section of this proxy

TABLE OF CONTENTS

statement captioned "- The Merger"), the Surviving Corporation (as defined in the section of this proxy statement captioned "- The Merger"), will be indirectly owned by the Thoma Bravo Funds and Sunstone Partners II, LP, Sunstone Partners II-A, LP, Sunstone Partners Executive Fund II, LP, Sunstone Partners III-Main, LP, and Sunstone Partners III-A, LP (together, the "Sunstone Partners Funds").

In connection with the transactions contemplated by the Merger Agreement, the Thoma Bravo Funds and the Sunstone Partners Funds have each provided Parent with an equity commitment. The amounts committed under the two equity commitment letters, each dated as of October 26, 2022 (each an "Equity Commitment Letter" and collectively, the "Equity Commitment Letters"), will be used to fund the aggregate purchase price required to be paid at the closing of the Merger (the "Closing") and to also fund certain other payments at the Closing (including the Required Amounts (as defined in the section of this proxy statement captioned "The Merger - Financing of the Merger")), subject to the terms and conditions of the Merger Agreement. In addition, the Thoma Bravo Funds and Sunstone Partners Funds have each agreed to guarantee the payment of certain liabilities and obligations of Parent and Merger Sub under the Merger Agreement, subject to an aggregate cap equal to $56,464,408 for the Thoma Bravo Funds and $11,295,592 for the Sunstone Partners Funds, including any termination fee and amounts in respect of certain reimbursement and indemnification obligations of Parent and Merger Sub for certain costs, expenses or losses incurred or sustained by us, as specified in the Merger Agreement. For more information, please see the section of this proxy statement captioned "The Merger - Financing of the Merger."

**The Merger**

Upon the terms and subject to the conditions of the Merger Agreement, Merger Sub will merge with and into UserTesting and the separate corporate existence of Merger Sub will cease, with UserTesting continuing as the surviving corporation and as a wholly owned subsidiary of Parent (the "Surviving Corporation"). As a result of the Merger, UserTesting common stock will no longer be publicly traded and will be delisted from the NYSE. In addition, UserTesting common stock will be deregistered under the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), and we will no longer file periodic reports with the United States Securities and Exchange Commission (the "SEC"). If the Merger is completed, you will not own any shares of the capital stock of the Surviving Corporation. The time at which the Merger will become effective will occur upon the filing of a certificate of merger with the Secretary of State of the State of Delaware in accordance with the applicable provision of the General Corporation Law of the State of Delaware (the "DGCL") (the time of such filing and the acceptance for record by the Secretary of State of the State of Delaware, or such later time as may be agreed in writing by Parent, Merger Sub and UserTesting and specified in the certificate of merger, the "Effective Time").

**Merger Consideration**

*UserTesting Common Stock*

At the Effective Time, each then-outstanding share of UserTesting common stock (other than shares of UserTesting common stock (i) directly owned by us (as treasury stock or otherwise) immediately prior to the Effective Time, (ii) directly owned by Parent or Merger Sub immediately prior to the Effective Time, or (iii) owned by UserTesting stockholders who have properly exercised and validly perfected their statutory rights of appraisal in respect of such shares of UserTesting common stock in accordance with Section 262 of the DGCL (collectively, the "Excluded Shares")) will be cancelled and automatically converted into the right to receive $7.50 in cash, without interest thereon (the "Per Share Merger Consideration"), less any applicable withholding taxes.

Prior to or at the Effective Time, Parent will deposit (or cause to be deposited) an amount of cash sufficient to pay the aggregate Per Share Merger Consideration payable at Closing with a designated payment agent for payment of each share of UserTesting common stock owned by each UserTesting stockholder. For more information, please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Exchange and Payment Procedures."

After the Merger is completed, you will have the right to receive the Per Share Merger Consideration, but you will no longer have any rights as a UserTesting stockholder (except that UserTesting stockholders who properly exercise their appraisal rights may have the right to receive payment for the "fair value" of their

TABLE OF CONTENTS

shares determined pursuant to an appraisal proceeding, as contemplated by Delaware law). For more information, please see the section of this proxy statement captioned "The Merger - Appraisal Rights."

***Treatment of Company Equity Awards***

**Company Options**

Each option to purchase shares of UserTesting common stock (each, a "Company Option") that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "Vested Company Option") will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Vested Company Option by (y) the total number of shares of UserTesting common stock underlying such Vested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Vested Company Option is equal to or greater than the Per Share Merger Consideration, such Vested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof.

Each Company Option that is outstanding as of immediately prior to the Effective Time and that is not a Vested Company Option (each, an "Unvested Company Option") will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Unvested Company Option by (y) the total number of shares of UserTesting common stock underlying such Unvested Company Option (the "Unvested Company Option Consideration"), subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Unvested Company Option is equal to or greater than the Per Share Merger Consideration, such Unvested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof.

Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company Option Consideration amounts will vest and become payable at the same time as the Unvested Company Option from which such Unvested Company Option Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time with respect to the receipt of the Unvested Company Option Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

**Company RSUs**

Each restricted stock unit award in respect of shares of UserTesting common stock (each, a "Company RSU") that is outstanding as of immediately prior to the Effective Time and either (x) held by a non-employee member of the Board of Directors (whether vested or unvested) or (y) vested in accordance with its terms as of the Effective Time (each, a "Vested Company RSU") will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Vested Company RSU by (y) the Per Share Merger Consideration, subject to applicable withholding taxes.

Each Company RSU that is outstanding as of immediately prior to the Effective Time and not a Vested Company RSU (each, an "Unvested Company RSU") will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Unvested Company RSU by (y) the Per Share Merger Consideration (the "Unvested Company RSU Consideration"), subject to applicable withholding taxes.

TABLE OF CONTENTS

Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company RSU Consideration amounts will vest and become payable at the same time as the Unvested Company RSU from which such Unvested Company RSU Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time with respect to the receipt of the Unvested Company RSU Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

**U.S. Federal Income Tax Consequences of the Merger**

The receipt of cash by our stockholders in exchange for shares of UserTesting common stock in the Merger will be a taxable transaction for U.S. federal income tax purposes. Such receipt of cash by a U.S. Holder (as defined in the section of this proxy statement captioned "The Merger - U.S. Federal Income Tax Consequences of the Merger") generally will result in the recognition of gain or loss in an amount equal to the difference, if any, between the amount of cash that such U.S. Holder receives in the Merger and such U.S. Holder's adjusted tax basis in the shares of UserTesting common stock surrendered pursuant to the Merger.

A Non-U.S. Holder (as defined in the section of this proxy statement captioned "The Merger - U.S. Federal Income Tax Consequences of the Merger") generally will not be subject to U.S. federal income tax with respect to the exchange of UserTesting common stock for cash in the Merger unless such Non-U.S. Holder has certain connections to the United States, but may be subject to backup withholding tax unless the Non-U.S. Holder complies with certain certification procedures or otherwise establishes a valid exemption from backup withholding tax.

For more information, please see the section of this proxy statement captioned "The Merger - U.S. Federal Income Tax Consequences of the Merger."

**UserTesting stockholders should consult their tax advisors concerning the U.S. federal income tax consequences relating to the Merger in light of their particular circumstances and any consequences arising under the laws of any state, local or non-U.S. tax jurisdiction.**

**Appraisal Rights**

If the Merger is consummated, UserTesting stockholders and beneficial owners who continuously hold or own shares of UserTesting common stock through the Effective Time, who do not vote in favor of the adoption of the Merger Agreement, who properly demand appraisal of their shares and who do not withdraw their demands or otherwise lose their rights to seek appraisal will be entitled to seek appraisal of their shares in connection with the Merger under Section 262 of the DGCL. This means that record holders and beneficial owners of UserTesting common stock may be entitled to have their shares appraised by the Delaware Court of Chancery, and to receive payment in cash of the "fair value" of their shares of UserTesting common stock, exclusive of any elements of value arising from the accomplishment or expectation of the Merger, together with interest to be paid on the amount determined to be "fair value," if any, as determined by the court (or in certain circumstances described in further detail in the section of this proxy statement captioned "The Merger - Appraisal Rights," on the difference between the amount determined to be the "fair value" and the amount paid by the Surviving Corporation in the Merger to each person entitled to appraisal prior to the entry of judgment in any appraisal proceeding). Due to the complexity of the appraisal process, persons who wish to seek appraisal of their shares are encouraged to seek the advice of legal counsel with respect to the exercise of appraisal rights.

UserTesting stockholders and beneficial owners considering seeking appraisal should be aware that the "fair value" of their shares as determined pursuant to Section 262 of the DGCL could be more than, the same as, or less than the value of the Per Share Merger Consideration that they would receive pursuant to the Merger Agreement if they did not seek appraisal of their shares of UserTesting common stock.

To exercise appraisal rights, record holders and beneficial owners of UserTesting common stock must: (i) properly submit a written demand for appraisal to us before the vote is taken on the proposal to adopt

TABLE OF CONTENTS

the Merger Agreement; (ii) not submit a proxy or otherwise vote in favor of the proposal to adopt the Merger Agreement; (iii) hold or own such shares upon the making of a demand under clause (i) and continue to hold or own their shares of UserTesting common stock through the Effective Time; (iv) not thereafter withdraw their demand for appraisal of their shares or otherwise lose their appraisal rights, each in accordance with the DGCL; and (v) strictly comply with all other procedures for exercising appraisal rights under the DGCL. Failure to follow exactly the procedures specified under the DGCL may result in the loss of appraisal rights. In addition, the Delaware Court of Chancery will dismiss appraisal proceedings in respect of UserTesting unless certain stock ownership conditions are satisfied by UserTesting stockholders and beneficial owners seeking appraisal. The DGCL requirements for exercising appraisal rights are described in further detail in this proxy statement, which is qualified in its entirety by Section 262 of the DGCL, the relevant section of the DGCL regarding appraisal rights. A copy of Section 262 of the DGCL is reproduced in Annex C to this proxy statement. For more information, please see the section of this proxy statement captioned "The Merger - Appraisal Rights."

**Litigation Related to the Merger**

Two lawsuits have been filed in federal courts against UserTesting and its directors: *O'Dell v. UserTesting, Inc., et al.*, 1:22-cv-10071 (S.D.N.Y.), and *Glanville v. UserTesting, Inc., et al.*, 3:22-cv-07568 (N.D. Cal.) (collectively, the "Stockholder Litigation"). The complaints name UserTesting and our directors as defendants. The complaints assert claims under Section 14(a) and Section 20(a) of the Exchange Act and Rule 14a-19 promulgated thereunder, and generally allege that the preliminary proxy statement misrepresents and/or omits certain purportedly material information relating to the Merger, including allegations relating to the background of the Merger, financial projections, analyses of our financial advisor and conflicts of interest by company insiders in pursuing the Merger. The complaints seek a variety of equitable and injunctive relief including, among other things, an injunction enjoining the consummation of the Merger, rescission of the Merger Agreement, rescission of the Merger if it is consummated, rescissory damages and costs and attorneys' fees. We have not yet responded to the complaints filed in the Stockholder Litigation.

In addition, three purported stockholders of UserTesting sent demand letters regarding the preliminary proxy statement (the "Demand Letters"). Based on the same core allegations as the Stockholder Litigation, the Demand Letters request that we disseminate corrective disclosures in an amendment or supplement to the preliminary proxy statement.

We believe the Stockholder Litigation and the Demand Letters are without merit, but there can be no assurance that we will ultimately prevail in the Stockholder Litigation or all such lawsuits. Additionally, additional lawsuits may be filed and demand letters may be sent before the Special Meeting and/or the consummation of the Merger.

**Regulatory Approvals Required for the Merger**

***HSR Act, U.S. Antitrust Matters and Other Regulatory Approvals***

Under the Merger Agreement, the Merger cannot be completed until the applicable 30-calendar-day waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), has expired or been terminated. UserTesting and Thoma Bravo made the filings required under the HSR Act on November 9, 2022. Completion of the Merger is further subject to certain regulatory actions by the United Kingdom Competition and Markets Authority ("CMA") and the Australian Competition and Consumer Commission ("ACCC").

For more information, please see the section of this proxy statement captioned "The Merger - Regulatory Approvals Required for the Merger."

**Closing Conditions**

The obligations of UserTesting, Parent and Merger Sub, as applicable, to effect the Merger are subject to the satisfaction or waiver of customary conditions, including (among other conditions), the following:

- the adoption of the Merger Agreement by the requisite affirmative vote of our stockholders;

TABLE OF CONTENTS

- the expiration or early termination of the applicable waiting period under the HSR Act and the absence of any agreement with a governmental entity not to close the Merger;

- certain regulatory actions by the CMA and ACCC;

- the absence of any laws or court orders making the Merger illegal or otherwise prohibiting the Merger;

- in the case of Parent and Merger Sub, the absence, since the date of the Merger Agreement, of any continuing change, event, effect or circumstance at UserTesting that would reasonably be expected to have a material adverse effect (with certain limitations) on the business, results of operations or financial condition of UserTesting and our subsidiaries, taken as a whole;

- the accuracy of the representations and warranties of UserTesting, Parent and Merger Sub in the Merger Agreement, subject to materiality qualifiers and monetary thresholds, as of the Effective Time or the date in respect of which such representation or warranty was specifically made (the "Representation Condition");

- the performance in all material respects by UserTesting, Parent and Merger Sub of their respective obligations and compliance in all material respects with all covenants required to be performed by them under the Merger Agreement at or prior to the Effective Time (the "Covenant Condition");

- the receipt by Parent of a certificate of UserTesting, dated as of the Closing Date and signed by our chief executive officer, certifying that the Representation Condition and the Covenant Condition, each in respect of UserTesting, have been satisfied;

- the receipt by Parent of certain customary payoff letters for certain indebtedness for borrowed money, as contemplated in the Merger Agreement; and

- the receipt by UserTesting of a certificate of Parent and Merger Sub, dated as of the Closing Date and signed by their respective president or chief executive officer, certifying that the Representation Condition and the Covenant Condition, each in respect of Parent and Merger Sub, have been satisfied.

**Financing of the Merger**

We presently anticipate that the total funds needed to complete the Merger and the related transactions will be approximately $1.3 billion, which will be funded via equity and, potentially, debt financing described below together with our cash on hand as of the Closing Date.

The obligation of Parent and Merger Sub to consummate the Merger is not subject to any financing condition. Parent and Merger Sub have represented to us that, subject to the satisfaction of certain conditions set forth in the Merger Agreement, the equity financing contemplated by the Equity Commitment Letters, if funded in accordance with the Equity Commitment Letters, will, together with cash on hand or other sources of immediately available funds, provide Parent with sufficient funds to pay the fees and expenses required to be paid at the Closing of the Merger by Parent and Merger Sub and Parent's other affiliates on the Closing Date. This includes funds needed to: (1) pay our stockholders the amounts due under the Merger Agreement for their UserTesting common stock, (2) make payments in respect of our outstanding Company Options and Company RSUs payable at the Closing of the Merger pursuant to the Merger Agreement; and (3) repayment or refinancing of certain indebtedness (collectively, the "Required Amounts").

The Thoma Bravo Funds and the Sunstone Partners Funds have committed to contribute or cause to be contributed to Parent at the Closing of the Merger certain equity financing, each subject to the terms and conditions set forth in their respective Equity Commitment Letters. We are an intended and express third-party beneficiary of the Equity Commitment Letters solely with respect to enforcing Parent's right to cause the commitment under the Equity Commitment Letters by the Thoma Bravo Funds or the Sunstone Partners Funds, as applicable, to be funded to Parent in accordance with such Equity Commitment Letters, and to cause Parent to enforce its rights against the Thoma Bravo Funds or the Sunstone Partners Funds, as applicable, to perform its funding obligations under the respective Equity Commitment Letter, in each case subject to (i) the limitations and conditions set forth in the applicable Equity Commitment Letter and (ii) the terms and conditions of the Merger Agreement.

TABLE OF CONTENTS

The Thoma Bravo Funds and the Sunstone Partners Funds have agreed, pursuant to the terms and conditions set forth in two limited guaranties, each dated as of October 26, 2022 (the "Guaranties"), to guarantee payment of certain liabilities and obligations of Parent or Merger Sub under the Merger Agreement, subject to an aggregate cap equal to $56,464,408 for the Thoma Bravo Funds and $11,295,592 for the Sunstone Partners Funds, including any termination fee and amounts in respect of certain reimbursement and indemnification obligations of Parent and Merger Sub for certain costs, expenses or losses incurred or sustained by us, as specified in the Merger Agreement. For more information, please see the section of this proxy statement captioned "The Merger - Financing of the Merger."

We have agreed to use our reasonable best efforts to provide, and to cause our subsidiaries (and their respective representatives) to use their reasonable best efforts to provide, to Parent and Merger Sub such cooperation as is customary and reasonably requested by Parent in connection with the arrangement of the potential debt financing contemplated by the Merger Agreement, in each case subject to the terms of and as set forth in the Merger Agreement. For more information, please see the section of this proxy statement captioned "The Merger - Cooperation with Debt Financing."

**Required Stockholder Approval**

The affirmative vote of the holders of a majority of the issued and outstanding shares of UserTesting common stock entitled to vote at the Special Meeting is required to adopt the Merger Agreement. At the close of business on December 2, 2022 (the "Record Date"), 73,429,540 votes constitute a majority of the issued and outstanding shares of our common stock. Approval of the proposal to adjourn the Special Meeting (the "adjournment proposal"), if a quorum is present, requires the affirmative vote of the holders of a majority of the issued and outstanding shares of UserTesting common stock entitled to vote that are present in person or represented by proxy at the Special Meeting and are voted for or against the matter.

As of the Record Date, our directors and executive officers beneficially owned and were entitled to vote, in the aggregate, 39,107,032 shares of UserTesting common stock, representing approximately 26.6% of the shares of UserTesting common stock issued and outstanding as of the Record Date.

We currently expect that our directors and executive officers will vote all of their respective shares of UserTesting common stock: (1) "**FOR**" the adoption of the Merger Agreement and (2) "**FOR**" the adjournment proposal.

**The Special Meeting**

*Date, Time and Place*

A special meeting of our stockholders to consider and vote on the proposal to adopt the Merger Agreement will be held on January 10, 2023, at 10:00 a.m., Pacific Time (the "Special Meeting"). We will hold the Special Meeting virtually via the Internet at www.virtualshareholdermeeting.com/USER2023SM (the "virtual meeting website"). You will not be able to attend the Special Meeting physically in person. For purposes of attendance at the Special Meeting, all references in this proxy statement to "present in person" or "in person" shall mean virtually present at the Special Meeting.

*Record Date; Shares Entitled to Vote*

You are entitled to vote at the Special Meeting if you owned shares of UserTesting common stock at the close of business on the Record Date. Each holder of UserTesting common stock shall be entitled to one (1) vote for each such share owned at the close of business on the Record Date.

*Quorum*

As of the Record Date, there were 146,859,078 shares of UserTesting common stock issued and outstanding and entitled to vote at the Special Meeting. The holders of a majority of the voting power of the shares of our capital stock issued and outstanding and entitled to vote at the Special Meeting as of the Record Date, present in person or represented by proxy, will constitute a quorum at the Special Meeting.

TABLE OF CONTENTS

**Recommendation of the UserTesting Board of Directors**

The Board of Directors has unanimously: (i) determined that it is in the best interests of UserTesting and our stockholders, and declared it advisable, to enter into the Merger Agreement; (ii) approved the execution, delivery and performance of the Merger Agreement and the consummation of the transactions contemplated thereby; and (iii) resolved to recommend that our stockholders adopt the Merger Agreement. The Board of Directors unanimously recommends that you vote: (1) "FOR" the adoption of the Merger Agreement and (2) "FOR" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

Prior to the adoption of the Merger Agreement by our stockholders, under certain circumstances, the Board of Directors may withdraw or change the foregoing recommendation if it determines in good faith (after consultation with its outside legal and financial advisors) that failure to do so would reasonably be expected to be inconsistent with the Board of Directors' fiduciary duties to UserTesting stockholders under applicable law. However, the Board of Directors cannot withdraw or change the foregoing recommendation unless it complies with certain procedures in the Merger Agreement, including, but not limited to, negotiating with Parent and its representatives in good faith over a four (4)-business-day period, after which the Board of Directors shall have determined that the failure of the Board of Directors to make a Change of Recommendation (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Board of Directors' Recommendation; Change of Recommendation") would reasonably be expected to be inconsistent with the Board of Directors' fiduciary duties to UserTesting stockholders under applicable law. The termination of the Merger Agreement by us following the Board of Directors' authorization for us to enter into a definitive agreement to consummate an alternative transaction contemplated by a Superior Proposal (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Go-Shop Period - Solicitation of Other Offers") will result in the payment by us of a termination fee of either (i) $10,160,000 if the Merger Agreement is terminated before 11:59 p.m. Pacific Time on December 20, 2022 for the purpose of entering into an agreement with respect to a Superior Proposal received from an Excluded Party (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Go-Shop Period - Solicitation of Other Offers") or (ii) $33,880,000, in the case of any other such termination. For more information, please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Board of Directors' Recommendation; Change of Recommendation."

**Opinion of Morgan Stanley & Co. LLC**

In connection with the Merger, Morgan Stanley & Co. LLC (which we refer to as "Morgan Stanley") rendered to the Board of Directors its oral opinion, subsequently confirmed in writing, that as of October 26, 2022, and based upon and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of review undertaken by Morgan Stanley as set forth in the written opinion, the $7.50 per share in cash to be received by the holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement was fair from a financial point of view to such holders of shares of UserTesting common stock, as set forth in such opinion as more fully described in the section of this proxy statement captioned "The Merger - Opinion of Morgan Stanley & Co. LLC."

**The full text of the written opinion of Morgan Stanley, dated as of October 26, 2022, which sets forth, among other things, the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of the review undertaken by Morgan Stanley in rendering its opinion, is attached to this proxy statement as Annex B and incorporated by reference in this proxy statement in its entirety. The summary of the opinion of Morgan Stanley in this proxy statement is qualified in its entirety by reference to the full text of the opinion. You are encouraged to read Morgan Stanley's opinion carefully and in its entirety. Morgan Stanley's opinion was directed to the Board of Directors, in its capacity as such, and addresses only the fairness from a financial point of view of the $7.50 per share in cash to be received by holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement as of the date of the opinion and does not address the relative merits of the Merger as compared to any other alternative business transaction, or other alternatives, or whether or not such alternatives could be achieved or are**

TABLE OF CONTENTS

**available. It was not intended to, and does not, constitute an opinion or a recommendation as to how UserTesting stockholders should vote at the Special Meeting.**

**For more information, see the section of this proxy statement captioned "The Merger - Opinion of Morgan Stanley & Co. LLC."**

**Interests of Our Executive Officers and Directors in the Merger**

When considering the foregoing recommendation of the Board of Directors that you vote to approve the proposal to adopt the Merger Agreement, UserTesting stockholders should be aware that certain of our non-employee directors and executive officers have interests in the Merger that are different from, or in addition to, those of our stockholders generally. The Board of Directors was aware of and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement, approving the Merger Agreement and the Merger, and recommending that the Merger Agreement be adopted by our stockholders. These interests include:

- at the Effective Time, each Company Option and Company RSU held by an executive officer or director will receive the treatment described in the section of this proxy statement captioned "The Merger - Interests of Our Executive Officers and Directors in the Merger - Treatment and Quantification of Company Equity Awards";

- eligibility of our executive officers to receive severance payments and benefits (including equity award vesting acceleration) under their change in control and severance agreements, as described in more detail in the section of this proxy statement captioned "The Merger - Interests of Our Executive Officers and Directors in the Merger - Change in Control and Severance Agreements"; and

- continued indemnification and directors' and officers' liability insurance to be provided by the Surviving Corporation.

In addition, upon completion of the Merger, it is anticipated that our Chief Executive Officer and, potentially, other members of our management team, will serve as members of the management team of the Surviving Corporation. Following the closing of the transaction, Thoma Bravo and Sunstone Partners intend to combine UserTesting and UserZoom. As of the date of this proxy statement, none of our executive officers has entered into any agreement with Parent or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates. Prior to and following the closing of the Merger, however, certain of our executive officers may have discussions, and following the closing of the Merger, may enter into agreements with, Parent or Merger Sub, their subsidiaries or their respective controlled affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates.

If the proposal to adopt the Merger Agreement is approved, the shares of UserTesting common stock held by our directors and executive officers will be treated in the same manner as issued and outstanding shares of UserTesting common stock held by all other UserTesting stockholders except as may be provided for pursuant to specific agreements. For more information, see the section of this proxy statement captioned "The Merger - Interests of Our Executive Officers and Directors in the Merger."

**Alternative Acquisition Proposals**

*The Go-Shop Period - Solicitation of Other Alternative Acquisition Proposals*

Under the Merger Agreement, from the date of the Merger Agreement until 11:59 p.m. Pacific Time on December 10, 2022 (such date, the "No-Shop Period Start Date" and, such period, the "Go-Shop Period"), we and our subsidiaries and respective representatives have the right to, among other things: (i) solicit, initiate, propose, induce the making or submission of, encourage or facilitate in any way any offer or proposal that constitutes, or could reasonably be expected to lead to, an Alternative Acquisition Proposal (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Go-Shop Period - Solicitation of Other Offers"), including by providing information (including non-public information and data) of or affording access to UserTesting and our subsidiaries to any third person that has entered into an Acceptable Confidentiality Agreement (as defined in the section of this proxy

TABLE OF CONTENTS

statement captioned "Proposal 1: Adoption of the Merger Agreement - The Go-Shop Period - Solicitation of Other Offers"); and (ii) continue, enter into, engage in or otherwise participate in any discussions or negotiations with any third person regarding any Alternative Acquisition Proposals, and cooperate with or assist or participate in, or facilitate in any way, any such inquiries, offers, proposals, discussions or negotiations or any effort or attempt to make any Alternative Acquisition Proposals or other proposals that could reasonably be expected to lead to Alternative Acquisition Proposals, including by granting a waiver, amendment or release under any pre-existing "standstill" or other similar provision to the extent necessary to allow for an Alternative Acquisition Proposal or amendment to an Alternative Acquisition Proposal to be made confidentially to UserTesting or to the Board of Directors. To date, we have not received any offer or proposal that constituted, or could reasonably be expected to lead to, an Alternative Acquisition Proposal during the Go-Shop Period.

### *The No-Shop Period - No Solicitation of Other Alternative Acquisition Proposals*

Under the Merger Agreement, from the No-Shop Period Start Date until the earlier of the Effective Time and the date on which the Merger Agreement is validly terminated pursuant to its terms (the "Termination Date"), we may not: (i) solicit, initiate or knowingly encourage, or knowingly facilitate the making or submission of any offer or proposal that constitutes, or would reasonably be expected to lead to, an Alternative Acquisition Proposal; (ii) participate in discussions or negotiations with, or provide any non-public information to, any person relating to, an Alternative Acquisition Proposal; (iii) approve, endorse or recommend any proposal that constitutes, or would be reasonably be expected to lead to, an Alternative Acquisition Proposal; or (iv) enter into any contract relating to an Alternative Acquisition Proposal, other than a confidentiality agreement permitted pursuant to the terms of the Merger Agreement.

Notwithstanding the foregoing, under certain specified circumstances, from the No-Shop Period Start Date until the adoption of the Merger Agreement by our stockholders, we may, among other things, engage in negotiations or discussions with, and provide information to, a third party (and its representatives and potential debt and equity financing sources) in respect of an Alternative Acquisition Proposal that was not received in response to or as a result of our obligations set forth in the immediately preceding paragraph, if the Board of Directors determines in good faith, after consultation with outside legal counsel and financial advisors, that such Alternative Acquisition Proposal either constitutes a Superior Proposal (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Go-Shop Period - Solicitation of Other Offers") or could reasonably be expected to lead to a Superior Proposal and the Board of Directors (or a committee thereof) has determined in good faith that the failure to take the actions in respect of such Alternative Acquisition Proposal would be inconsistent with its fiduciary duties under applicable law. For more information, please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The No-Shop Period - No Solicitation of Other Offers."

Both during the Go-Shop Period and after the No-Shop Period Start Date but prior to the adoption of the Merger Agreement by our stockholders, we are entitled to terminate the Merger Agreement to enter into a definitive agreement in respect of a Superior Proposal only if it complies with certain procedures in the Merger Agreement, including, but not limited to, negotiating with Parent in good faith over a four (4)-business-day period in an effort to amend the terms and conditions of the Merger Agreement and other agreements so that such Superior Proposal no longer constitutes a Superior Proposal relative to the transactions contemplated by the Merger Agreement, amended pursuant to such negotiations.

**The termination of the Merger Agreement by us following the Board of Directors' authorization for us to enter into a definitive agreement to consummate an alternative transaction contemplated by a Superior Proposal will result in the payment by us of a termination fee of either (i) $10,160,000 if the Merger Agreement is terminated before 11:59 p.m. Pacific Time on December 20, 2022 for the purpose of entering into an agreement with respect to a Superior Proposal received from an Excluded Party and we have complied in all material respects with the non-solicitation provisions set forth in the Merger Agreement with respect to such Superior Proposal or (ii) $33,880,000, in the case of any other such termination. For more information, please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Board of Directors' Recommendation; Change of Recommendation."**

TABLE OF CONTENTS

**Termination of the Merger Agreement**

In addition to the circumstances described above, Parent and UserTesting have certain rights to terminate the Merger Agreement under customary circumstances, including by mutual agreement, if the Merger has not been consummated on or before April 26, 2023 (the "Initial End Date") (subject to an automatic extension until October 26, 2023 (the "First Extended End Date") in the event the Effective Time has not occurred due to the failure to have satisfied certain regulatory conditions as of the close of business on the date that is two (2) business days immediately prior to the Initial End Date, and, subject to another automatic extension until January 26, 2024 in the event that the Effective Time has not occurred due to the failure to have satisfied certain regulatory conditions as of the close of business on the date that is two (2) business days immediately prior to the Initial End Date as a result of ongoing review by the CMA (as further described in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Termination of the Merger Agreement")), the imposition of non-appealable court orders that permanently enjoin or otherwise prohibit the Merger, if our stockholders fail to adopt the Merger Agreement at the Special Meeting (or any adjournment or postponement thereof) or an uncured breach of the Merger Agreement by the other party. The term "End Date" shall mean the Initial End Date, unless the Initial End Date has initially been extended according to the foregoing, in which case, the term "End Date" shall mean the First Extended End Date, unless the First Extended End Date has been extended according to the foregoing, in which case, the term "End Date" shall mean the Second Extended End Date. Under certain circumstances, (i) we are required to pay Parent a termination fee equal to either $10,160,000 or $33,880,000; and (ii) Parent is required to pay us a termination fee equal to $67,760,000. Please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Termination Fee."

**Effect on UserTesting if the Merger Is Not Completed**

If the Merger Agreement is not adopted by our stockholders, or if the Merger is not completed for any other reason:

i. UserTesting stockholders will not be entitled to, nor will they receive, any payment for their respective shares of our common stock pursuant to the Merger Agreement;

ii. (A) we will remain an independent public company; (B) our common stock will continue to be listed and traded on the NYSE and registered under the Exchange Act; and (C) we will continue to file periodic reports with the SEC; and

iii. under certain specified circumstances, we will be required to pay Parent a termination fee of either $10,160,000 or $33,880,000, upon the termination of the Merger Agreement. For more information, please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Termination Fee."

TABLE OF CONTENTS

## QUESTIONS AND ANSWERS

The following questions and answers address some commonly asked questions regarding the Merger, the Merger Agreement and the Special Meeting. These questions and answers may not address all questions that are important to you. You should carefully read and consider the more detailed information contained elsewhere in this proxy statement and the annexes to this proxy statement, including, but not limited to, the Merger Agreement, along with all of the documents we refer to in this proxy statement, as they contain important information about, among other things, the Merger and how it affects you. You may obtain the information incorporated herein by reference without charge by following the instructions under the caption, "Where You Can Find More Information."

**Q:  Why am I receiving these materials?**

A:  The Board of Directors is furnishing this proxy statement and form of proxy card to our stockholders in connection with the solicitation of proxies to be voted at the Special Meeting.

**Q:  When and where is the Special Meeting?**

A:  We will hold the Special Meeting virtually via the Internet at the virtual meeting website. You will not be able to attend the Special Meeting physically in person.

**Q:  What am I being asked to vote on at the Special Meeting?**

A:  You are being asked to vote on the following proposals:

    (i)  to adopt the Merger Agreement pursuant to which Merger Sub will merge with and into UserTesting, and UserTesting will become a wholly owned subsidiary of Parent; and

    (ii)  to approve the adjournment of the Special Meeting to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

**Q:  Who is entitled to vote at the Special Meeting?**

A:  Our stockholders as of the close of business on December 2, 2022 (the "Record Date") are entitled to notice of the Special Meeting and to vote at the Special Meeting. Each holder of our common stock shall be entitled to cast one (1) vote on each matter properly brought before the Special Meeting for each such share owned at the close of business on the Record Date.

**Q:  May I attend the Special Meeting and vote in person?**

A:  Yes. If you are a UserTesting stockholder of record, you may attend the Special Meeting virtually via the Internet at the virtual meeting website on www.virtualshareholdermeeting.com/USER2023SM, and complete a virtual ballot, whether or not you sign and return your proxy card. If you are a UserTesting stockholder of record, you will need your assigned control number to vote shares electronically at the Special Meeting. The control number can be found on the proxy card, voting instruction form or other applicable proxy notices.

Even if you plan to attend the Special Meeting in person, to ensure that your shares will be represented at the Special Meeting, we encourage you to sign, date and return the enclosed proxy card in the accompanying prepaid reply envelope or grant your proxy electronically over the Internet or by telephone (using the instructions provided in the enclosed proxy card). If you attend the Special Meeting and complete a virtual ballot, your vote will revoke any proxy previously submitted.

If you hold your shares in "street name," you should instruct your bank, broker or other nominee how to vote your shares in accordance with the voting instruction form that you will receive from your bank, broker or other nominee. Your broker or other agent cannot vote on any of the proposals, including the proposal to adopt the Merger Agreement, without your instructions. If you hold your shares in "street name," you may not vote your shares in person at the Special Meeting unless you obtain a "legal proxy" from your bank, broker or other nominee.

TABLE OF CONTENTS

**Q:  What will I receive in respect of my shares of UserTesting common stock if the Merger is completed?**

A:  Upon completion of the Merger, you will be entitled to receive the Per Share Merger Consideration of $7.50 in cash, subject to applicable withholding taxes, for each share of UserTesting common stock that you own, unless you have properly exercised and not withdrawn your appraisal rights under the DGCL. For example, if you own 100 shares of UserTesting common stock, you will receive $750.00 in cash in exchange for your shares of UserTesting common stock, subject to applicable withholding taxes.

**Q:  What will the holders of outstanding Company Options and Company RSUs receive if the Merger is completed?**

A:  Upon completion of the Merger:

Each Vested Company Option will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Vested Company Option, by (y) the total number of shares of UserTesting common stock underlying such Vested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Vested Company Option is equal to or greater than the Per Share Merger Consideration, such Vested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof.

Each Unvested Company Option will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Unvested Company Option, by (y) the total number of shares of UserTesting common stock underlying such Unvested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Unvested Company Option is equal to or greater than the Per Share Merger Consideration, such Unvested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company Option Consideration amounts will vest and become payable at the same time as the Unvested Company Option from which such Unvested Company Option Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time with respect to the receipt of the Unvested Company Option Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

Each Vested Company RSU will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Vested Company RSU, by (y) the Per Share Merger Consideration, subject to applicable withholding taxes.

Each Unvested Company RSU will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Unvested Company RSU, by (y) the Per Share Merger Consideration, subject to applicable withholding taxes. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company RSU Consideration amounts will vest and become payable at the same time as the Unvested Company RSU from which such Unvested Company RSU Consideration, was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested

TABLE OF CONTENTS

Company RSU immediately prior to the Effective Time with respect to the receipt of the Unvested Company RSU Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

**Q:  What vote is required to adopt the Merger Agreement?**

A:  The affirmative vote of the holders of a majority of the issued and outstanding shares of UserTesting common stock entitled to vote at the Special Meeting is required to adopt the Merger Agreement.

If a quorum is present at the Special Meeting, the failure of any UserTesting stockholder of record to: (i) submit a signed proxy card; (ii) grant a proxy over the Internet or by telephone (using the instructions provided in the enclosed proxy card); or (iii) vote in person by virtual ballot at the Special Meeting will have the same effect as a vote "**AGAINST**" the proposal to adopt the Merger Agreement. If you hold your shares in "street name" and a quorum is present at the Special Meeting, the failure to instruct your bank, broker or other nominee how to vote your shares will have the same effect as a vote "**AGAINST**" the proposal to adopt the Merger Agreement. If a quorum is present at the Special Meeting, abstentions will have the same effect as a vote "**AGAINST**" the proposal to adopt the Merger Agreement but will have no effect on any proposal to adjourn the Special Meeting to a later date or dates to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting. Each "broker non-vote" will also count as a vote "**AGAINST**" the proposal to adopt the Merger Agreement but will have no effect on any proposal to adjourn the Special Meeting to a later date or dates to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting. If you properly sign your proxy card but do not mark the boxes showing how your shares should be voted on a matter, the shares represented by your properly signed proxy will be voted: (1) "**FOR**" the adoption of the Merger Agreement and (2) "**FOR**" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

**Q:  I understand that a quorum is required in order to conduct business at the Special Meeting. What constitutes a quorum?**

A:  The holders of a majority of the voting power of the shares of our capital stock issued and outstanding and entitled to vote at the Special Meeting as of the Record Date must be present at the Special Meeting in order to hold the Special Meeting and conduct business. This presence is called a quorum. Your shares are counted as present at the Special Meeting if you are present and vote at the Special Meeting or if you have properly submitted a proxy.

**Q:  What happens if the Merger is not completed?**

A:  If the Merger Agreement is not adopted by our stockholders or if the Merger is not completed for any other reason, UserTesting stockholders will not receive any payment for their shares of UserTesting common stock. Instead, we will remain an independent public company, our common stock will continue to be listed and traded on the NYSE and registered under the Exchange Act and we will continue to file periodic reports with the SEC.

Under specified circumstances, we will be required to pay Parent a termination fee of either (i) $10,160,000 if the Merger Agreement is terminated before December 20, 2022 for the purpose of entering into an agreement with respect to a Superior Proposal received from an Excluded Party (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Go-Shop Period - Solicitation of Other Offers") or (ii) $33,880,000, in the case of any other such termination, as described in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Termination Fee."

**Q:  What do I need to do now?**

A:  You should carefully read and consider this entire proxy statement and the annexes to this proxy statement, including, but not limited to, the Merger Agreement, along with all of the documents that we refer to in this proxy statement, as they contain important information about, among other things, the Merger and how it affects you. Then sign, date and return, as promptly as possible, the enclosed proxy

TABLE OF CONTENTS

card in the accompanying reply envelope, or grant your proxy electronically over the Internet or by telephone (using the instructions provided in the enclosed proxy card), so that your shares can be voted at the Special Meeting, unless you wish to seek appraisal. If you hold your shares in "street name," please refer to the voting instruction forms provided by your bank, broker or other nominee to vote your shares.

**Q:** **May I exercise dissenters' rights or rights of appraisal in connection with the Merger?**

**A:** Yes. In order to exercise your appraisal rights, you must follow the requirements set forth in Section 262 of the DGCL. Under Delaware law, UserTesting stockholders of record who do not vote in favor of adopting the Merger Agreement will have the right to seek appraisal of the "fair value" of their shares as determined by the Court of Chancery of the State of Delaware if the merger is completed. Appraisal rights will only be available to UserTesting stockholders who properly deliver, and do not properly withdraw, a written demand for an appraisal to UserTesting prior to the vote on the proposal to adopt the Merger Agreement at the Special Meeting and who comply with the procedures and requirements set forth in Section 262 of the DGCL, which are summarized in this proxy statement. The appraisal amount could be more than, the same as or less than the amount a UserTesting stockholder would be entitled to receive under the terms of the Merger Agreement. A copy of Section 262 of the DGCL is included as Annex C to this proxy statement. For additional information, see the section entitled "The Merger - Appraisal Rights."

**Q:** **Should I surrender my book-entry shares now?**

**A:** No. After the Merger is completed, the paying agent will send each holder of record a letter of transmittal and written instructions that explain how to exchange shares of UserTesting common stock represented by such holder's book-entry shares for the Per Share Merger Consideration.

**Q:** **What happens if I sell or otherwise transfer my shares of UserTesting common stock after the Record Date but before the Special Meeting?**

**A:** The Record Date for the Special Meeting is earlier than the date of the Special Meeting and the date the Merger is expected to be completed. If you sell or transfer your shares of UserTesting common stock after the Record Date but before the Special Meeting, unless special arrangements (such as provision of a proxy) are made between you and the person to whom you sell or otherwise transfer your shares and each of you notifies UserTesting in writing of such special arrangements, you will transfer the right to receive the Per Share Merger Consideration, if the Merger is completed, to the person to whom you sell or transfer your shares, but you will retain your right to vote those shares at the Special Meeting. Even if you sell or otherwise transfer your shares of UserTesting common stock after the Record Date, we encourage you to sign, date and return the enclosed proxy card in the accompanying reply envelope or grant your proxy electronically over the Internet or by telephone (using the instructions provided in the enclosed proxy card). In addition, if you sell your shares prior to the Effective Time, you will not be eligible to exercise your appraisal rights in respect of the Merger. For a more detailed discussion of your appraisal rights and the requirements for properly demanding your appraisal rights, please see the section of this proxy statement captioned "The Merger - Appraisal Rights."

**Q:** **What is the difference between holding shares as a UserTesting stockholder of record and as a beneficial owner?**

**A:** If your shares are registered directly in your name with our transfer agent, American Stock Transfer & Trust Company, LLC ("AST"), you are considered, with respect to those shares, to be the "UserTesting stockholder of record." In this case, this proxy statement and your proxy card have been sent directly to you by UserTesting.

If your shares are held through a bank, broker or other nominee, you are considered the "beneficial owner" of shares of UserTesting common stock held in "street name." In that case, this proxy statement has been forwarded to you by your bank, broker or other nominee who is considered, with respect to those shares, to be the UserTesting stockholder of record. As the beneficial owner, you have the right to direct your bank, broker or other nominee how to vote your shares by following their instructions for voting. You are also invited to attend the Special Meeting. However, because you are not the UserTesting

TABLE OF CONTENTS

stockholder of record, you may not vote your shares in person at the Special Meeting unless you obtain a "legal proxy" from your bank, broker or other nominee.

**Q:** **How may I vote?**

**A:** If you are a UserTesting stockholder of record (that is, if your shares of UserTesting common stock are registered in your name with AST, our transfer agent), there are four (4) ways to vote:

- by signing, dating and returning the enclosed proxy card in the accompanying prepaid reply envelope;
- by visiting the Internet at the address on your proxy card;
- by calling toll-free (within the U.S. or Canada) the phone number on your proxy card; or
- by attending the Special Meeting virtually via the Internet at the virtual meeting website and completing a virtual ballot.

A control number, located on your proxy card, is designed to verify your identity and allow you to vote your shares of UserTesting common stock, and to confirm that your voting instructions have been properly recorded when voting electronically over the Internet or by telephone (using the instructions provided in the enclosed proxy card). Please be aware that, although there is no charge for voting your shares, if you vote electronically over the Internet by visiting the address on your proxy card or by telephone by calling the phone number on your proxy card, in each case, you may incur costs such as Internet access and telephone charges for which you will be responsible.

Even if you plan to attend the Special Meeting in person, you are strongly encouraged to vote your shares of UserTesting common stock by proxy. If you are a record holder or if you obtain a "legal proxy" to vote shares that you beneficially own, you may still vote your shares of UserTesting common stock in person by virtual ballot at the Special Meeting even if you have previously voted by proxy. If you are present at the Special Meeting and vote in person by virtual ballot, your previous vote by proxy will not be counted.

If your shares are held in "street name" through a bank, broker or other nominee, you may vote through your bank, broker or other nominee by completing and returning the voting form provided by your bank, broker or other nominee, or, if such a service is provided by your bank, broker or other nominee, electronically over the Internet or by telephone. To vote over the Internet or by telephone through your bank, broker or other nominee, you should follow the instructions on the voting form provided by your bank, broker or nominee.

**Q:** **If my broker holds my shares in "street name," will my broker vote my shares for me?**

**A:** No. Your bank, broker or other nominee is permitted to vote your shares on any proposal currently scheduled to be considered at the Special Meeting only if you instruct your bank, broker or other nominee how to vote. You should follow the procedures provided by your bank, broker or other nominee to vote your shares. Without instructions, your shares will not be voted on such proposals, which will have the same effect as if you voted against adoption of the Merger Agreement but will have no effect on the adjournment proposal.

**Q:** **May I change my vote after I have mailed my signed and dated proxy card?**

**A:** Yes. If you are a UserTesting stockholder of record, you may change your vote or revoke your proxy at any time before it is voted at the Special Meeting by:

- signing another proxy card with a later date and returning it to us prior to the Special Meeting;
- submitting a new proxy electronically over the Internet or by telephone after the date of the earlier submitted proxy;
- delivering a written notice of revocation to our Corporate Secretary; or
- attending the Special Meeting virtually via the Internet at the virtual meeting website and completing a virtual ballot.

TABLE OF CONTENTS

If you hold your shares of UserTesting common stock in "street name," you should contact your bank, broker or other nominee for instructions regarding how to change your vote. You may also vote in person at the Special Meeting if you obtain a "legal proxy" from your bank, broker or other nominee.

**Q:  What is a proxy?**

A:  A proxy is your legal designation of another person to vote your shares of UserTesting common stock. The written document describing the matters to be considered and voted on at the Special Meeting is called a "proxy statement." The document used to designate a proxy to vote your shares of UserTesting common stock is called a "proxy card." Andy MacMillan, our President, Chief Executive Officer and Chairperson of the Board of Directors, and Mona Sabet, our Chief Corporate Strategy Officer and Corporate Secretary, are the proxy holders for the Special Meeting, with full power of substitution and re-substitution.

**Q:  If a UserTesting stockholder gives a proxy, how are the shares voted?**

A:  Regardless of the method you choose to vote, the individuals named on the enclosed proxy card, or your proxies, will vote your shares in the way that you indicate. When completing the Internet or telephone process or the proxy card, you may specify whether your shares should be voted for or against or to abstain from voting on all, some or none of the specific items of business to come before the Special Meeting.

If you properly sign your proxy card but do not mark the boxes showing how your shares should be voted on a matter, the shares represented by your properly signed proxy will be voted: (1) "FOR" the adoption of the Merger Agreement and (2) "FOR" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

**Q:  What should I do if I receive more than one (1) set of voting materials?**

A:  Please sign, date and return (or grant your proxy electronically over the Internet or by telephone using the instructions provided in the enclosed proxy card) each proxy card and voting instruction card that you receive.

You may receive more than one (1) set of voting materials, including multiple copies of this proxy statement and multiple proxy cards or voting instruction cards. For example, if you hold your shares in more than one (1) brokerage account, you will receive a separate voting instruction card for each brokerage account in which you hold shares. If you are a UserTesting stockholder of record and your shares are registered in more than one (1) name, you will receive more than one (1) proxy card.

**Q:  Who will count the votes?**

A:  The inspector of elections appointed for the Special Meeting will tabulate votes cast by proxy or by ballot at the Special Meeting. The inspector of elections will also determine whether a quorum is present.

**Q:  Where can I find the voting results of the Special Meeting?**

A:  We intend to publish final voting results in a Current Report on Form 8-K to be filed with the SEC following the Special Meeting. All reports that we file with the SEC are publicly available when filed. For more information, please see the section of this proxy statement captioned "Where You Can Find More Information."

**Q:  Will I be subject to U.S. federal income tax upon the exchange of UserTesting common stock for cash pursuant to the Merger?**

A:  The exchange of UserTesting common stock for cash pursuant to the Merger will be a taxable transaction for U.S. federal income tax purposes. Accordingly, a U.S. Holder (as defined in the section of this proxy statement captioned "The Merger - U.S. Federal Income Tax Consequences of the Merger") who exchanges shares of UserTesting common stock for cash in the Merger will generally recognize gain or loss in an amount equal to the difference, if any, between the amount of cash received with respect to such shares and the U.S. Holder's adjusted tax basis in such shares. If you are a

TABLE OF CONTENTS

Non-U.S. Holder (as defined in the section of this proxy statement captioned "The Merger - U.S. Federal Income Tax Consequences of the Merger"), the Merger will generally not result in U.S. federal income tax to you unless you have certain connections with the United States, but may be subject to U.S. backup withholding tax unless you comply with certain certification procedures or otherwise establish a valid exemption from U.S. backup withholding tax.

For a more complete description of the U.S. federal income tax consequences of the Merger, see the section of this proxy statement captioned "The Merger - U.S. Federal Income Tax Consequences of the Merger."

**Q:  When do you expect the Merger to be completed?**

A:  We are working toward completing the Merger as quickly as possible and currently expect to complete the Merger in the first half of 2023. However, the exact timing of completion of the Merger cannot be predicted, because the Merger is subject to the closing conditions specified in the Merger Agreement, many of which are outside of our control.

**Q:  Who will solicit and pay the cost of soliciting proxies?**

A:  The expenses of soliciting proxies will be paid by us. We have retained Mackenzie Partners, Inc. to assist in soliciting proxies for a fee of up to $20,000, plus costs and expenses. We and our agents may solicit proxies by mail, electronic mail, telephone, facsimile, by other similar means or in person. Our directors, officers and other employees, without additional compensation, and employees of Mackenzie Partners, Inc. may solicit proxies personally or in writing, by telephone, email or otherwise. We will request brokers, custodians, nominees and other record holders to forward copies of the soliciting materials to persons for whom they hold shares and to request authority for the exercise of proxies. In such cases, we, upon the request of the record holders, will reimburse such holders for their reasonable expenses. If you choose to access the proxy materials through the internet, you are responsible for any internet access charges you may incur.

**Q:  What if during the check-in time or during the meeting I have technical difficulties or trouble accessing the virtual meeting website?**

A:  We will have technicians ready to assist you with any technical difficulties you may have accessing the virtual meeting website. If you encounter any difficulties accessing the Special Meeting during the check-in time or during the Special Meeting, please call the technical support number that will be posted on the Special Meeting log-in page.

**Q:  Do any of UserTesting's directors or officers have interests in the Merger that may be in addition to or differ from those of UserTesting stockholders generally?**

A:  Yes. In considering the recommendation of the Board of Directors with respect to the proposal to adopt the Merger Agreement, you should be aware that our directors and executive officers may have interests in the Merger different from, or in addition to, the interests of UserTesting stockholders generally. The Board of Directors was aware of and considered these interests, to the extent such interests existed at the time, among other matters, in evaluating and negotiating the Merger Agreement and the Merger, in making their respective recommendations and determinations, including in the case of the Board of Directors, in approving the Merger Agreement and the Merger and in recommending that the Merger Agreement be adopted by UserTesting stockholders. For a description of the interests of our directors and executive officers in the Merger, see the section entitled "The Merger - Interests of Our Executive Officers and Directors in the Merger."

TABLE OF CONTENTS

**Q:  Who can help answer my questions?**

A:  If you have any questions concerning the Merger, the Special Meeting or the accompanying proxy statement, would like additional copies of the accompanying proxy statement or need help voting your shares of UserTesting common stock, please contact our proxy solicitor:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Toll-free: 1-800-322-2885
Email: proxy@mackenziepartners.com

19

TABLE OF CONTENTS

## FORWARD-LOOKING STATEMENTS

This proxy statement, and any document to which we refer in this proxy statement, contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), Section 21E of the Exchange Act and the Private Securities Litigation Reform Act of 1995, which are intended to be covered by the safe harbor created by such sections and other applicable laws. Such forward-looking statements include statements relating to our strategy, goals, future focus areas and the value of the proposed transaction to our stockholders. These forward-looking statements are based on UserTesting management's beliefs and assumptions and on information currently available to management. Forward-looking statements include all statements that are not historical facts and may be identified by terms such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or similar expressions and the negatives of those terms. We have based the forward-looking statements contained in this proxy statement primarily on our current expectations and projections, in light of currently available information, about future events and trends that we believe may affect our business, financial condition, results of operations and prospects. These forward-looking statements involve known and unknown risks, uncertainties, and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements, expressed or implied by the forward-looking statements, including the uncertainty associated with the potential impacts of global political, macroeconomic, social, health and market conditions, including rising inflation, political instability, terrorist activities or military conflicts on our business, financial condition, results of operations and prospects. Additional factors that could cause or contribute to such differences include, but are not limited to, the following:

- the completion of the Merger on anticipated terms and timing, including obtaining stockholder and regulatory approvals, anticipated tax treatment, unforeseen liabilities, future capital expenditures, revenues, expenses, earnings, synergies, economic performance, indebtedness, financial condition, losses, future prospects, business and management strategies for the management, expansion and growth of our business and other conditions to the completion of the transaction;

- our future financial performance, including expectations regarding subscription and professional revenue, cost of revenue, gross profit, gross margin, operating expenses, including changes in operating expenses, and our ability to achieve and maintain future profitability;

- our ability to implement our business strategy and our pricing model, and our ability to effectively manage our growth;

- anticipated trends, growth rates, and challenges in our business and in the markets in which we operates;

- market acceptance of our platform, products and services and our ability to increase adoption of our platform, products and services;

- significant transaction costs associated with the Merger;

- potential litigation relating to the Merger;

- the risk that disruptions from the Merger will harm our business, including current plans and operations;

- our ability to retain and hire key personnel;

- potential adverse reactions or changes to business relationships resulting from the announcement of the Merger;

- legislative, regulatory and economic developments affecting our business;

- the evolving legal, regulatory and tax regimes under which we operate;

- potential business uncertainty, including changes to existing business relationships, during the pendency of the Merger that could affect our financial performance;

- restrictions during the pendency of the Merger that may impact our ability to pursue certain business opportunities or strategic transactions;

TABLE OF CONTENTS

- unpredictability and severity of catastrophic events, including, but not limited to, acts of terrorism, cyber-attacks, or outbreak of war or hostilities, as well as our response to any of the aforementioned factors; and

- such other risks and uncertainties described more fully in documents we file with or furnish to the SEC, including our Annual Report on Form 10-K filed with the SEC on March 4, 2022, and our Quarterly Reports on Form 10-Q filed with the SEC on May 4, 2022, August 4, 2022 and October 31, 2022.

We expressly qualify in their entirety all forward-looking statements attributable to either us or any person acting on our behalf by the cautionary statements contained or referred to in this proxy statement. All information provided in this proxy statement is as of the date hereof and we undertake no duty to update this information except as required by law.

21

TABLE OF CONTENTS

## THE SPECIAL MEETING

The enclosed proxy is solicited on behalf of the Board of Directors for use at the Special Meeting.

### Date, Time and Place

The Special Meeting will be held on January 10, 2023, at 10:00 a.m., Pacific Time. We will hold the Special Meeting virtually via the Internet at the virtual meeting website. You will not be able to attend the Special Meeting physically in person.

### Purpose of the Special Meeting

At the Special Meeting, we will ask UserTesting stockholders to vote on proposals to: (i) adopt the Merger Agreement and (ii) adjourn the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

### Record Date; Shares Entitled to Vote; Quorum

Only our stockholders of record as of the Record Date are entitled to notice of the Special Meeting and to vote at the Special Meeting. As of the Record Date, there were 146,859,078 shares of UserTesting common stock issued and outstanding and entitled to vote at the Special Meeting. For ten days prior to the Special Meeting, a complete list of the UserTesting stockholders entitled to vote at the Special Meeting will be available for examination by any stockholder for any purpose relating to the Special Meeting upon a written request by such stockholder to our Investor Relations team at ir@usertesting.com. A list of UserTesting stockholders entitled to vote at the Special Meeting will also be available at the virtual meeting website during the Special Meeting.

The holders of a majority of the voting power of the shares of our capital stock issued and outstanding and entitled to vote at the Special Meeting as of the Record Date, present in person or represented by proxy, will constitute a quorum at the Special Meeting. In the event that a quorum is not present at the Special Meeting, it is expected that the meeting will be adjourned to solicit additional proxies.

### Vote Required; Abstentions and Broker Non-Votes

The affirmative vote of the holders of a majority of the issued and outstanding shares of UserTesting common stock entitled to vote at the Special Meeting is required to adopt the Merger Agreement. As of the Record Date, 73,429,540 votes constitute a majority of the issued and outstanding shares of our common stock. Adoption of the Merger Agreement by our stockholders is a condition to the Closing of the Merger.

Approval of the proposal to adjourn the Special Meeting, if a quorum is present, requires the affirmative vote of the holders of a majority of the issued and outstanding shares of UserTesting common stock entitled to vote that are present in person or represented by proxy at the Special Meeting and are voted for or against the matter.

If a UserTesting stockholder abstains from voting, that abstention will have the same effect as if the UserTesting stockholder voted "**AGAINST**" the proposal to adopt the Merger Agreement but will have no effect on any proposal to adjourn the Special Meeting to a later date or dates to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting (provided a quorum is present with respect to the vote to adopt the Merger Agreement).

Each "broker non-vote" will also count as a vote "**AGAINST**" the proposal to adopt the Merger Agreement but will have no effect on any proposal to adjourn the Special Meeting to a later date or dates to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting (provided a quorum is present with respect to the vote to adopt the Merger Agreement). A so-called "broker non-vote" results when banks, brokers and other nominees return a valid proxy voting upon a matter or matters for which the applicable rules provide discretionary authority but do not vote on a particular proposal because they do not have discretionary authority to vote on the matter and have not received specific voting instructions from the beneficial owner of such shares. We do not expect any broker non-votes at the Special Meeting because the rules applicable to banks, brokers and other nominees only

TABLE OF CONTENTS

provide brokers with discretionary authority to vote on proposals that are considered routine, whereas each of the proposals to be presented at the Special Meeting is considered non-routine. As a result, no broker will be permitted to vote your shares of UserTesting common stock at the Special Meeting without receiving instructions. Failure to instruct your broker on how to vote your shares will have the same effect as a vote "**AGAINST**" the proposal to adopt the Merger Agreement.

**Stock Ownership and Interests of Certain Persons**

*Shares Held by UserTesting's Directors and Executive Officers*

As of the Record Date, our directors and executive officers beneficially owned and were entitled to vote, in the aggregate, 39,107,032 shares of UserTesting common stock, representing approximately 26.6% of the shares of UserTesting common stock issued and outstanding on the Record Date.

**Voting of Proxies**

If your shares are registered in your name with our transfer agent, AST, you may cause your shares to be voted by returning a signed and dated proxy card in the accompanying prepaid envelope, or you may vote in person at the Special Meeting. Additionally, you may grant a proxy electronically over the Internet or by telephone (using the instructions provided in the enclosed proxy card). You must have the enclosed proxy card available and follow the instructions on the proxy card in order to grant a proxy electronically over the Internet or by telephone. Based on your proxy cards or Internet and telephone proxies, the proxy holders will vote your shares according to your directions.

If you plan to attend the Special Meeting and wish to vote in person, you will be given a virtual ballot at the Special Meeting. If your shares are registered in your name, you are encouraged to vote by proxy even if you plan to attend the Special Meeting. If you attend the Special Meeting and vote in person by virtual ballot, your vote will revoke any previously submitted proxy.

Voting instructions are included on your proxy card. All shares represented by properly signed and dated proxies received in time for the Special Meeting will be voted at the Special Meeting in accordance with the instructions of the UserTesting stockholder. Properly signed and dated proxies that do not contain voting instructions will be voted: (1) "**FOR**" adoption of the Merger Agreement and (2) "**FOR**" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.

If your shares are held in "street name" through a bank, broker or other nominee, you may vote through your bank, broker or other nominee by completing and returning the voting form provided by your bank, broker or other nominee or attending the Special Meeting and voting in person with a "legal proxy" from your bank, broker or other nominee. If such a service is provided, you may vote over the Internet or telephone through your bank, broker or other nominee by following the instructions on the voting form provided by your bank, broker or other nominee. If you do not return your bank's, broker's or other nominee's voting form, do not vote via the Internet or telephone through your bank, broker or other nominee, if possible, or do not attend the Special Meeting and vote in person with a "legal proxy" from your bank, broker or other nominee, it will have the same effect as if you voted "**AGAINST**" the proposal to adopt the Merger Agreement but will not have any effect on the adjournment proposal.

**Revocability of Proxies**

If you are a UserTesting stockholder of record, you may change your vote or revoke your proxy at any time before it is voted at the Special Meeting by:

- signing another proxy card with a later date and returning it to us prior to the Special Meeting;

- submitting a new proxy electronically over the Internet or by telephone after the date of the earlier submitted proxy;

- delivering a written notice of revocation to our Corporate Secretary; or

TABLE OF CONTENTS

- attending the Special Meeting virtually via the Internet at the virtual meeting website and completing a virtual ballot.

If you have submitted a proxy, your appearance at the Special Meeting will not have the effect of revoking your prior proxy; provided that you do not vote in person or submit an additional proxy or revocation, which, in each case, will have the effect of revoking your proxy.

If you hold your shares of UserTesting common stock in "street name," you should contact your bank, broker or other nominee for instructions regarding how to change your vote. You may also vote in person at the Special Meeting if you obtain a "legal proxy" from your bank, broker or other nominee.

Any adjournment, postponement or other delay of the Special Meeting, including for the purpose of soliciting additional proxies, will allow UserTesting stockholders who have already sent in their proxies to revoke them at any time prior to their use at the Special Meeting as adjourned, postponed or delayed.

**Board of Directors' Recommendation**

The Board of Directors has unanimously: (i) determined that it is in the best interests of UserTesting and our stockholders, and declared it advisable, to enter into the Merger Agreement; (ii) approved the execution, delivery and performance of the Merger Agreement by UserTesting, the performance by UserTesting of its covenants under the Merger Agreement, and the consummation of the transactions contemplated thereof, including the Merger; and (iii) resolved to recommend that our stockholders adopt the Merger Agreement and directed that such matter be submitted for the consideration of our stockholders at the Special Meeting.

**The Board of Directors unanimously recommends that you vote: (1) "FOR" the adoption of the Merger Agreement and (2) "FOR" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.**

**Solicitation of Proxies**

The expenses of soliciting proxies will be paid by UserTesting. We have retained Mackenzie Partners, Inc. to assist in soliciting proxies for a fee of up to $20,000, plus costs and expenses. We and our agents may solicit proxies by mail, electronic mail, telephone, facsimile, by other similar means, or in person. Our directors, officers and other employees, without additional compensation, and employees of Mackenzie Partners, Inc. may solicit proxies personally or in writing, by telephone, email or otherwise. We will request brokers, custodians, nominees and other record holders to forward copies of the soliciting materials to persons for whom they hold shares and to request authority for the exercise of proxies. In such cases, we, upon the request of the record holders, will reimburse such holders for their reasonable expenses. If you choose to access the proxy materials through the internet, you are responsible for any internet access charges you may incur.

**Anticipated Date of Completion of the Merger**

Assuming timely satisfaction of necessary closing conditions, including the approval by UserTesting stockholders of the proposal to adopt the Merger Agreement, we currently expect that the Merger will be consummated in the first half of 2023.

**Appraisal Rights**

If the Merger is consummated, UserTesting stockholders and beneficial owners who continuously hold or own shares of UserTesting common stock through the Effective Time, who do not vote in favor of the adoption of the Merger Agreement and who properly demand appraisal of their shares and do not withdraw their demands or otherwise lose their rights to seek appraisal will be entitled to seek appraisal of their shares in connection with the Merger under Section 262 of the DGCL. This means that record holders and beneficial owners of UserTesting common stock who perfect their appraisal rights, who do not thereafter withdraw their demand for appraisal and who follow the procedures in the manner prescribed by Section 262

24

TABLE OF CONTENTS

of the DGCL may be entitled to have their shares appraised by the Delaware Court of Chancery and to receive payment in cash of the "fair value" of their shares of UserTesting common stock, exclusive of any elements of value arising from the accomplishment or expectation of the Merger, as determined by the Delaware Court of Chancery, together with interest to be paid on the amount determined to be "fair value," if any (or in certain circumstances described in further detail in the section of this proxy statement captioned "The Merger - Appraisal Rights," on the difference between the amount determined to be the "fair value" and the amount paid by the Surviving Corporation in the Merger to each person entitled to appraisal prior to the entry of judgment in any appraisal proceeding). Due to the complexity of the appraisal process, persons who wish to seek appraisal of their shares are encouraged to review Section 262 of the DGCL carefully and to seek the advice of legal counsel with respect to the exercise of appraisal rights.

**UserTesting stockholders and beneficial owners considering seeking appraisal should be aware that the "fair value" of their shares as determined pursuant to Section 262 of the DGCL could be more than, the same as or less than the value of the Per Share Merger Consideration that they would receive pursuant to the Merger Agreement if they did not seek appraisal of their shares.**

To exercise your appraisal rights, you must: (i) properly submit a written demand for appraisal to us before the vote is taken on the proposal to adopt the Merger Agreement; (ii) not submit a proxy or otherwise vote in favor of the proposal to adopt the Merger Agreement; (iii) hold or own such shares upon the making of a demand under clause (i) and continue to hold or own your shares of UserTesting common stock through the Effective Time; (iv) not thereafter withdraw your demand for appraisal of your shares or otherwise lose your appraisal rights, each in accordance with the DGCL; and (v) strictly comply with all other procedures for exercising appraisal rights under Section 262 of the DGCL. Your failure to follow exactly the procedures specified under Section 262 of the DGCL may result in the loss of your appraisal rights. In addition, the Delaware Court of Chancery will dismiss appraisal proceedings in respect of the Merger unless certain stock ownership conditions are satisfied by the UserTesting stockholders and beneficial owners seeking appraisal. The DGCL requirements for exercising appraisal rights are described in further detail in the section of this proxy statement captioned "The Merger - Appraisal Rights," which is qualified in its entirety by Section 262 of the DGCL, the relevant section of the DGCL regarding appraisal rights. A copy of Section 262 of the DGCL is reproduced and attached as Annex C to this proxy statement and incorporated herein by reference.

### Delisting and Deregistration of UserTesting Common Stock

If the Merger is completed, our common stock will be delisted from the NYSE and deregistered under the Exchange Act, and will no longer be publicly traded.

### Other Matters

At this time, we know of no other matters to be voted on at the Special Meeting. If any other matters properly come before the Special Meeting, your shares of UserTesting common stock will be voted in accordance with the discretion of the appointed proxy holders.

### Householding of Special Meeting Materials

Unless we have received contrary instructions, we may send a single copy of this proxy statement to any household at which two (2) or more UserTesting stockholders reside if we believe such stockholders are members of the same family. Each UserTesting stockholder in the household will continue to receive a separate proxy card. This process, known as "householding," reduces the volume of duplicate information received at your household and helps to reduce our expenses.

If you would like to receive your own set of our disclosure documents, please contact us using the instructions set forth below. Similarly, if you share an address with another UserTesting stockholder and together both of you would like to receive only a single set of our disclosure documents, please contact us using the instructions set forth below.

If you are a UserTesting stockholder of record, you may contact us by writing to UserTesting at 144 Townsend Street, San Francisco, California 94107, or by calling us at (888) 877-1882 and requesting to

TABLE OF CONTENTS

speak with our investor relations department. If a bank, broker or other nominee holds your shares, please contact your bank, broker or other nominee directly.

**Questions and Additional Information**

If you have any questions concerning the Merger, the Special Meeting or this proxy statement, would like additional copies of this proxy statement or need help voting your shares of UserTesting common stock, please contact our proxy solicitor:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Toll-free: 1-800-322-2885
Email: proxy@mackenziepartners.com

TABLE OF CONTENTS

## THE MERGER

*This discussion of the Merger is qualified in its entirety by reference to the Merger Agreement, which is attached to this proxy statement as Annex A and incorporated into this proxy statement by reference. You should carefully read and consider the entire Merger Agreement, which is the legal document that governs the Merger, because this document contains important information about the Merger and how it affects you.*

**Parties Involved in the Merger**

UserTesting, Inc.
144 Townsend Street
San Francisco, California 94107
(888) 877-1882

UserTesting has fundamentally changed the way organizations get insights from customers with fast, opt-in feedback and experience capture technology. We have pioneered a video-first, enterprise-grade software-as-a-service platform that enables organizations to see and hear the experiences of real people as they engage with products, designs, apps, processes, concepts, or brands. Our platform captures authentic, credible, and highly contextualized customer perspectives from targeted audiences who have opted in to share their thoughts, whether for digital, real-world, or omnichannel experiences. Using machine learning, our platform analyzes these perspectives and surfaces key moments of insight rapidly and at scale. This helps organizations to free up time and resources and make better customer experience decisions faster using the power of video to drive alignment and action. We are headquartered in San Francisco, California. Our common stock is listed on the NYSE under the symbol "USER."

Thunder Holdings, LLC
c/o Thoma Bravo, L.P.
600 Montgomery Street, 20th Floor
San Francisco, California 94111
(415) 263-3600

Parent was formed on October 24, 2022 solely for the purpose of engaging in the transactions contemplated by the Merger Agreement, and has not engaged in any business activities other than in connection with the transactions contemplated by the Merger Agreement and arranging of the equity financing and potential debt financing in connection with the Merger.

Thunder Merger Sub, Inc.
c/o Thoma Bravo, L.P.
600 Montgomery Street, 20th Floor
San Francisco, California 94111
(415) 263-3600

Merger Sub is a wholly owned subsidiary of Parent and was formed on October 12, 2022 solely for the purpose of engaging in the transactions contemplated by the Merger Agreement, and has not engaged in any business activities other than in connection with the transactions contemplated by the Merger Agreement and arranging of the equity financing and potential debt financing in connection with the Merger.

Parent and Merger Sub are each affiliated with the Thoma Bravo Funds and are managed by Thoma Bravo, L.P. . UserZoom, Parent, Merger Sub, and the Thoma Bravo Funds are each affiliated with Thoma Bravo, L.P. UserZoom is owned by the Thoma Bravo Funds and funds affiliated with Sunstone Partners. Thoma Bravo and Sunstone Partners are leading private equity firms focused on the software and technology-enabled services sectors. At the Effective Time, the Surviving Corporation will be indirectly owned by the Thoma Bravo Funds and certain of its affiliates.

In connection with the transactions contemplated by the Merger Agreement, the Thoma Bravo Funds and Sunstone Partners Funds have each provided Parent with equity commitments. The amounts committed under the Equity Commitment Letters will be used to fund the aggregate purchase price required to be paid at the Closing of the Merger and to also fund certain other payments at the Closing (including the Required Amounts), subject to the terms and conditions of the Merger Agreement. In addition, the Thoma

TABLE OF CONTENTS

Bravo Funds and Sunstone Partners Funds have each agreed to guarantee the payment of certain liabilities and obligations of Parent or Merger Sub under the Merger Agreement, subject to an aggregate cap equal to $56,464,408 for the Thoma Bravo Funds and $11,295,592 for the Sunstone Partners Funds, including any termination fee and amounts in respect of certain reimbursement and indemnification obligations of Parent and Merger Sub for certain costs, expenses or losses incurred or sustained by us, as specified in the Merger Agreement. For more information, please see the section of this proxy statement captioned "- Financing of the Merger."

**Effect of the Merger**

Upon the terms and subject to the conditions of the Merger Agreement, Merger Sub will merge with and into UserTesting and the separate corporate existence of Merger Sub will cease, with UserTesting continuing as the Surviving Corporation. As a result of the Merger, UserTesting will become a wholly owned subsidiary of Parent, and our common stock will no longer be publicly traded and will be delisted from the NYSE. In addition, our common stock will be deregistered under the Exchange Act, and we will no longer file periodic reports with the SEC. If the Merger is completed, you will not own any shares of the capital stock of the Surviving Corporation.

The Effective Time will occur upon the filing of a certificate of merger with the Secretary of State of the State of Delaware (or at such later time as we, Parent and Merger Sub may agree and specify in the certificate of merger).

**Effect on UserTesting If the Merger Is Not Completed**

If the Merger Agreement is not adopted by our stockholders, or if the Merger is not completed for any other reason:

i.   UserTesting stockholders will not be entitled to, nor will they receive, any payment for their respective shares of UserTesting common stock pursuant to the Merger Agreement;

ii.  (a) we will remain an independent public company; (b) our common stock will continue to be listed and traded on the NYSE and registered under the Exchange Act; and (c) we will continue to file periodic reports with the SEC;

iii. we anticipate that (a) management will operate the business in a manner similar to that in which it is being operated today and (b) UserTesting stockholders will be subject to similar types of risks and uncertainties as those to which they are currently subject, including, but not limited to, risks and uncertainties with respect to our business, prospects and results of operations, as such may be affected by, among other things, the highly competitive industry in which we operate and economic conditions;

iv.  the price of UserTesting common stock may decline significantly, and if that were to occur, it is uncertain when, if ever, the price of UserTesting common stock would return to the price at which it trades as of the date of this proxy statement;

v.   the Board of Directors will continue to evaluate and review our business operations, strategic direction and capitalization, among other things, and will make such changes as are deemed appropriate; irrespective of these efforts, it is possible that no other transaction acceptable to the Board of Directors will be offered or that our business, prospects and results of operations will be adversely impacted; and

vi.  under specified circumstances, we will be required to pay Parent a termination fee of either (i) $10,160,000 if the Merger Agreement is terminated before December 20, 2022 for the purpose of entering into an agreement with respect to a Superior Proposal received from an Excluded Party (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Go-Shop Period - Solicitation of Other Offers") or (ii) $33,880,000, in the case of any other such termination, as described in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Termination Fee."

TABLE OF CONTENTS

**Merger Consideration**

*UserTesting Common Stock*

At the Effective Time, each then-outstanding share of UserTesting common stock (other than the Excluded Shares) will be cancelled and automatically converted into the right to receive the Per Share Merger Consideration, less any applicable withholding taxes.

Prior to or at the Effective Time, Parent will deposit (or cause to be deposited) with a U.S. bank or trust company, approved in advance by us in writing that shall be appointed to act as a paying agent (the "Paying Agent") an amount of cash sufficient to pay the aggregate Per Share Merger Consideration payable at Closing. For more information, please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Exchange and Payment Procedures."

After the Merger is completed, you will have the right to receive the Per Share Merger Consideration in respect of each share of UserTesting common stock that you own (less any applicable withholding taxes), but you will no longer have any rights as a UserTesting stockholder (except that UserTesting stockholders who properly exercise their appraisal rights will have the right to receive payment for the "fair value" of their shares determined pursuant to an appraisal proceeding, as contemplated by Delaware law). For more information, please see the section of this proxy statement captioned "- Appraisal Rights."

*Treatment of Company Equity Awards*

The Merger Agreement provides that UserTesting's equity awards that are outstanding immediately prior to the Effective Time will be subject to the following treatment as of the Effective Time:

**Company Options**

Each Vested Company Option will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Vested Company Option by (y) the total number of shares of UserTesting common stock underlying such Vested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Vested Company Option is equal to or greater than the Per Share Merger Consideration, such Vested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof.

Each Unvested Company Option will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Unvested Company Option by (y) the total number of shares of UserTesting common stock underlying such Unvested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Unvested Company Option is equal to or greater than the Per Share Merger Consideration, such Unvested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company Option Consideration amounts will vest and become payable at the same time as the Unvested Company Option from which such Unvested Company Option Consideration was converted would have vested pursuant and been payable to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time with respect to the receipt of the Unvested Company Option Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

**Company RSUs**

Each Vested Company RSU will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest,

TABLE OF CONTENTS

equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Vested Company RSU by (y) the Per Share Merger Consideration, subject to applicable withholding taxes.

Each Unvested Company RSU will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Unvested Company RSU by (y) the Per Share Merger Consideration, subject to applicable withholding taxes. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company RSU Consideration amounts will vest and become payable at the same time as the Unvested Company RSU from which such Unvested Company RSU Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time with respect to the receipt of the Unvested Company RSU Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

### Treatment of Company ESPP

In accordance with the terms of the Merger Agreement, on October 26, 2022, the Board of Directors adopted resolutions providing that with respect to the Company ESPP, (i) participation in the Company ESPP will be limited to those employees who are participants on the date of the Merger Agreement, (ii) participants may not increase their payroll deduction elections or rate of contributions from those in effect on the date of the Merger Agreement or make any separate non-payroll contributions to the Company ESPP on or following the date of the Merger Agreement, (iii) no offering or purchase period will be commenced after the date of the Merger Agreement, (iv) each then-outstanding purchase right shall be exercised as of the earlier of (A) the end of the offering or purchase period in effect on the date of the Merger Agreement or (B) ten (10) days prior to the date on which the Effective Time occurs, and (v) the Company ESPP will terminate immediately prior to, but contingent upon the occurrence of, the Effective Time, but subsequent to the exercise of purchase rights on such purchase date (in accordance with the terms of the Company ESPP). On such exercise date, we will apply the funds credited as of such date pursuant to the Company ESPP within each participant's payroll withholding account to the purchase of whole shares of UserTesting common stock in accordance with the terms of the Company ESPP and each share purchased thereunder immediately prior to the Effective Time will be canceled at the Effective Time and converted into the right to receive the Per Share Merger Consideration, subject to any applicable withholding taxes. Any accumulated contributions of each participant under the Company ESPP as of immediately prior to the Effective Time will, to the extent not used to purchase shares in accordance with the terms and conditions of the Company ESPP, be refunded to such participant as promptly as practicable following the Effective Time (without interest).

### Background of the Merger

*The following chronology summarizes the key meetings and events that led to the signing of the Merger Agreement. The following chronology does not purport to catalogue every conversation among the Board, the Transaction Committee or our representatives and other parties.*

As part of our ongoing consideration and evaluation of UserTesting's long-term strategic goals and plans, the Board and our management periodically review, consider and assess our operations and financial performance, as well as overall industry conditions, as they may affect those strategic goals and plans. This review at times includes, among other things, the consideration of potential opportunities for business combinations, acquisitions and other financial and strategic alternatives, in each case, with a view towards enhancing stockholder value.

On several occasions in 2020 and 2021, we met with representatives of Thoma Bravo and discussed our company and potential transactions involving us and Thoma Bravo, including a potential investment in or acquisition of us by Thoma Bravo.

30

TABLE OF CONTENTS

In the second half of 2021, as we prepared for our initial public offering, we also evaluated a sale transaction as a potential alternative to create value for our stockholders. Accordingly, in the third quarter of 2021, we instructed representatives of Morgan Stanley & Co. LLC ("Morgan Stanley"), a lead underwriter in our initial public offering, to contact certain strategic and financial sponsor counterparties to determine whether they would be interested in discussing a potential acquisition of our company at a valuation that would be attractive compared to the valuation we expected to receive in an initial public offering. However, in view of market conditions at the time and the high valuations companies in our industry were receiving during their own initial public offerings, we determined that pursuing an initial public offering was in the best interests of our stockholders.

On November 17, 2021, we completed an initial public offering of our common stock at a price of $14.00 per share. Following the initial public offering, the price of our common stock declined. During 2022 our common stock traded below the initial public offering price, with a volume weighted average price of $5.65 during the 90-day period ending August 19, 2022 and a 52-week low of $3.31 per share in September 2022. During 2022, equity securities of other companies in the software industry generally also experienced significant declines.

In July 2022, a senior representative of Thoma Bravo reached out to Andy MacMillan, our Chief Executive Officer, and suggested a meeting to explore the potential for an acquisition of us by Thoma Bravo.

On August 19, 2022, Mr. MacMillan and Jon Pexton, our Chief Financial Officer, met with representatives of Thoma Bravo, including A.J. Rohde, Senior Partner at Thoma Bravo, and David Tse, Vice President at Thoma Bravo, to learn more about our company and to explore the potential for an acquisition of us by Thoma Bravo (the "Proposed Transaction"). At this meeting, the senior representative of Thoma Bravo informed Messrs. MacMillan and Pexton that Thoma Bravo was evaluating making a proposal for a potential acquisition of us at a price of between $9.00 and $11.00 per share, representing a premium of approximately 84% to 125% over our closing stock price of $4.88 on August 18, 2022, subject to customary due diligence, and that following the consummation of a transaction, Thoma Bravo would expect to integrate our business with that of its portfolio company UserZoom. At this meeting, Thoma Bravo also discussed the possibility of Mr. MacMillan serving as the chief executive officer of the combined companies. However, as of the date of this proxy statement, Thoma Bravo and Mr. MacMillan have not discussed specific terms for Mr. MacMillan to act in such capacity.

On August 26, 2022, the Board held a meeting at which Mr. Pexton and Mona Sabet, our Chief Corporate Strategy Officer, and representatives of Fenwick & West LLP, our outside corporate counsel ("Fenwick & West"), were present. Mr. MacMillan informed the Board of the discussions with Thoma Bravo, including his anticipated role following the consummation of a transaction. At the meeting, representatives of Fenwick & West reviewed with the Board its fiduciary duties in connection with a potential business combination transaction and considerations with respect to a process for such a transaction. Mr. Pexton then discussed our anticipated financial results as an independent company. In light of the discussions with Thoma Bravo, the Board determined to retain financial advisors, and directed our senior management to contact Morgan Stanley and another investment bank that specializes in mergers and acquisitions, which we refer to as "Advisor A," for that purpose, based on both of these banks' experience with acquisition transactions in our industry and, specifically in the case of Morgan Stanley, their experience with our company (as they had served as a lead underwriter in our initial public offering), and in advising companies in acquisition transactions with Thoma Bravo.

On August 29, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Advisor A were present. At the meeting, representatives of Advisor A presented to the Board with respect to the Proposed Transaction, including Advisor A's credentials, the current market environment, perspectives on our financial performance and trading price, and process objectives and considerations.

On August 30, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, representatives of Morgan Stanley and the Board discussed the Proposed Transaction, including Morgan Stanley's credentials, our positioning in the market, perspectives on our financial performance and trading price, and potential parties that might be

TABLE OF CONTENTS

interested in, and capable of, completing an acquisition of us. Morgan Stanley reviewed possible next steps with respect to the Proposed Transaction for the Board to consider. Representatives of Morgan Stanley then left the meeting and the Board discussed the Proposed Transaction and the presentations by Advisor A and Morgan Stanley. The Board then determined to engage Morgan Stanley as our financial advisor in connection with the Proposed Transaction because of, among other things, Morgan Stanley's familiarity with our business based on its existing relationship with us, its qualifications, expertise and reputation, extensive expertise and experience with transactions in our industry, and its prior experience negotiating numerous transactions with Thoma Bravo. The Board then discussed the potential process for, and Board oversight and management of, the Proposed Transaction, including the formation of a strategic review committee of the Board to manage and oversee the Proposed Transaction (the "Transaction Committee"). The Board established the Transaction Committee, composed of Shannon Nash, Cynthia Russo and Alexander Wong, to consider, oversee, manage and direct the process for a Proposed Transaction. The Board then directed our management to coordinate a response to Thoma Bravo with representatives of Morgan Stanley, and to inform Thoma Bravo that it should provide a written indication of interest with a specific price and that such price should be in the upper half of the range of the verbal proposal provided by the senior representative of Thoma Bravo on August 19, 2022.

On September 2, 2022, at the direction of the Board, representatives of Morgan Stanley contacted representatives of Thoma Bravo to convey the message from the Board. Representatives of Thoma Bravo indicated that they would continue to consider valuation.

On September 6, 2022, the Transaction Committee held a meeting at which the other members of the Board, Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, representatives of Morgan Stanley reviewed the discussion that had occurred with Thoma Bravo on September 2, 2022. Representatives of Morgan Stanley then left the meeting and Mr. Pexton reviewed a financial forecast for 2023 through 2025 (the "September Financial Forecast"), a copy of which had been provided to the Board for review prior to the meeting. The Transaction Committee then discussed the Proposed Transaction, including the update provided by Morgan Stanley, and the September Financial Forecast. Ms. Sabet and representatives of Fenwick & West reviewed the terms set forth in a proposed engagement letter with Morgan Stanley. The Transaction Committee then discussed the possibility of contacting other parties that might potentially be interested in, and capable of, completing an acquisition of us, the potential risks of such a process, the potential adverse consequences of information regarding the Proposed Transaction if it were to become publicly known at this time, including the increased risk that a broad outreach would become publicly known, which could disrupt our business, and the possibility of contacting other potential acquirors through a "go shop" process following an announcement of the Potential Transaction.

On September 8, 2022, Thoma Bravo and UserZoom jointly submitted a non-binding indication of interest to acquire all of the outstanding shares of our common stock for $9.50 per share in an all-cash transaction (the "September 8 Proposal"), subject to customary due diligence and representing a premium of approximately 137% over our closing stock price of $4.01 on September 7, 2022. The September 8 Proposal contemplated a 30-day exclusivity period during which we could not solicit alternative proposals prior to execution of a merger agreement and that we would not engage in a "go-shop" process following execution of a merger agreement (subject to a "fiduciary out" with respect to unsolicited proposals). We provided a copy of the September 8 Proposal to the members of the Board later that day.

Later on September 8, 2022, the Transaction Committee held a meeting at which Messrs. MacMillan and Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, Mr. MacMillan and representatives of Morgan Stanley reviewed the September 8 Proposal, and the Transaction Committee discussed potential responses to the September 8 Proposal.

On September 10, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, representatives of Morgan Stanley reviewed certain financial aspects of the September 8 Proposal and provided an overview of our financial and stock performance since our initial public offering and its views on the current market environment. The Board discussed with representatives of Morgan Stanley preliminary perspectives on our proposed valuation, and discussed our prospects as an independent company. Representatives of Morgan Stanley and the Board then discussed the September 8 Proposal, views on strategic parties and other private equity sponsors

TABLE OF CONTENTS

that might be interested in evaluating, and capable of completing, a potential business combination transaction with us, and our response to the September 8 Proposal. The representatives from Morgan Stanley then left the meeting and the Board discussed the terms of the proposed engagement letter between UserTesting and Morgan Stanley, and directed us to execute the engagement letter. A representative of Fenwick & West then reviewed with the Board its fiduciary duties in connection with a response to Thoma Bravo. The Board then further discussed the response to the September 8 Proposal and determined to respond to Thoma Bravo that we were interested in discussing a transaction but instructed our management to seek to obtain a higher price per share from Thoma Bravo.

Following this meeting, on September 10, 2022, we executed the engagement letter with Morgan Stanley on the terms approved by the Board.

On September 12, 2022, at the direction of the Board, representatives of Morgan Stanley spoke with a senior representative of Thoma Bravo and informed him that we were interested in discussing a transaction but pressed Thoma Bravo to increase its proposed price per share consistent with the guidance previously provided by the Board. The senior representative of Thoma Bravo indicated that they would continue to evaluate its proposed price per share.

On September 14, 2022, Thoma Bravo and UserZoom submitted a revised non-binding indication of interest to acquire all of the outstanding shares of our common stock for $10.00 per share (the "September 14 Proposal"), subject to customary due diligence and representing a premium of approximately 151% over our closing stock price of $3.98 on September 14, 2022. Similar to the September 8 Proposal, the September 14 Proposal contemplated a 30-day exclusivity period during which we could not solicit alternative proposals prior to execution of a merger agreement and that we would not engage in a "go-shop" process following execution of a merger agreement (subject to a "fiduciary out" with respect to unsolicited proposals). We provided a copy of the September 14 Proposal to the members of the Board later that day.

On September 16, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, representatives of Morgan Stanley reviewed with the Board certain financial aspects of the September 14 Proposal and provided an update with respect to the discussions that Morgan Stanley had with Thoma Bravo since September 10, 2022. The Board then discussed with representatives of Morgan Stanley preliminary perspectives on our valuation, and the Board and representatives of Morgan Stanley discussed strategic parties and other private equity sponsors that might potentially be interested in evaluating, and capable of completing, a potential business combination transaction with us, including potential strategies for soliciting proposals from such parties, either prior to execution of a merger agreement or through a go-shop process following execution of a merger agreement, and our proposed response to the September 14 Proposal. The representatives of Morgan Stanley left the meeting, and the Board continued to discuss the response to the September 14 Proposal. During this discussion, a representative of Fenwick & West reviewed with the Board its fiduciary duties in connection with a response to Thoma Bravo and in evaluating a process to solicit interest in a transaction from other parties. Following this discussion, the Board determined to direct Morgan Stanley to inform Thoma Bravo that we were willing to proceed to due diligence, and negotiation of a merger agreement, based on the September 14 Proposal, but would not agree to any exclusivity period during which we could not solicit alternative bids prior to execution of a merger agreement, and would require that any merger agreement provide for a 45-day go shop period in which we could solicit proposals from other parties following execution of a merger agreement. In addition, the Board determined to direct Morgan Stanley to contact a financial sponsor with existing investments in our industry and a strategic party, which we refer to herein as "Party A" and "Party B," respectively, to discuss their interest in discussing an acquisition of us, as the Board believed that Party A and Party B were most likely to be interested in evaluating, and capable of completing, such a transaction at an attractive valuation. These two parties were among those previously contacted regarding a potential acquisition of us in the third quarter of 2021 prior to our initial public offering. The Board discussed the desirability of contacting other parties at this time in addition to these two parties, and determined not to do so, and instead to solicit interest from other parties through a go-shop process following execution of any definitive agreement providing for an acquisition of us, in view of the increased risk that a broad outreach would become publicly known, which could disrupt our business.

On September 18, 2022, at the direction of the Board, representatives of Morgan Stanley spoke with a senior representative of Thoma Bravo and informed him that, based on the September 14 Proposal, we were

TABLE OF CONTENTS

willing to allow Thoma Bravo to conduct due diligence, and begin negotiation of a merger agreement but that we would not agree to any exclusivity period and would require a 45-day go shop period. The senior representative of Thoma Bravo indicated that Thoma Bravo was willing to proceed without exclusivity and would provide for a go shop period, the length of which would need to be determined in connection with negotiating the definitive agreement.

On September 19, 2022, representatives of Morgan Stanley met with representatives of Thoma Bravo and discussed the anticipated due diligence process for the Proposed Transaction, including the need to restrict UserZoom's access to competitive information.

On September 19, 2022, a representative of Fenwick & West spoke with a representative of Kirkland & Ellis LLP ("Kirkland & Ellis"), outside counsel to Thoma Bravo, regarding the process for drafting a merger agreement.

On September 20, 2022, we entered into a letter agreement regarding confidentiality (the "Confidentiality Agreement") with Thoma Bravo. The Confidentiality Agreement included a customary standstill provision that did not include a so-called "don't ask, don't waive" provision and was subject to a customary "fall-away" provision under which it would terminate if we were to enter into a merger agreement with a third party providing for a change of control transaction of our company. In addition, the Confidentiality Agreement restricted the ability of Thoma Bravo to disclose our confidential information to UserZoom.

Following execution of the Confidentiality Agreement, on September 20, 2022, Messrs. MacMillian and Pexton and Ms. Sabet met with representatives of Thoma Bravo and Sunstone Partners to provide a management presentation and answer questions regarding our business, customers, strategy, financial results and the September Financial Forecast, with representatives of Morgan Stanley in attendance. A copy of the September Financial Forecast that was presented at this meeting was subsequently provided to Thoma Bravo and its advisors.

On September 20, 2022, at the direction of the Board, representatives of Morgan Stanley contacted Party A and Party B, respectively, to determine whether they would be interested in discussing a potential acquisition of our company.

Later on September 20, 2022, a representative of Party A informed representatives of Morgan Stanley that Party A was not currently interested in discussing an acquisition of us. On the same day, Party B informed representatives of Morgan Stanley that it would consider whether it was interested in engaging in any such discussions, and would respond at a later date once it had made such a determination.

On September 21, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, representatives of Fenwick & West described the proposed terms of a draft Merger Agreement to be delivered to Thoma Bravo, including the proposed transaction structure, treatment of unvested stock options and RSUs, closing conditions, potential remedies for the failure of Thoma Bravo to close the Proposed Transaction, provision for a 45-day "go-shop" process and termination fees payable in the event of a superior proposal from a third party. Representatives of Morgan Stanley then provided an update on discussions with Thoma Bravo since the September 16, 2022 Board meeting. Representatives of Morgan Stanley informed the Board that Thoma Bravo had verbally agreed that we would not be subject to an exclusivity period prior to signing of the Merger Agreement, which would permit us to solicit alternative bids prior to signing of the Merger Agreement, and would permit the inclusion of a "go-shop" provision in the Merger Agreement, which would enable us to solicit alternative bids after signing of the Merger Agreement for a period of time. Representatives of Morgan Stanley then informed the Board that Party A was not interested in pursuing an acquisition of us and that Party B had indicated that it would consider whether it was interested in engaging in any such discussions, and that it would respond at a later date once it had made such a determination.

On September 22, 2022, Thoma Bravo and its advisors were provided with access to a virtual data room with diligence information regarding our company.

On September 23, 2022, representatives of Fenwick & West sent an initial draft of a clean team confidentiality agreement that had been prepared by Fenwick & West to representatives of Kirkland & Ellis to apply to certain competitive information that had not yet been provided in the virtual data room, and

34

TABLE OF CONTENTS

on September 25, 2022, we and Thoma Bravo executed the clean team agreement. On September 25, 2022, pursuant to the clean team agreement, certain representatives of Thoma Bravo and representatives of Kirkland & Ellis and other advisors to Thoma Bravo were provided with access to a clean team specific virtual data room with sensitive diligence information regarding our company.

Later on September 23, 2022, representatives of Fenwick & West sent an initial draft of the Merger Agreement that had been prepared by Fenwick & West to representatives of Kirkland & Ellis. The initial draft Merger Agreement provided for (i) a "go-shop" provision in the Merger Agreement that would enable us to solicit alternative bids for 45 days after signing, that had been previously agreed by the parties, (ii) Thoma Bravo to pay us a reverse termination fee of 5.4% of the equity value, including if the Proposed Transaction cannot close because of a failure to obtain necessary antitrust approvals or clearances, (iii) us to pay Thoma Bravo a termination fee of 2.7% of the equity value under certain circumstances (0.9% with respect to a proposal made during the "go-shop" period) and (iv) a portion of the unvested stock options and RSUs held by employees be accelerated in the event that they were terminated without cause, or for "good reason".

Later on September 23, 2022, a representative of Party B informed representatives of Morgan Stanley that Party B would not be making a proposal to acquire us.

On September 25, 2022, Morgan Stanley provided us with a customary disclosure document describing certain relationships between Morgan Stanley and representatives thereof on the one hand and UserTesting and Thoma Bravo, and their respective affiliates, on the other hand. This disclosure document indicated, among other matters, that Morgan Stanley or an affiliate thereof was a lender to certain portfolio companies of Thoma Bravo, and acted as administrative agent with respect to credit facilities of two such portfolio companies, including UserZoom. We provided a copy of this disclosure document to the Board on September 26, 2022.

Between September 26, 2022 and October 3, 2022, members of our management conducted several meetings with representatives of Thoma Bravo at which members of our management provided due diligence presentations and answered questions. Representatives of Fenwick & West and Kirkland & Ellis were in attendance for the meetings with respect to legal matters.

On September 28, Mr. MacMillan met with representatives of Thoma Bravo and Sunstone Partners to become better acquainted and to discuss our company.

On September 30, 2022, representatives of Fenwick & West and representatives of Kirkland & Ellis discussed the initial draft of the Merger Agreement. During this meeting, the representatives of Kirkland & Ellis (i) proposed a "go-shop" period of 30 days, (ii) rejected our proposal that Thoma Bravo pay us a reverse termination fee if the Proposed Transaction cannot close because of a failure to obtain necessary antitrust approvals or clearances, (iii) proposed that we pay Thoma Bravo a termination fee of 3.0% of the equity if the Merger Agreement was terminated under certain circumstances (1.5% with respect to a proposal made during the "go-shop" period), and (iv) rejected our proposal that a portion of the unvested stock options and RSUs held by employees be accelerated in the event that they were terminated without cause, or for "good reason."

Later on September 30, 2022, Messrs. MacMillan, Pexton, Satterwhite and Doktorczky and Mses. Sabet and Mekhalfa, met with representatives of Thoma Bravo and discussed our anticipated third quarter financial results, with representatives of Morgan Stanley and Ernst & Young in attendance. These anticipated results included revenue and calculated billings (total revenue plus the change in contract liabilities from the beginning to the end of the period, a non-GAAP financial measure that is indicative of amounts invoiced to customers) that were lower than those anticipated by Wall Street analysts, Thoma Bravo and the September Financial Forecast.

On October 3, 2022, a senior representative of Thoma Bravo contacted representatives of Morgan Stanley and informed them that, as a result of our third quarter financial results (and in particular, our calculated billings for the quarter), trends in our end markets and the increased cost to Thoma Bravo to secure debt financing for the Proposed Transaction in light of current debt market conditions, Thoma Bravo was no longer willing to proceed at the previously proposed price of $10.00 per share but did not indicate a price per share at which Thoma Bravo was willing to proceed.

TABLE OF CONTENTS

Following that call, on October 3, 2022, as a result of Thoma Bravo's indication that it would be reducing the valuation, we instructed our advisors to cease engaging with Thoma Bravo's advisors.

On October 4, 2022, representatives of Thoma Bravo contacted representatives of Morgan Stanley and verbally indicted that Thoma Bravo may be prepared to resume discussions at a price of $7.50 per share, subject to further due diligence regarding our financial outlook and our go-to-market strategy (the "October 4 Proposal"). The October 4 Proposal represented a premium of approximately 95% over our closing stock price of $3.84 on October 3, 2022.

Following that call, on October 4, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, Mr. MacMillan and representatives of Morgan Stanley reviewed the October 4 Proposal, including the rationales conveyed by Thoma Bravo for the price decrease. Messrs. MacMillan and Pexton provided the Board an update on our financial results for the quarter ended September 30, 2022. A representative of Fenwick & West then reviewed the fiduciary duties of the Board in considering the October 4 Proposal. Following discussion, the Board directed representatives of Morgan Stanley and our management to reject the October 4 Proposal because of the magnitude of the price decrease and the lack of certainty and specificity in the October 4 Proposal.

Later on October 4, 2022, a representative of Morgan Stanley contacted a senior representative of Thoma Bravo and informed him that the Board had rejected the October 4 Proposal.

Later on October 4, 2022, the same senior representative of Thoma Bravo then contacted Mr. MacMillan to reiterate Thoma Bravo's rationale for its revised view of valuation.

On October 5, 2022, as a result of the Board's determination, we terminated the engagement letter with Morgan Stanley and also terminated the access of Thoma Bravo and its advisors to the virtual data room.

On October 9, 2022, representatives of Thoma Bravo contacted Mr. MacMillan and verbally indicated that it was evaluating its ability to proceed at a price of $7.50 per share, subject to further due diligence regarding our financial outlook and our go-to-market strategy. Mr. MacMillan responded that, in light of the Board's previous direction regarding the October 4 Proposal, any proposal would need to provide us with substantially greater certainty and specificity, and not be subject to any further due diligence that could affect valuation.

On October 12, 2022, representatives of Thoma Bravo contacted Mr. MacMillan and verbally indicated that it would likely be willing to proceed at a price of $7.00 per share given market conditions, which represented a premium of approximately 89% over our closing stock price of $3.71 on October 11, 2022. Mr. MacMillan responded that the proposal to proceed at a price of $7.00 per share was insufficient and the proposal did not provide us with the level of certainty and specificity that was necessary. Mr. MacMillan noted that, at the October 4, 2022 Board Meeting, the Board was not supportive of $7.50 per share without greater certainty and specificity.

On October 13, 2022, representatives of Thoma Bravo contacted Mr. MacMillan and verbally indicated that Thoma Bravo would be willing to proceed at a price of $7.25 per share, which represented a premium of approximately 94% over our closing stock price of $3.74 on October 12, 2022, subject to further due diligence regarding our financial outlook. Mr. MacMillan responded that he did not anticipate the Board would support a transaction at a price of $7.25 per share, especially in view of the continued lack of certainty and specificity as to terms and due diligence requirements, but that, nevertheless, he would communicate the proposal to the Board. Later that day, Mr. MacMillan communicated this proposal to the Board.

On October 16, 2022, we sent a letter to Thoma Bravo requesting that Thoma Bravo and its advisors return to us, or destroy, all confidential information that had been provided to them pursuant to the Confidentiality Agreement.

On October 20, 2022, representatives of Thoma Bravo contacted Mr. MacMillan and verbally indicated that Thoma Bravo would be willing to proceed at a price of $7.50 per share and that it had generally completed their due diligence on us (other than confirmatory legal due diligence), to which Mr. MacMillan responded that Thoma Bravo should put the offer in writing and provide along with any proposed

36

TABLE OF CONTENTS

significant changes to the draft Merger Agreement so that the Board could fully evaluate the terms being proposed and the certainty of the Proposed Transaction.

On October 20, 2022, Thoma Bravo and UserZoom submitted a further revised non-binding indication of interest to acquire all of the outstanding shares of our common stock for $7.50 per share (the "October 20 Proposal"), representing a premium of approximately 112% over our closing stock price of $3.54 on October 20, 2022, and a revised draft of the Merger Agreement. Among other terms reflected in the draft Merger Agreement, the Merger Agreement (i) included a "go-shop" period of 45 days, which was unchanged from the initial draft Merger Agreement that Fenwick & West sent to Kirkland & Ellis, (ii) rejected our proposal that Thoma Bravo pay us a reverse termination fee if the Proposed Transaction cannot close because of a failure to obtain necessary antitrust approvals or clearances, (iii) proposed that we pay Thoma Bravo a termination fee of 2.7% of the equity under certain circumstances (0.9% with respect to a proposal made during the "go-shop" period), which was unchanged from the initial draft Merger Agreement that Fenwick & West sent to Kirkland & Ellis and (iv) rejected our proposal that a portion of the unvested stock options and RSUs held by employees be accelerated in the event that they were terminated without cause, or for "good reason."

Later on October 20, 2022, our management contacted representatives of Morgan Stanley to discuss the October 20 Proposal and next steps, and determined to engage in further discussions with Thoma Bravo to confirm that Thoma Bravo was firm on price and that Thoma Bravo did not require additional due diligence that could be expected to affect their valuation, and determined that upon such confirmation from Thoma Bravo, we would review the October 20 Proposal with the Board.

On October 21, 2022, at the direction of our management, representatives of Morgan Stanley discussed the Proposed Transaction with representatives of Thoma Bravo, including Thoma Bravo's plan to commit equity capital to fund the entire cash consideration payable at closing under the Merger Agreement and that Thoma Bravo would potentially seek debt financing for a portion of the purchase price following the signing of the Merger Agreement. During such discussion and at the direction of our management, representatives of Morgan Stanley also noted that we had updated the September Financial Forecast to reflect our third quarter financial performance, and estimates for the fourth quarter. In addition, representatives of Morgan Stanley mentioned that the Board would review the October 20 Proposal after Thoma Bravo confirmed it was now firm on price and that no additional diligence items were needed for Thoma Bravo to complete its valuation diligence. Representatives of Thoma Bravo replied that they needed to see our revenue and billing results for the third quarter along with current revenue and billings estimates for the fourth quarter, and a current fully-diluted share calculation.

Later on October 21, 2022, at the direction of our management, representatives of Fenwick & West sent a revised draft of the Merger Agreement, and an initial draft of our related disclosure letter to representatives of Kirkland & Ellis.

On October 22, 2022, we provided representatives of Thoma Bravo with our revenue and billing results for the third quarter along with current revenue and billings estimates for the fourth quarter and a current fully-diluted share calculation and, after reviewing this information, Thoma Bravo confirmed to representatives of Morgan Stanley the $7.50 per share price included in the October 20 Proposal and that no additional due diligence that could be expected to affect their valuation remained outstanding.

Later on October 22, 2022, representatives of Fenwick & West and Kirkland & Ellis discussed the revised draft of the Merger Agreement, and between October 23, 2022 and October 26, 2022, representatives of Fenwick & West and Kirkland & Ellis exchanged revised drafts of the Merger Agreement and our disclosure letter and conducted a number of conference calls regarding the draft Merger Agreement. Among other items in the draft Merger Agreement, the parties negotiated exceptions to the interim operating covenants regarding actions that we could take following the execution of the Merger Agreement.

Later on October 22, 2022, Morgan Stanley provided us with an updated customary disclosure document describing certain relationships between Morgan Stanley and representatives thereof on the one hand and UserTesting and Thoma Bravo, and their respective affiliates, on the other hand, which reiterated the relationships identified in the disclosure document previously provided to us. We provided a copy of this disclosure document to the Board on October 23, 2022.

TABLE OF CONTENTS

On October 23, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, Mr. MacMillan and representatives of Morgan Stanley reviewed the October 20 Proposal and the status of the Proposed Transaction, including that Thoma Bravo had confirmed the price included in the October 20 Proposal and that no additional valuation diligence remained outstanding. Mr. Pexton then presented the updated long-term financial forecast that was developed by our management over the course of October, a copy of which had been provided to the Board for review prior to the meeting, for the fiscal years ending December 31, 2022 through 2025 with certain extrapolations prepared by Morgan Stanley for the fiscal years ending December 31, 2026 through 2036 with the guidance of our management (the "October Financial Forecast") that reflected the potential impact of our financial results for the third quarter ended September 30, 2022 on future periods, and which reflected reduced levels of revenue, gross margin, EBITDA and unlevered free cash flow as compared to the September Financial Forecast as a result of our revenue and billing results for the third quarter and estimates for the fourth quarter and trends in our end markets that we observed subsequent to our preparation of the September 21 forecast. The October Financial Forecast is described in more detail in the section of this proxy statement captioned "- Management Projections". A representative of Fenwick & West then described the status of negotiations of the Merger Agreement. The Board then discussed the October 20 Proposal in light of the October Financial Forecast and these trends in our end markets, and the risks to our business of current increased economic and market uncertainty, and directed our senior management to continue to work with Thoma Bravo to complete negotiations on the basis of the October 20 Proposal. Representatives of Morgan Stanley left the meeting. The Board and a representative of Fenwick & West then discussed the updated relationship disclosure that had been provided by Morgan Stanley, and the Board determined to re-engage Morgan Stanley and we subsequently executed an addendum to the engagement letter with Morgan Stanley on October 24, 2022 to reinstate the terms of such engagement letter. The Board then approved the use of the October Financial Forecast by Morgan Stanley in its financial analyses of the Proposed Transaction.

Later on October 23, 2022, representatives of Kirkland & Ellis sent to representatives of Fenwick & West initial drafts of each of the Equity Commitment Letters and Guaranties to be entered into by the Thoma Bravo Funds and by the Sunstone Partners Funds concurrently with the execution of the Merger Agreement. From October 24, 2022 through October 26, 2022, representatives from Fenwick & West and Kirkland & Ellis negotiated the Equity Commitment Letters and Guaranties.

On October 25, 2022, the Board held a meeting at which Mr. Pexton, Ms. Sabet and representatives of Fenwick & West and Morgan Stanley were present. At the meeting, Mr. MacMillan, Ms. Sabet and Morgan Stanley provided an update on the discussions with Thoma Bravo and Fenwick & West then led a discussion regarding material terms of the Merger Agreement and certain open issues, including the restrictions on the operation of our business following execution of the Merger Agreement.

On October 26, 2022, representatives of Kirkland & Ellis and representatives of Fenwick & West completed their negotiation of the Merger Agreement, Equity Commitment Letters and Guaranties.

On October 26, 2022, the Board held a meeting at which Mr. Pexton, Mses. Sabet and Huff and representatives of Fenwick & West and Morgan Stanley were present. Representatives of Morgan Stanley delivered to the Board its oral opinion, which was subsequently confirmed by delivery of a written opinion dated October 26, 2022, to the effect that, as of October 26, 2022, and based upon and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of review undertaken by Morgan Stanley as set forth in the written opinion, the per share consideration of $7.50 in cash to be received by the holders of shares of our common stock (other than holders of the Excluded Shares) pursuant to the Merger Agreement was fair from a financial point of view to such holders of shares of our common stock. Morgan Stanley's opinion is more fully described in the section of this proxy statement captioned "- Opinion of Morgan Stanley & Co. LLC." Representatives of Fenwick & West reviewed with the Board its fiduciary duties and summarized the key terms of the transaction, including the outcome of the negotiations with respect to the "go-shop" provision and the restrictions on the operation of our business following execution of the Merger Agreement. Following discussion and consideration of the Merger Agreement and the other transactions contemplated by the Merger Agreement (including the factors described in the section titled "- Reasons for the Merger; Recommendation of the Board"), the members of the Board unanimously (i) determined that it was in the best interests of us and our

38

TABLE OF CONTENTS

stockholders, and declared it advisable, to enter into the Merger Agreement; (ii) approved the execution and delivery of the Merger Agreement by us, the performance by us of our covenants and other obligations thereunder, and the consummation of the merger upon the terms and subject to the conditions set forth therein; (iii) recommended that our stockholders adopt the Merger Agreement in accordance with the DGCL; and (iv) directed that the adoption of the Merger Agreement be submitted for consideration by our stockholders at a meeting thereof. Further, the members of the Board reviewed and approved the equity commitment letters, the limited guaranties, our disclosure letter and other transaction documents. Representatives of Morgan Stanley then reviewed the proposed "go-shop" process, including providing a list of parties to be contacted by Morgan Stanley following announcement of the transaction, and the Board directed Morgan Stanley to contact these parties to determine whether they would be interested in evaluating an acquisition of our company.

Overnight on October 26, 2022, we and Thoma Bravo executed the Merger Agreement and delivered the executed Equity Commitment Letters and Limited Guaranties. After execution of the transaction agreements, we and Thoma Bravo issued a joint press release announcing the entry into the Merger Agreement before the opening of The New York Stock Exchange on October 27, 2022.

From October 27, 2022, after the transaction was announced, and through December 5, 2022, at the direction of the Board and the Transaction Committee, Morgan Stanley contacted 25 strategic counterparties and 19 financial sponsor counterparties regarding a potential acquisition of us in connection with the "go-shop" provision in the Merger Agreement. Over the course of this period, 22 of the strategic counterparties contacted, and all 19 of the financial sponsor counterparties contacted, affirmatively declined to further evaluate a potential transaction.

On December 10, 2022, at 11:59 p.m. Pacific Time, the go-shop period provided for in the Merger Agreement will expire.

**Recommendation of the Board of Directors and Reasons for the Merger**

*Recommendation of the Board of Directors*

**The Board carefully reviewed and considered the proposed Merger in consultation with UserTesting's management and legal and financial advisors and the Board has unanimously (i) determined that it is in the best interests of UserTesting and our stockholders, and declared it advisable, to enter into the Merger Agreement, (ii) approved the execution, delivery and performance of the Merger Agreement and the consummation of the transactions contemplated thereby, including the Merger, and (iii) resolved to recommend that our stockholders adopt the Merger Agreement and directed that such matter be submitted for the consideration of our stockholders at the Special Meeting.**

**The Board unanimously recommends that you vote: (1) "FOR" the adoption of the Merger Agreement and (2) "FOR" the adjournment of the Special Meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting.**

*Reasons for the Merger*

The Board carefully reviewed and considered the proposed Merger in consultation with our management and legal and financial advisors and the Board has unanimously (i) determined that it is in the best interests of us and our stockholders, and declared it advisable, to enter into the Merger Agreement, (ii) approved the execution, delivery and performance of the Merger Agreement and the consummation of the transactions contemplated thereby, and (iii) recommended that our stockholders adopt the Merger Agreement and directed that such matter be submitted for the consideration of our stockholders at a special meeting of our stockholders.

In reaching these decisions, the Board considered the following positive reasons to support the Merger Agreement and the transactions contemplated thereby:

- the fact that the price of $7.50 per share in cash payable in the Merger provides certainty, immediate value and liquidity to our stockholders;

TABLE OF CONTENTS

- the historical market prices, volatility and trading information with respect to shares of our common stock, including the fact that $7.50 per share to be received by our stockholders in the Merger constituted a premium of:
  - approximately 94% over the closing price of our common stock as of October 26, 2022, the last trading day before the public announcement of the Merger; and
  - approximately 96% over the average price of our common stock for the 30 trading days ended October 26, 2022;

- the current and prospective business environment in which we operate, including international, national and local economic conditions, the competitive environment, and the likely effect of these factors on us and the execution of our plans as a standalone company, including the risks of current increased economic and market uncertainty;

- the Board's belief that the $7.50 per share in cash payable in the Merger was more favorable to our stockholders on a risk-adjusted basis than the potential value that might result from other alternatives reasonably available to us, based upon the directors' extensive knowledge of our business, assets, financial condition and results of operations, the execution challenges that we potentially face, our historical and projected financial performance, and market dynamics, and the belief that the Merger represented an attractive and comparatively certain value for our stockholders relative to the risk-adjusted prospects for us on a standalone basis;

- the fact that the consideration to be paid in the Merger is payable solely in cash, which allows our stockholders to realize immediate liquidity and certainty of value in respect of their shares of common stock, while eliminating the effect on our stockholders of long-term business and execution risk;

- the results of our outreach, with the assistance of Morgan Stanley, to the strategic parties and financial sponsors that the Board believed would be most likely to be interested in evaluating a potential transaction and able to provide an attractive valuation;

- the potential negative risk to the business in the event that discussions regarding a potential acquisition should become publicly known;

- our right, pursuant to a go-shop period ending 11:59 p.m. Pacific Time on December 10, 2022, to solicit Alternative Acquisition Proposals from, and participate in discussions and negotiations with, third parties regarding Alternative Acquisition Proposals;

- the belief that, after multiple rounds of negotiations with Thoma Bravo and its representatives (as described in more detail under the section of this proxy statement captioned "- Background of the Merger"), $7.50 per share was the highest price that Thoma Bravo was willing to pay as of the date of execution of the Merger Agreement and that the terms of the Merger Agreement include the most favorable terms to us, in the aggregate, to which Thoma Bravo was willing to agree;

- the oral opinion of Morgan Stanley rendered to the Board, subsequently confirmed in writing, that, as of October 26, 2022, and based upon and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of review undertaken by Morgan Stanley as set forth therein, the $7.50 per share in cash to be received by holders of shares of our common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement was fair, from a financial point of view, to such holders of shares of our common stock, as more fully described below under the section of this proxy statement captioned "- Opinion of Morgan Stanley & Co. LLC," which full text of the written opinion is attached as Annex B to this proxy statement and is incorporated by reference in this proxy statement in its entirety;

- the fact that we have sufficient operating flexibility to conduct our business in the ordinary course prior to the consummation of the Merger;

- the conditions to closing contained in the Merger Agreement, which are limited in number and scope, and which, in the case of the condition related to the accuracy of our representations and warranties, is generally subject to a Company Material Adverse Effect (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Representations and Warranties") qualification;

TABLE OF CONTENTS

- the ability of the Board to furnish information to, and conduct negotiations with, third parties in certain circumstances, to terminate the Merger Agreement to accept a Superior Proposal upon payment of a termination fee of $33,880,000 (which the Board believed was reasonable under the circumstances) and to terminate the Merger Agreement to accept a Superior Proposal received prior to 11:59 p.m. Pacific Time on December 20, 2022 to enter into a definitive agreement with respect to a Superior Proposal received from certain parties upon payment of a reduced termination fee equal to $10,160,000;

- the End Date of April 26, 2023 (subject to extension under certain circumstances), which is expected to allow for sufficient time to complete the Merger;

- the availability of statutory appraisal rights to our stockholders who do not vote in favor of the adoption of the Merger Agreement and otherwise comply with all required procedures under the DGCL;

- the absence of a financing condition in the Merger Agreement, the obligations of Parent under the Merger Agreement to arrange and consummate the financing, and the limited number and nature of the conditions in the Financing Letters;

- our ability, under circumstances specified in the Merger Agreement and the Equity Commitment Letter, to specifically enforce Parent's obligation to cause the equity financing to be funded as contemplated by the Merger Agreement and the Equity Commitment Letter;

- the requirement that, in the event of a failure of the Merger to be consummated under certain circumstances, Parent will pay us a termination fee of $67,760,000, and the obligations of the Thoma Bravo Funds and the Sunstone Partners Funds under the Guaranties to fund such amount;

- representations by Parent in the Merger Agreement that it will have adequate resources to pay the merger consideration and other amounts required to consummate the Merger, taking into account the proceeds from the Financing Letters and our projected cash balance;

- our rights to specific performance under the terms and subject to the conditions set forth in the Merger Agreement; and

- the likelihood that the Merger would be consummated, in light of the experience, reputation and financial capabilities of Thoma Bravo and its equity financing sources.

In the course of its deliberations, the Board also considered, among other things, the following negative factors:

- the fact that we would no longer exist as an independent, publicly traded company and our stockholders would not benefit from any future growth potential or benefit from any future increase in our value as a private company;

- the possibility that the Merger will not be consummated and the potential negative effects on our business, operations, financial results and stock price;

- the potential negative effects of the public announcement of the Merger on our sales, operating results and stock price, its ability to retain key management, sales, engineering and other personnel, and its relationships with customers, suppliers and partners;

- the restrictions on the conduct of our business prior to the completion of the Merger, requiring us to conduct our business in the ordinary course and preventing us from taking certain specified actions, subject to specific limitations and exceptions, all of which may delay or prevent us from undertaking business opportunities pending completion of the Merger;

- the significant costs involved in connection with entering into the Merger Agreement and completing the Merger (many of which are payable whether or not the Merger is consummated) and the substantial time and effort of our management required to complete the Merger, which may disrupt our business operations and have a negative effect on its financial results;

- the conditions to the obligations of Parent to complete the Merger and the right of Parent to terminate the Merger Agreement under certain circumstances;

TABLE OF CONTENTS

- the fact that the Merger Agreement precludes us from actively soliciting Alternative Acquisition Proposals after the Go-Shop Period, and the possibility that we may be obligated to pay Parent a termination fee of $33,880,000, or $10,160,000 in the event that we terminate the Merger Agreement under certain circumstances;

- if Parent fails to complete the Merger as a result of the failure to obtain the financing under the Debt Commitment Letter or a breach of the Merger Agreement in certain circumstances, remedies are generally limited to the Parent termination fee payable by Parent as described above, which may be inadequate to compensate us for the damage caused, and if available, other rights and remedies may be expensive and difficult to enforce, and the success of any such action may be uncertain;

- the fact that completion of the Merger requires certain regulatory clearances, including under applicable antitrust laws, and the fact that even if obtained, these clearances may delay the completion of the Merger;

- the possible loss of our key management or other personnel during the pendency of the Merger;

- the risk of litigation;

- the fact that the consideration consists of cash and will therefore be taxable to our stockholders who are subject to taxation for U.S. federal income tax purposes; and

- the interests that certain of our directors and executive officers may have with respect to the Merger, in addition to their interests as our stockholders generally, as described in the section of this proxy statement captioned "The Merger - Interests of Executive Officers and Directors of UserTesting in the Merger."

The foregoing discussion of reasons for the recommendation to adopt the Merger Agreement is not meant to be exhaustive but addresses the material information and factors considered by the Board in consideration of their respective recommendations. In view of the wide variety of factors considered by the Board in connection with its evaluation of the Merger and the complexity of these matters, the Board did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific factors considered in reaching their respective determinations and recommendations. Rather, in considering the information and factors described above, individual members of the Board each applied his or her own personal business judgment to the process and may have given differing weights to differing factors. The Board based their respective unanimous recommendations on the totality of the information presented. The explanation of the factors and reasoning set forth above contain forward-looking statements that should be read in conjunction with the section of this proxy statement captioned "Forward-Looking Statements."

**Opinion of Morgan Stanley & Co. LLC**

UserTesting retained Morgan Stanley to provide it with financial advisory services and a financial opinion in connection with the possible sale of UserTesting. The Board of Directors selected Morgan Stanley to act as its financial advisor based on Morgan Stanley's qualifications, expertise and reputation, its extensive expertise and experience advising software companies in connection with potential strategic transactions (including but not limited to numerous transactions with Thoma Bravo), and its knowledge of UserTesting's business and affairs based on its longstanding relationship with UserTesting, including as a result of acting as UserTesting's lead underwriter in its initial public offering in November 2021. At the meeting of the Board of Directors on October 26, 2022, Morgan Stanley rendered its oral opinion, subsequently confirmed in writing, that, as of October 26, 2022, and based upon and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of review undertaken by Morgan Stanley as set forth in the written opinion, the $7.50 per share in cash to be received by holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement was fair from a financial point of view to such holders of shares of UserTesting common stock.

**The full text of the written opinion of Morgan Stanley, dated as of October 26, 2022, which sets forth, among other things, the assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of the review undertaken by Morgan Stanley in rendering its opinion, is attached to this proxy statement as Annex B and incorporated by reference in this proxy statement in its entirety. The summary**

TABLE OF CONTENTS

**of the opinion of Morgan Stanley in this proxy statement is qualified in its entirety by reference to the full text of the opinion. You are encouraged to read Morgan Stanley's opinion carefully and in its entirety. Morgan Stanley's opinion was directed to the Board of Directors, in its capacity as such, and addresses only the fairness from a financial point of view of the $7.50 per share in cash to be received by the holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement as of the date of the opinion and does not address the relative merits of the Merger as compared to any other alternative business transaction, or other alternatives, or whether or not such alternatives could be achieved or are available. It was not intended to, and does not, constitute an opinion or a recommendation as to how UserTesting stockholders should vote at the Special Meeting. The summary of the opinion of Morgan Stanley set forth below is qualified in its entirety by reference to the full text of the opinion.**

In connection with rendering its opinion, Morgan Stanley, among other things:

- reviewed certain publicly available financial statements and other business and financial information of UserTesting;

- reviewed certain internal financial statements and other financial and operating data concerning UserTesting;

- reviewed certain financial projections prepared by the management of UserTesting and certain extrapolations prepared with guidance from the management of UserTesting (which were reviewed and approved by the Board of Directors for Morgan Stanley's use);

- discussed the past and current operations and financial condition and the prospects of UserTesting with senior executives of UserTesting;

- reviewed the reported prices and trading activity for UserTesting common stock;

- compared the financial performance of UserTesting and the prices and trading activity of UserTesting common stock with that of certain other publicly-traded companies comparable with UserTesting, and their securities;

- reviewed the financial terms, to the extent publicly available, of certain comparable acquisition transactions;

- participated in certain discussions and negotiations among representatives of UserTesting, Parent and their legal advisors;

- reviewed a draft of the Merger Agreement dated as of October 26, 2022, drafts of each of the Equity Commitment Letters and the Guaranties, in each case substantially in the form of the drafts dated October 26, 2022, and certain related documents; and

- performed such other analyses, reviewed such other information and considered such other factors as Morgan Stanley deemed appropriate.

In arriving at its opinion, Morgan Stanley assumed and relied upon, without independent verification, the accuracy and completeness of the information that was publicly available or supplied or otherwise made available to Morgan Stanley by UserTesting, and formed a substantial basis for its opinion. With respect to the October Financial Forecast, Morgan Stanley assumed that they had been reasonably prepared on bases reflecting the best currently available estimates and judgments of UserTesting's management of the future financial performance of UserTesting. Morgan Stanley expressed no view as to such financial projections or the assumptions on which they were based. In addition, Morgan Stanley assumed that the Merger would be consummated in accordance with the terms set forth in the Merger Agreement without any waiver, amendment or delay of any terms or conditions, including among other things, that Parent will obtain financing in accordance with the terms set forth in the Equity Commitment Letters, and that the definitive merger agreement and Equity Commitment Letters would not differ in any material respect from the drafts thereof furnished to Morgan Stanley. Morgan Stanley assumed that, in connection with the receipt of all the necessary governmental, regulatory or other approvals and consents required for the proposed Merger, no delays, limitations, conditions or restrictions would be imposed that would have a material adverse effect on the contemplated benefits expected to be derived in the proposed Merger. Morgan Stanley is not a legal, tax or regulatory advisor. Morgan Stanley is a financial advisor only and relied upon, without independent verification, the assessment of UserTesting and its legal, tax or regulatory advisors with respect

43

TABLE OF CONTENTS

to legal, tax or regulatory matters. Morgan Stanley's opinion does not address the relative merits of the Merger as compared to any other alternative business transaction, or other alternatives, or whether or not such alternatives could be achieved or are available. Morgan Stanley expressed no opinion with respect to the fairness of the amount or nature of the compensation to any of UserTesting's officers, directors or employees, or any class of such persons, relative to the $7.50 per share in cash to be received by the holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) in the Merger. Morgan Stanley did not make any independent valuation or appraisal of the assets or liabilities of UserTesting, nor was Morgan Stanley furnished with any such valuations or appraisals. Morgan Stanley's opinion was necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to Morgan Stanley as of, October 26, 2022. Events occurring after October 26, 2022 may affect Morgan Stanley's opinion and the assumptions used in preparing it, and Morgan Stanley did not assume any obligation to update, revise or reaffirm its opinion.

### *Summary of Financial Analyses*

The following is a brief summary of the material analyses performed by Morgan Stanley in connection with its oral opinion as of October 26, 2022, subsequently confirmed in writing as of such date, to the Board of Directors. The following summary is not a complete description of Morgan Stanley's opinion or the financial analyses performed and factors considered by Morgan Stanley in connection with its opinion, nor does the order of analyses described represent the relative importance or weight given to those analyses. Some of these summaries of financial analyses include information presented in tabular format. In order to fully understand the financial analyses used by Morgan Stanley, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses. The analyses listed in the tables and described below must be considered as a whole; considering any portion of such analyses and the factors considered, without considering all analyses and factors, could create a misleading or incomplete view of the process underlying Morgan Stanley's opinion.

In performing the financial analyses summarized below and in arriving at its opinion, Morgan Stanley utilized and was directed by the Board of Directors to rely upon, among other matters, (i) the October Financial Forecast, which included extrapolations through calendar year 2036 prepared by Morgan Stanley that were reviewed and approved for Morgan Stanley's use by the Board of Directors, and (ii) certain estimates of equity research analysts available as of October 26, 2022, which included extrapolations through calendar year 2025 prepared by Morgan Stanley (the "Street Consensus"). The October Financial Forecast are more fully described below in the section of this proxy statement captioned "- Projections." In accordance with direction from the Board of Directors, Morgan Stanley utilized the Street Consensus and the October Financial Forecast in its financial analyses described below.

### *Public Trading Comparables Analysis*

Morgan Stanley performed a public trading comparables analysis, which attempts to provide an implied value of a company by comparing it to similar companies that are publicly traded. Morgan Stanley reviewed and compared certain financial estimates for UserTesting with comparable publicly available consensus equity analyst research estimates for companies, selected based on Morgan Stanley's professional judgment and experience, that share similar business characteristics and have certain comparable operating characteristics including, among other things, similarly sized revenue and/or revenue growth rates, market capitalizations, profitability, scale and/or other similar operating characteristics (these companies are referred to as the "comparable companies"). These comparable companies are identified below.

For purposes of this analysis, Morgan Stanley analyzed the ratio of aggregate value to estimated revenue for each of the comparable companies utilizing publicly available financial information from consensus equity analyst research estimates for calendar year 2023 (which ratio is referred to herein as "AV/CY2023E Revenue Multiple"). For purposes of its analyses, Morgan Stanley defined "aggregate value" as a company's fully diluted equity value plus total debt, less cash and cash equivalents.

The range of observed AV/CY2023E Revenue Multiples for the selected customer experience comparable companies was 2.7x to 6.0x, with a median observed multiple of 4.8x, and for the selected software financial

44

TABLE OF CONTENTS

comparable companies was 1.3x to 4.8x, with a median observed multiple of 2.5x. The following is a list of the selected comparable companies reviewed, together with the applicable multiples:

| Selected Comparable Company | AV/CY2023E Revenue Multiple |
|---|---|
| **Selected Customer Experience Comparable Companies** | |
| Amplitude, Inc. | 6.0x |
| Braze, Inc. | 5.6x |
| Qualtrics International Inc. | 4.0x |
| Sprinklr, Inc. | 2.7x |
| **Selected Software Financial Comparable Companies** | |
| BigCommerce Holdings, Inc. | 3.2x |
| CS Disco, Inc. | 2.5x |
| Couchbase, Inc. | 2.6x |
| Semrush Holdings, Inc. | 4.8x |
| Sumo Logic, Inc. | 1.9x |
| WalkMe Ltd. | 1.3x |

Based on an analysis of the relevant metrics for each of the comparable companies and upon the application of its professional judgment and experience, Morgan Stanley selected a representative range of AV/CY2023E Revenue Multiples of 2.0x - 4.0x and applied this range of multiples to the estimated revenue for UserTesting for calendar year 2023 based on the Street Consensus. In addition, for the purpose of this analysis, Morgan Stanley calculated UserTesting's aggregate value assuming UserTesting's net cash as of September 30, 2022 as provided by UserTesting's management. Based on the calculations set forth above and the outstanding shares of UserTesting common stock on a fully diluted basis as provided by UserTesting management on October 25, 2022, this analysis implied an estimated value per share of UserTesting common stock of $3.80 to $6.46.

No company utilized in the public trading comparables analysis is identical to UserTesting. In evaluating the comparable companies, Morgan Stanley made numerous assumptions with respect to industry performance, general business, regulatory, economic, market and financial conditions and other matters, many of which are beyond UserTesting's control. These include, among other things, the impact of competition on UserTesting's business and the industry generally, industry growth, and the absence of any adverse material change in the financial condition and prospects of UserTesting and the industry, and in the financial markets in general. Mathematical analysis (such as determining the average or median) is not in itself a meaningful method of using comparable company data.

*Discounted Equity Value Analysis*

Morgan Stanley performed a discounted equity value analysis, which is designed to provide insight into a theoretical estimate of the potential future equity value of a company as a function of such company's estimated future revenue. The resulting estimated future equity value is subsequently discounted back to the present day to arrive at an illustrative estimate of the implied present value for the company's common stock. In connection with this analysis, Morgan Stanley calculated a range of implied present equity values per share of UserTesting common stock on a standalone basis for each of the Street Consensus and October Financial Forecast.

To calculate the discounted equity value per share of UserTesting common stock, Morgan Stanley used calendar year 2025 estimated revenue of approximately $335 million based on the Street Consensus and approximately $348 million based on the October Financial Forecast. For each scenario, Morgan Stanley calculated the future-implied aggregate value of UserTesting as of December 31, 2024 by applying its public trading comparables analysis reference range for AV/CY2023E Revenue Multiples of 2.0x - 4.0x to UserTesting's calendar year 2025 estimated revenue based on each of the Street Consensus and the October

45

TABLE OF CONTENTS

Financial Forecast. In each case, Morgan Stanley then divided the future-implied aggregate value by estimated future diluted shares outstanding (with such estimates provided by UserTesting's management) to calculate a future implied equity value per share. Morgan Stanley then discounted the resulting future implied equity value per share to December 31, 2022 using a discount rate equal to UserTesting's assumed cost of equity of 13.5 percent, which cost of equity was selected based on the application of Morgan Stanley's professional judgment and experience. Based on these calculations, this analysis implied the following value ranges per share of UserTesting's common stock:

| Forecast Scenario | Implied Value Per Share Range of UserTesting Common Stock ($) |
|---|---|
| Street Consensus | 3.84 - 7.15 |
| October Financial Forecast | 4.08 - 7.51 |

### *Discounted Cash Flow Analysis*

Morgan Stanley performed a discounted cash flow analysis, which is designed to provide an implied value of a company by calculating the present value of the estimated future cash flows and terminal value of such company. Morgan Stanley calculated a range of fully diluted equity values per share for UserTesting common stock based on a discounted cash flow analysis to value UserTesting as a standalone entity. Morgan Stanley utilized estimates from the October Financial Forecast for purposes of its discounted cash flow analysis, as more fully described below.

Morgan Stanley first calculated the estimated unlevered free cash flow, which is defined as non-GAAP earnings before interest, taxes, depreciation and amortization (burdened by stock based compensation), less taxes and capital expenditures, and adjusted for changes in net working capital (excluding deferred revenue) and deferred revenue. To calculate terminal value, Morgan Stanley applied a range of perpetual growth rates of 3.0 percent to 4.0 percent, based on Morgan Stanley's professional judgment. Morgan Stanley then discounted the unlevered free cash flows and terminal value to present values as of December 31, 2022 using a range of discount rates from 12.5% to 14.5%, which discount rates were selected based on the application of Morgan Stanley's professional judgment and experience, to reflect an estimate of UserTesting's weighted average cost of capital. The resulting aggregate value was then adjusted to add net cash and further adjusted to add the net present value of net operating losses.

Based on the outstanding shares of UserTesting common stock on a fully diluted basis as provided by UserTesting's management on October 25, 2022, this analysis implied an estimated value per share of UserTesting common stock of $3.59 to $5.17.

### *Precedent Transactions Multiples Analysis*

Morgan Stanley performed a precedent transactions multiples analysis, which is designed to imply a value of a company based on publicly available financial terms, by reviewing publicly available statistics for selected comparable transactions. Such comparable transactions included certain software transactions since 2018 that were selected because they shared certain characteristics with the Merger, as determined based on the application of Morgan Stanley's professional judgment and experience. For each such transaction, Morgan Stanley noted the aggregate value of the transaction as a multiple of the estimated revenue of the target company for the twelve month period following the announcement date of the applicable transaction (which multiple is referred to herein as "AV/NTM Revenue Multiple").

TABLE OF CONTENTS

The following is the list of the selected software transactions reviewed:

| Selected Software Transactions (Target/Acquiror) | Announcement Date | AV/NTM Revenue Multiple |
|---|---|---|
| **_Strategic Acquirors_** | | |
| Callidus Software Inc. / SAP America, Inc. | 2018 | 8.3x |
| Carbon Black, Inc. / VMware, Inc. | 2019 | 8.0x |
| Carbonite, Inc. / Open Text Corporation | 2019 | 2.7x |
| Datto, Inc. / Kaseya Limited | 2022 | 8.3x |
| MobileIron, Inc. / Ivanti, Inc. | 2020 | 4.1x |
| VMware, Inc / Broadcom Inc. | 2022 | 4.7x |
| **_Financial Sponsor Acquirors_** | | |
| Apptio, Inc. / Vista Equity Partners Management, LLC | 2018 | 7.0x |
| Athenahealth, Inc. / Veritas Capital Fund Management, L.L.C. | 2018 | 3.9x |
| Avalara, Inc. / Vista Equity Partners Management, LLC | 2022 | 9.1x |
| Cambium Learning Group, Inc. / Veritas Capital Fund Management, L.L.C. | 2018 | 4.2x |
| CDK Global, Inc. / Brookfield Business Partners L.P. | 2022 | 4.5x |
| Cision Ltd. / Platinum Equity Advisors, LLC | 2019 | 3.5x |
| Citrix Systems, Inc. / Vista Equity Partners Management, LLC | 2022 | 5.0x |
| Cloudera, Inc. / Clayton Dubilier & Rice, LLC; Kohlberg Kravis Roberts & Co. L.P. | 2021 | 5.3x |
| Ellie Mae, Inc. / Thoma Bravo LLC | 2019 | 6.8x |
| Endurance International Group Holdings, Inc. / Clearlake Capital Group L.P. | 2020 | 2.7x |
| Forescout Technologies, Inc. / Advent International Corporation; Crosspoint Capital Partners, LP | 2020 | 4.9x |
| ForgeRock, Inc. / Thoma Bravo LP | 2022 | 8.3x |
| Imperva, Inc. / Thoma Bravo LLC | 2018 | 4.7x |
| Instructure, Inc. / Thoma Bravo LLC | 2019 | 6.6x |
| LogMeIn, Inc. / Francisco Partners Management L.P.; Evergreen Coast Capital Corporation | 2019 | 3.4x |
| McAfee Corp. / Advent International Corporation; Permira Advisers LLC; Crosspoint Capital Partners, L.P. | 2021 | 7.3x |
| MINDBODY, Inc. / Vista Equity Partners Management, LLC | 2018 | 6.8x |
| Ping Identity Holding Corp. / Thoma Bravo LP | 2022 | 7.9x |
| Pluralsight, Inc. / Vista Equity Partners Management, LLC | 2020 | 7.8x |
| Proofpoint, Inc. / Thoma Bravo LP | 2021 | 9.3x |
| QAD Inc. / Thoma Bravo LP | 2021 | 5.3x |
| RealPage, Inc. / Thoma Bravo LP | 2020 | 8.2x |
| Sophos Ltd. / Thoma Bravo LP | 2019 | 5.1x |
| Talend S.A. / Thoma Bravo LP | 2021 | 7.3x |
| Ultimate Software Group, Inc. / Hellman & Friedman LLC | 2019 | 8.2x |
| Zendesk, Inc. / Hellman & Friedman LLC; Permira Advisors LLC | 2022 | 5.4x |

TABLE OF CONTENTS

Based on its analysis of the AV/NTM Revenue Multiples for each of the transactions listed above and upon the application of its professional judgment and experience, Morgan Stanley selected a representative multiple range of 4.5x to 7.5x and applied this range to UserTesting's estimated calendar year 2023 revenue based on each of the Street Consensus and the October Financial Forecast. The results of this analysis were as follows:

| Forecast Scenario | Implied Value Per Share Range of UserTesting Common Stock ($) |
|---|---|
| Street Consensus | 7.12 - 11.10 |
| October Financial Forecast | 6.92 - 10.77 |

No company or transaction utilized in the precedent transactions analysis is identical to UserTesting or the Merger. In evaluating the precedent transactions, Morgan Stanley made numerous assumptions with respect to industry performance, general business, regulatory, economic, market and financial conditions and other matters, many of which are beyond UserTesting's control. These include, among other things, the impact of competition on UserTesting's business and the industry generally, industry growth, and the absence of any adverse material change in the financial condition and prospects of UserTesting and the industry, and in the financial markets in general, which could affect the public trading value of the companies and the aggregate value and fully diluted equity value of the transactions to which they are being compared. The fact that points in the range of implied present value per share of UserTesting derived from the valuation of precedent transactions were less than or greater than the $7.50 per share in cash to be received by the holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) is not necessarily dispositive in connection with Morgan Stanley's analysis of the consideration for the Merger, but is one of many factors Morgan Stanley considered.

### Other Information

Morgan Stanley observed additional factors that were not considered part of Morgan Stanley's financial analysis with respect to its opinion, but which were noted as reference data for the Board of Directors.

#### Illustrative Precedent Transaction Premiums

Morgan Stanley reviewed the premiums paid by acquirers in selected public software company transactions occurring in 2022 with an aggregate value greater than $1 billion. For each such transaction, Morgan Stanley noted the distributions of the following financial statistics, where available: (i) the implied premium to the acquired company's closing share price on the last trading day prior to announcement (or the last full trading day prior to the share price being affected by acquisition rumors or similar merger-related news); and (ii) the implied premium to the acquired company's 30-day average closing share price prior to announcement (or the last full trading day prior to the share price being affected by acquisition rumors or similar merger-related news).

Based on its analysis of the premia for such transactions and based upon the application of its professional judgment and experience, Morgan Stanley selected (i) a representative range of premia and applied such range to UserTesting's closing share price on October 26, 2022 and (ii) a representative range of premia and applied such range to UserTesting's closing share price during the 30 trading days prior to and including October 26, 2022.

The following table summarizes such calculations:

| Premia | Representative Range | Implied Value per Share Range of UserTesting Common Stock ($) |
|---|---|---|
| Premia to 1-Day Unaffected Share Price | 30% - 65% | 5.02 - 6.37 |
| Premia to 30-day Average Unaffected Share Price | 30% - 55% | 4.96 - 5.92 |

48

TABLE OF CONTENTS

*Historical Trading Ranges*

Morgan Stanley reviewed the historical trading range of UserTesting common stock for various periods ending on October 26, 2022. Morgan Stanley observed the following:

| Trading Periods | Historical Per Share Range of UserTesting Common Stock ($) |
| --- | --- |
| Last 30 Days ending on October 26, 2022 | 3.43 - 4.29 |
| Last 90 Days ending on October 26, 2022 | 3.43 - 6.42 |
| Since IPO on November 17, 2021 and ending on October 26, 2022 | 3.43 - 14.01 |

*Equity Research Analysts' Future Price Targets*

Morgan Stanley reviewed certain future public market trading price targets for UserTesting common stock prepared and published by equity research analysts prior to October 26, 2022. These targets reflected each analyst's estimate of the future public market trading price of UserTesting common stock. The range of undiscounted analyst price targets for the UserTesting common stock was $4.50 to $9.00 per share, with a median of $8.00 per share. Morgan Stanley then discounted the range of analyst price targets per share for the UserTesting common stock to December 31, 2022 at a rate of 13.5%, which was the discount rate selected by Morgan Stanley, upon the application of its professional judgment and experience, to reflect UserTesting's cost of equity. This analysis indicated an implied range of fully diluted equity values for UserTesting common stock of $4.06 to $8.12 per share.

The public market trading price targets published by equity research analysts do not necessarily reflect current market trading prices for UserTesting common stock, and these estimates are subject to uncertainties, including the future financial performance of UserTesting and future financial market conditions.

*Illustrative Leveraged Buyout Analysis.*

Morgan Stanley reviewed a hypothetical leveraged buyout analysis to determine the prices at which a financial sponsor might effect a leveraged buyout of UserTesting. Morgan Stanley based its analysis on the October Financial Forecast. Based on its professional judgment and experience, Morgan Stanley assumed (i) a transaction date of December 31, 2022 and an investment period ending December 31, 2027, (ii) a target range of annualized internal rates of return for the financial sponsor of 20% to 22.5%, (iii) a 21.4% debt-to-capitalization ratio, and balance sheet cash at December 31, 2022 of $165 million as provided by UserTesting's management as of September 30, 2022, (iv) a range from 3.0x to 4.0x applied to the estimated calendar year 2027 next twelve (12) month revenue exit multiples and (v) no synergies. Based on these calculations, this analysis indicated a range of implied equity value per share of UserTesting common stock of $5.43 to $7.47 per share.

**General**

In connection with the review of the Merger by the Board of Directors, Morgan Stanley performed a variety of financial and comparative analyses for purposes of rendering its opinion. The preparation of a financial opinion is a complex process and is not necessarily susceptible to a partial analysis or summary description. In arriving at its opinion, Morgan Stanley considered the results of all of its analyses as a whole and did not attribute any particular weight to any analysis or factor it considered. Morgan Stanley believes that selecting any portion of its analyses, without considering all analyses as a whole, would create an incomplete view of the process underlying its analyses and opinion. In addition, Morgan Stanley may have given various analyses and factors more or less weight than other analyses and factors, and may have deemed various assumptions more or less probable than other assumptions. As a result, the ranges of valuations resulting from any particular analysis described above should not be taken to be Morgan Stanley's view of the actual value of UserTesting. In performing its analyses, Morgan Stanley made numerous assumptions with respect to industry performance, general business, regulatory, economic, market and financial conditions and other matters, many of which are beyond UserTesting's control. These include, among other things, the impact of competition on UserTesting's business and the industry generally, industry growth, and the absence of any adverse material change in the financial condition and prospects of UserTesting and

49

TABLE OF CONTENTS

the industry, and in the financial markets in general. Any estimates contained in Morgan Stanley's analyses are not necessarily indicative of future results or actual values, which may be significantly more or less favorable than those suggested by such estimates.

Morgan Stanley conducted the analyses described above solely as part of its analysis of the fairness from a financial point of view of the $7.50 per share in cash to be received by the holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement and in connection with the delivery of its opinion dated as of October 26, 2022 to the Board of Directors. These analyses do not purport to be appraisals or to reflect the prices at which shares of UserTesting common stock might actually trade.

The $7.50 per share in cash to be received by the holders of shares of UserTesting common stock (other than the holders of the Excluded Shares) pursuant to the Merger Agreement was determined through arm's-length negotiations between UserTesting and Parent and was approved by the Board of Directors. Morgan Stanley provided advice to the Board of Directors during these negotiations but did not, however, recommend any specific consideration to UserTesting or the Board of Directors, nor did Morgan Stanley opine that any specific consideration constituted the only appropriate consideration for the Merger. Morgan Stanley's opinion did not address the relative merits of the Merger as compared to any other alternative business transaction, or other alternatives, or whether or not such alternatives could be achieved or are available. Morgan Stanley's opinion was not intended to, and does not, constitute an opinion or a recommendation as to how UserTesting stockholders should vote at the Special Meeting.

Morgan Stanley's opinion and its presentation to the Board of Directors was one of many factors taken into consideration by the Board of Directors to approve and adopt the Merger Agreement. Consequently, the analyses as described above should not be viewed as determinative of the opinion of the Board of Directors with respect to the consideration pursuant to the Merger Agreement or of whether the Board of Directors would have been willing to agree to a different consideration. Morgan Stanley's opinion was approved by a committee of Morgan Stanley investment banking and other professionals in accordance with Morgan Stanley's customary practice.

The Board of Directors retained Morgan Stanley based upon Morgan Stanley's qualifications, experience and expertise. Morgan Stanley is a global financial services firm engaged in the securities, investment management and individual wealth management businesses. Its securities business is engaged in securities underwriting, trading and brokerage activities, foreign exchange, commodities and derivatives trading, prime brokerage, as well as providing investment banking, financing and financial advisory services. Morgan Stanley, its affiliates, directors and officers may at any time invest on a principal basis or manage funds that invest, hold long or short positions, finance positions, and may trade or otherwise structure and effect transactions, for their own account or the accounts of their customers, in debt or equity securities or loans of UserTesting, Parent, Thoma Bravo and their respective affiliates, or any other company, or any currency or commodity, that may be involved in the Merger, or any related derivative instrument. In addition, Morgan Stanley, its affiliates, directors or officers, including individuals working with UserTesting in connection with the Merger, may have committed and may commit in the future to invest in private equity funds managed by Thoma Bravo or its affiliates and their affiliated funds' respective portfolio companies (which are referred to collectively herein as the "Thoma Bravo Related Entities") or in affiliates of Morgan Stanley that may hold direct equity and/or partnership interests in private equity funds managed by Thoma Bravo or the Thoma Bravo Related Entities.

Under the terms of its engagement letter, Morgan Stanley provided UserTesting financial advisory services and an opinion, described in this section and attached to this proxy statement as Annex B, in connection with the Merger, and UserTesting has agreed to pay Morgan Stanley a fee of approximately $20.4 million for its services, $3 million of which was earned following delivery of the opinion described in this section and attached to this proxy statement as Annex B and the remainder of which is contingent upon the consummation of the Merger. UserTesting has also agreed to reimburse Morgan Stanley for its expenses, including fees of outside counsel and other professional advisors, incurred in connection with its engagement. In addition, UserTesting has agreed to indemnify Morgan Stanley and its affiliates, its and their respective officers, directors, employees and agents and each other person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses related to, arising out of or in connection with Morgan Stanley's engagement, including certain liabilities under the federal securities laws.

TABLE OF CONTENTS

In the two years prior to the date of Morgan Stanley's opinion, Morgan Stanley and its affiliates have provided financial advisory and financing services for UserTesting and received aggregate fees of approximately $2 to $5 million in connection with such services. In the two years prior to the date of Morgan Stanley's opinion, Morgan Stanley and its affiliates have provided financing services for Thoma Bravo and the Thoma Bravo Related Entities, and have received aggregate fees of approximately $10 to $20 million in connection with such services. Morgan Stanley may also seek to provide financial advisory and financing services to UserTesting, Thoma Bravo, or the Thoma Bravo Related Entities and their respective affiliates in the future and would expect to receive fees for the rendering of these services. In addition, as of the date of Morgan Stanley's opinion, Morgan Stanley or one of its affiliates was a lender to certain portfolio companies of Thoma Bravo, and acted as administrative agent with respect to the credit facilities of two such portfolio companies, including UserZoom.

**Management Projections**

*Summary of Projections*

Except for financial outlooks with respect to the current fiscal quarter and year issued in connection with our ordinary course earnings announcements, we do not, as a matter of course, publicly disclose forecasts or projections as to future performance, earnings or other results due to the inherent unpredictability of the underlying assumptions, estimates and projections, especially over the longer term periods. In connection with the evaluation of the Merger, however, our management prepared the following preliminary financial forecasts:

- the October Financial Forecast, which was prepared by our management in October 2022 for the fiscal years ending December 31, 2022 through 2025 and included certain extrapolations prepared by Morgan Stanley for the fiscal years ending December 31, 2026 through 2036 with the guidance of our management; and

- the September Financial Forecast, which was prepared by our management in September 2022 for the fiscal years ending December 31, 2022 through 2025.

The October Financial Forecast and September Financial Forecast are referred to collectively as the "Management Projections".

The October Financial Forecast was provided to the Board in connection with its consideration of the Merger, and, at the direction of the Board, was used by Morgan Stanley in connection with its financial analysis for purposes of its fairness opinion (as described in more detail in the section of this proxy statement captioned "- Opinion of Morgan Stanley & Co. LLC"). The September 2022 Projections, together with our billings and revenue results for the third quarter of 2022 of approximately $46.4 million and $49.4 million, respectively, and our billings and revenue estimates for the fourth quarter of 2022 of approximately $54.3 million and $50.6 million, respectively, were provided to Parent and Merger Sub in connection with their due diligence review of our company.

The following tables present a summary of the Management Projections.

**October Financial Forecast**

| | Management Case | | | | Extrapolations | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CY2022E | CY2023E | CY2024E | CY2025E | CY2026E | CY2027E | CY2028E | CY2029E | CY2030E | CY2031E | CY2032E | CY2033E | CY2034E | CY2035E | CY2036E |
| Revenue | $194 | $220 | $264 | $348 | $449 | $567 | $703 | $853 | $1,013 | $1,178 | $1,339 | $1,489 | $1,617 | $1,714 | $1,774 |
| Gross Profit | $152 | $170 | $205 | $274 | $353 | $446 | $553 | $671 | $797 | $926 | $1,053 | $1,171 | $1,272 | $1,348 | $1,396 |
| EBITDA[1] | $(33) | $(26) | $(22) | $(14) | $(8) | $3 | $21 | $46 | $78 | $119 | $167 | $220 | $275 | $330 | $382 |
| uFCF[2] | $(59) | $(60) | $(48) | $(47) | $(50) | $(37) | $(16) | $16 | $57 | $106 | $151 | $173 | $192 | $208 | $217 |

(1) EBITDA is a non-GAAP financial measure defined as net loss or income adjusted to exclude interest, taxes, depreciation and amortization.

TABLE OF CONTENTS

(2)   uFCF (Unlevered Free Cash Flow) is a non-GAAP financial measure defined as EBITDA less stock-based compensation, taxes, capital expenditures and plus any decrease (and minus any increase) in net working capital and deferred revenue.

**September Financial Forecast**

| | CY2022E | CY2023E | CY2024E | CY2025E |
|---|---|---|---|---|
| Revenue | $ 195 | $ 242 | $ 308 | $ 412 |
| Gross Profit | $ 152 | $ 186 | $ 238 | $ 321 |
| Non-GAAP Net Income[1] | $ (40) | $ (21) | $ (14) | $  2 |
| Calculated Billings[2] | $ 213 | $ 261 | $ 341 | $ 455 |

(1)   Non-GAAP net income is a non-GAAP financial measure defined as net income, excluding the impact of stock-based compensation, amortization of intangibles, other non-operating income, benefit from income taxes and certain other items.

(2)   Calculated billings is a non-GAAP financial measure defined as total revenue plus the change in contract liabilities from the beginning to the end of the period, and is intended to reflect amounts invoiced to customers. 2022 Calculated Billings includes actual calculated billings of $50 million and $53 million for the quarters ended March 31, 2022 and June 30, 2022, respectively, and estimated calculated billings of $51 million and $60 million for the quarters ending September 30, 2022 and December 31, 2022, respectively.

*Important Information Regarding the Management Projections*

The Management Projections were developed by our management on a standalone basis without giving effect to the Merger and the other transactions contemplated by the Merger Agreement. Furthermore, the Management Projections do not take into account the effect of any failure of the transactions contemplated by the Merger Agreement to be completed and should not be viewed as accurate or continuing in that context. Although the Management Projections are presented with numerical specificity, they were based on numerous variables and assumptions made by our management with respect to industry performance, general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to our business, all of which are difficult or impossible to predict accurately and many of which are beyond our control. The Management Projections constitute forward-looking information and are subject to many risks and uncertainties that could cause actual results to differ materially from the results forecasted in the Management Projections, including, but not limited to, our performance, industry performance, general business and economic conditions, customer requirements, competition, adverse changes in applicable laws, regulations or rules, the ability to successfully pursue and complete acquisitions, and the various risks set forth in our reports filed with the SEC. There can be no assurance that the Management Projections will be realized or that actual results will not be significantly higher or lower than the Management Projections. The Management Projections cover several years, and such information by its nature becomes less reliable with each successive year. In addition, the Management Projections will be affected by our ability to achieve strategic goals, objectives and targets over the applicable periods. The Management Projections reflect assumptions as to certain business decisions that are subject to change and cannot, therefore, be considered a guarantee of future operating results, and this information should not be relied on as such. The inclusion of the Management Projections should not be regarded as an indication that we, Morgan Stanley, our and their respective officers, directors, affiliates, advisors, or other representatives or anyone who received this information then considered, or now considers, them a reliable prediction of future events, and this information should not be relied upon as such. The inclusion of the Management Projections in this proxy statement should not be regarded as an indication that the Management Projections will be necessarily predictive of actual future events. No representation is made by us or any other person regarding the Management Projections or our ultimate performance compared to such information. The Management Projections should be evaluated, if at all, in conjunction with the historical financial statements and other information about us contained in our public filings with the SEC. For more information, please see the section of this proxy statement captioned "Where You Can Find More Information." In light of the foregoing factors, and the uncertainties inherent in the Management Projections, our stockholders are cautioned not to place undue, if any, reliance on the Management Projections.

The Management Projections were not prepared with a view toward public disclosure or with a view toward complying with the published guidelines of the SEC regarding projections or accounting principles generally accepted in the United States ("GAAP"), or the guidelines established by the American Institute of

TABLE OF CONTENTS

Certified Public Accountants with respect to the preparation or presentation of prospective financial information. The Management Projections included in this proxy statement have been prepared by, and are the responsibility of, the Company's management. Ernst & Young LLP has not audited, reviewed, examined, compiled nor applied agreed-upon procedures with respect to the accompanying Management Projections and, accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto. The Ernst & Young LLP report incorporated by reference into this proxy statement relates to the Company's previously issued financial statements. It does not extend to the Management Projections and should not be read to do so.

EBITDA, unlevered free cash flow and non-GAAP net income contained in the Management Projections summarized above are "non-GAAP financial measures," which are financial performance measures that are not calculated in accordance with GAAP. The non-GAAP financial measures used in the Management Projections were relied upon by Morgan Stanley for purposes of its opinion and by the Board of Directors in connection with their evaluation of the Merger. The SEC rules which would otherwise require a reconciliation of a non-GAAP financial measure to a GAAP financial measure do not apply to non-GAAP financial measures included in disclosures relating to a proposed business combination such as the Merger if the disclosure is included in a document such as this proxy statement. In addition, reconciliations of non-GAAP financial measures were not relied upon by Morgan Stanley for purposes of its opinion or by the Board of Directors in connection with its evaluation of the Merger. Accordingly, we have not provided a reconciliation of the financial measures included in the Management Projections to the relevant GAAP financial measures. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by us may not be comparable to similarly titled amounts used by other companies. Furthermore, there are limitations inherent in non-GAAP financial measures because they exclude charges and credits that are required to be included in a GAAP presentation. Accordingly, these non-GAAP financial measures should be considered together with, and not as an alternative to, financial measures prepared in accordance with GAAP.

The summary of such information above is included solely to give our stockholders access to the information that was made available to the Board of Directors, Morgan Stanley, Parent and Merger Sub, and is not included in this proxy statement in order to influence any stockholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal rights with respect to their shares of our common stock. In addition, the Management Projections have not been updated or revised to reflect information or results after the date they were prepared or as of the date of this proxy statement, and except as required by applicable securities laws, we do not intend to update or otherwise revise the Management Projections or the specific portions presented to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even in the event that any or all of the underlying assumptions are shown to be in error.

**BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF THE MANAGEMENT PROJECTIONS, WE UNDERTAKE NO OBLIGATIONS TO UPDATE, OR PUBLICLY DISCLOSE ANY UPDATE TO, THE MANAGEMENT PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THE MANAGEMENT PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE MANAGEMENT PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE, EXCEPT AND ONLY TO THE EXTENT THAT MAY BE OTHERWISE REQUIRED BY APPLICABLE LAW.**

### Interests of Our Executive Officers and Directors in the Merger

In considering the recommendation of the Board of Directors that UserTesting stockholders vote to adopt the Merger Agreement, our stockholders should be aware that certain of our non-employee directors and executive officers have interests in the Merger that are different from, or in addition to, those of UserTesting stockholders generally. The Board of Directors was aware of and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement, approving the Merger Agreement and the Merger, and recommending that the Merger Agreement be adopted by our stockholders.

TABLE OF CONTENTS

*Certain Assumptions*

Except as otherwise specifically noted, for purposes of quantifying the potential payments and benefits described in this section, the following assumptions were used:

- The Effective Time is October 31, 2022, which is the assumed date of the Closing of the Merger solely for purposes of the disclosure in this section (the "Change in Control Date");

- The employment of each of our executive officers will have been terminated by us without "cause" or due to the executive officer's resignation for "good reason" (as such terms are defined in each of their Change in Control and Severance Agreements), in either case, immediately following the Change in Control Date; and

- The potential payments and benefits described in this section are not at a level subject to a "cutback" to avoid the "golden parachute" excise tax that may be imposed under Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code").

For purposes of this disclosure, (1) UserTesting's executive officers are: (i) Andy MacMillan, our President, Chief Executive Officer and Chairperson; (ii) Jon Pexton, our Chief Financial Officer; (iii) Mona Sabet, our Chief Corporate Strategy Officer; (iv) Kaj van de Loo, our Chief Technology Officer; (v) Michelle Huff, our Chief Marketing Officer; (vi) David Satterwhite, our Chief Revenue Officer; and (vii) Matthew Zelen, our Chief Operating Officer, and (2) UserTesting's named executive officers are: (i) Andy MacMillan; (ii) Jon Pexton; and (iii) David Satterwhite.

As the amounts provided below are estimates based on multiple assumptions that may or may not actually occur or be accurate as of the date referenced, the actual amounts, if any, that may be paid or become payable may materially differ from the amounts set forth below.

*Treatment and Quantification of Company Equity Awards*

**Company Options**

At the Effective Time, each Vested Company Option will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Vested Company Option by (y) the total number of shares of UserTesting common stock underlying such Vested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Vested Company Option is equal to or greater than the Per Share Merger Consideration, such Vested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof.

At the Effective Time, each Unvested Company Option will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per-share exercise price for such Unvested Company Option by (y) the total number of shares of UserTesting common stock underlying such Unvested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Unvested Company Option is equal to or greater than the Per Share Merger Consideration, such Unvested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company Option Consideration amounts will vest and become payable at the same time as the Unvested Company Option from which such Unvested Company Option Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time with respect to the receipt of the Unvested Company Option Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

TABLE OF CONTENTS

**Company RSUs**

At the Effective Time, each Vested Company RSU will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Vested Company RSU by (y) the Per Share Merger Consideration, subject to applicable withholding taxes.

At the Effective Time, each Unvested Company RSU will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Unvested Company RSU by (y) the Per Share Merger Consideration, subject to applicable withholding taxes. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company RSU Consideration amounts will vest and become payable at the same time as the Unvested Company RSU from which such Unvested Company RSU Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time with respect to the receipt of the Unvested Company RSU Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

***Quantification of Company Equity Awards***

At the Effective Time, each Company RSU (whether vested or unvested) held by a non-employee member of the Board of Directors is considered a Vested Company RSU and will convert into Merger Consideration in the manner described above. Based on the assumptions described above under the section of this proxy statement captioned "- Interests of Our Executive Officers and Directors in the Merger - Certain Assumptions," the estimated aggregate amounts that would become payable to UserTesting's six (6) non-employee directors in respect of their Vested Company RSUs is $645,337.50, which excludes any grants of Company RSUs that may be made by UserTesting to the non-employee directors following the date of this proxy statement.

At the Effective Time, each Unvested Company RSU and Unvested Company Option held by the executive officers will convert into cash awards of Unvested Company RSU Consideration and Unvested Company Option Consideration in the manner described above and will generally remain subject to the same vesting conditions and other terms and conditions as were applicable immediately prior to the Effective Time. Each award of Unvested Company RSU Consideration and Unvested Company Option Consideration will vest in the event that an executive officer experiences a termination of employment by UserTesting without "cause" or by the executive officer for "good reason," in either case, within three (3) months prior to the Change in Control Date or within twelve (12) months following the Change in Control Date.

***Change in Control and Severance Agreements***

Prior to the initiation of discussions and negotiations regarding the Merger Agreement, we entered into individual Change in Control and Severance Agreements (the "Severance Agreements") with each of our executive officers (other than with respect to our Chief Product Officer, who commenced employment shortly prior to the signing of the Merger Agreement, and entered into our standard form of Severance Agreement in the ordinary course of business and consistent with our prior practice for our executive officers), under which each of our executive officers is eligible to receive certain severance payments and benefits upon a qualifying termination of employment. The Severance Agreements generally provide that if the executive officer's employment is terminated by us without "cause" or the executive officer terminates his or her employment with "good reason," in either case, within three (3) months prior to the Change in Control Date or within twelve (12) months following the Change in Control Date, then the executive officer will be eligible to receive:

- a lump-sum cash severance amount equal to 100% of the executive officer's annual base salary;

TABLE OF CONTENTS

- an additional cash payment equal to a pro-rated portion of his or her annual target bonus (or the full target bonus in the case of our Chief Executive Officer);

- to the extent that the applicable executive officer elects continued coverage under COBRA, he or she will also receive a further cash payment in an amount equal to his or her COBRA premiums for twelve (12) months plus an additional amount designed to account for the fact that such payment is made on an after-tax basis; and

- accelerated vesting of 100% of the unvested shares subject to all outstanding equity compensation awards held by the executive officer immediately prior to such termination of employment, with performance-based equity awards vesting based on actual achievement or, if not yet determined, then at 100% of target achievement.

The provision of payments and benefits described above is conditioned upon the executive officer's execution of a release of claims. The Severance Agreement further provides that if an executive officer receives any amount that is subject to the "golden parachute" excise tax imposed pursuant to Section 280G and 4999 of the Code, the amount of the payments to be made to the executive officer will be reduced to the extent such reduction would result in a greater amount of after-tax proceeds.

*Vesting Acceleration*

At the Effective Time, the Unvested Company Options pursuant to the stock option agreement granted on June 4, 2020, by and between UserTesting and Mr. MacMillan will fully vest and accelerate and will be considered Vested Company Options.

*Equity Grants to Non-Employee Directors*

We may grant and issue up to 22,667 Company RSUs (in addition to any Permitted Equity Grants granted and issued) to our non-employee directors, on terms consistent with UserTesting's Independent Director Compensation Policy, in the event the Closing has not occurred on or prior to June 1, 2023.

*Compensation Arrangements with Parent*

As of the date of this proxy statement, none of our executive officers have discussed or entered into any agreement with Parent or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, Parent or one or more of its affiliates. Prior to or following the Closing of the Merger, however, some or all of our executive officers may discuss or enter into agreements with Parent or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, Parent or one or more of its affiliates.

*Indemnification and Insurance*

Pursuant to the terms of the Merger Agreement, our directors and executive officers will be entitled to certain ongoing indemnification and coverage for a period of six (6) years following the Effective Time under directors' and officers' liability insurance policies from the Surviving Corporation. This indemnification and insurance coverage is further described in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Indemnification and Insurance."

*Post-Closing Management of UserTesting and UserZoom*

In addition, upon completion of the Merger, it is anticipated that our Chief Executive Officer and, potentially, other members of our management team, will serve as members of the management team of the Surviving Corporation. Following the closing of the transaction, Thoma Bravo and Sunstone Partners intend to combine UserTesting and UserZoom. As of the date of this proxy statement, none of our executive officers has entered into any agreement with Parent or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates. Prior to and following the closing of the Merger, however, certain of our executive officers may have discussions, and following the closing of the Merger, may enter into agreements with, Parent or Merger

TABLE OF CONTENTS

Sub, their subsidiaries or their respective controlled affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates.

**Financing of the Merger**

We presently anticipate that the total funds needed to complete the Merger and the related transactions will be approximately $1.3 billion, which will be funded via equity and, potentially, debt financing described below together with our cash on hand as of the Closing Date.

Parent and Merger Sub have represented to us that, subject to the satisfaction of certain conditions set forth in the Merger Agreement, the equity financing contemplated by the Equity Commitment Letters, if funded in accordance with the Equity Commitment Letters, will, together with cash on hand, or other sources of immediately available funds, provide Parent with sufficient funds to pay the fees and expenses required to be paid at the Closing of the Merger by Parent and Merger Sub and Parent's other affiliates on the Closing Date. This includes funds needed to: (1) pay our stockholders the amounts due under the Merger Agreement for their UserTesting common stock, (2) make payments in respect of our outstanding Company Options and Company RSUs payable at the Closing of the Merger pursuant to the Merger Agreement; and (3) repayment or refinancing of certain indebtedness.

Parent and Merger Sub have obtained committed financing consisting of equity to be provided by the Thoma Bravo Funds and the Sunstone Partners Funds pursuant to the terms of their respective Equity Commitment Letters. In connection with the Merger Agreement, Parent and Merger Sub have delivered to us copies of the Equity Commitment Letters. Notwithstanding anything in the Merger Agreement to the contrary, in no event shall the receipt or availability of any funds or financing (including the financing contemplated by the Equity Commitment Letters or any debt financing) by or to Parent or any of its affiliates or any other financing transaction be a condition precedent to any of the obligations of Parent or Merger Sub under the Merger Agreement.

*Equity Financing*

Pursuant to the Equity Commitment Letters, the Thoma Bravo Funds and the Sunstone Partners Funds have each committed to contribute or cause to be contributed to Parent at the Closing of the Merger certain equity financing for the purpose of funding the Required Amounts. We refer to the equity financing described in the preceding sentence as the "Equity Financing." The obligations of the Thoma Bravo Funds and the Sunstone Partners Funds to provide the Equity Financing under the Equity Commitment Letters are subject to a number of conditions, including, but not limited to: (i) the execution and delivery of the Merger Agreement, (ii) the satisfaction or written waiver (to the extent permitted under the Merger Agreement) by the parties, as applicable, of each of the conditions to the parties' obligations to consummate the Merger contemplated by the Merger Agreement (other than any conditions that by their nature are to be satisfied at the Closing, but subject to the prior or substantially concurrent satisfaction of such conditions), and the substantially concurrent consummation of the Merger in accordance with the terms of the Merger Agreement and (iii) no material amendment or modification of the Merger Agreement, unless Parent has consented in writing to such amendment or modification.

The obligation of each of the Thoma Bravo Funds and the Sunstone Partners Funds to fund the equity commitment will automatically and immediately terminate upon the earliest to occur of: (i) the consummation of the Closing and the payment of the aggregate Per Share Merger Consideration payable at the Closing in accordance with the Merger Agreement, (ii) the termination of the Merger Agreement in accordance with its terms, and (iii) the occurrence of any event which, by the terms of the Guaranties, is an event which terminates the guarantors' obligations or liabilities under their respective Guaranties.

We are an intended and express third-party beneficiary of the Equity Commitment Letters solely with respect to the right to cause Parent to enforce, and to enforce against the other investors party thereto, the commitment under the Equity Commitment Letters to be funded to Parent in accordance with the applicable Equity Commitment Letter, in each case subject to (i) the limitations and conditions set forth in the Equity Commitment Letters and (ii) the terms and conditions of the Merger Agreement.

57

TABLE OF CONTENTS

*Guaranties*

Pursuant to the Guaranties, the Thoma Bravo Funds and the Sunstone Partners Funds together have agreed to guarantee the due, punctual and complete payment and performance of: (1) the aggregate amount of the Parent Termination Fee (as defined in the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - Termination Fee") if and when any of the Parent Termination Fee is payable pursuant to the Merger Agreement (with the Thoma Bravo Funds covering 83.33% and the Sunstone Partners Funds covering the remaining 16.67%); (2) any out-of-pocket fees, costs and expenses of enforcement due by Parent pursuant to legal proceedings as a result of certain defaults under the Merger Agreement together with interest on the amount of the Parent Termination Fee, if due pursuant to the terms of the Merger Agreement (with the Thoma Bravo Funds covering 83.33% and the Sunstone Partners Funds covering the remaining 16.67%); and (3) the reimbursement obligations of Parent pursuant to the indemnification obligations of UserTesting and our representatives in connection with any debt financing (with the Thoma Bravo Funds covering 83.33% and the Sunstone Partners Funds covering the remaining 16.67%). We refer to the obligations set forth in the preceding sentence as the "Guaranteed Obligations." The obligations of the Thoma Bravo Funds under the Guaranties are subject to an aggregate cap equal to $56,464,408 and the obligations of the Sunstone Partners Funds under the Guaranties are subject to an aggregate cap equal to $11,295,592.

Subject to specified exceptions, the applicable Guaranty will terminate upon the earliest of:

- funding of the equity commitments as set forth in the applicable Equity Commitment Letter;

- the Effective Time;

- the date that is thirty (30) days following the valid termination of the Merger Agreement in accordance with its terms, other than a termination pursuant to which we would be entitled to the Parent Termination Fee under the Merger Agreement, in which case the Guaranty shall terminate ninety (90) days after such termination unless we shall have delivered a written notice with respect to the Guaranteed Obligations prior to such ninetieth (90th) day; provided that if the Merger Agreement has been so terminated and such notice has been provided, the Thoma Bravo Funds or Sunstone Partners Funds, as applicable, as the guarantor entities under the Guaranty, shall have no further liability or obligation under the applicable Guaranty from and after the earliest of (x) the Closing of the Merger, including payment of the aggregate Per Share Merger Consideration payable at the Closing of the Merger in accordance with the Merger Agreement, (y) a final, non-appealable order of a court of competent jurisdiction determining that the Thoma Bravo Funds or Sunstone Partners Funds, as applicable, as the guarantor entities under the applicable Guaranty, do not owe any amount under such Guaranty and (z) a written agreement between the Thoma Bravo Funds or Sunstone Partners Funds, as applicable, as the guarantor entities under the applicable Guaranty, and us terminating the obligations and liabilities of the Thoma Bravo Funds or Sunstone Partners Funds, as applicable, as the guarantor entities under the applicable Guaranty, pursuant to such Guaranty; and

- payment of the portion of the Guaranteed Obligations validly claimed as payable by us by or on behalf of the Thoma Bravo Funds or the Sunstone Partners Funds, as applicable, as the guarantor entities under the applicable Guaranty, to Parent and/or Merger Sub.

*Debt Financing*

Pursuant to the Merger Agreement, to the extent reasonably requested by Parent in writing and prior to the Closing Date, we will use our reasonable best efforts to provide, and to cause our subsidiaries (and our respective representatives) to use their reasonable best efforts to provide, subject to certain exceptions, customary cooperation to Parent and Merger Sub, in each case at Parent's sole cost and expense in connection with the arrangement of the potential debt financing for the transactions contemplated by the Merger Agreement.

**Closing and Effective Time**

The Closing of the Merger will take place at 5:00 a.m., Pacific Time, on the second (2nd) business day following the satisfaction or waiver of all conditions to Closing of the Merger (as described in the section of

TABLE OF CONTENTS

this proxy statement captioned, "Proposal 1: Adoption of the Merger Agreement - Conditions to the Closing of the Merger"), other than conditions that by their terms are to be satisfied at the Closing but subject to the satisfaction or waiver of such conditions.

**Appraisal Rights**

If the Merger is consummated, UserTesting stockholders and beneficial owners who continuously hold or own shares of UserTesting common stock through the Effective Time, who do not vote in favor of the adoption of the Merger Agreement, who properly demand appraisal of their shares and who do not withdraw their demands or otherwise lose their rights of appraisal will be entitled to seek appraisal of their shares in connection with the Merger under Section 262 the DGCL ("Section 262"). The following discussion is not a complete statement of the law pertaining to appraisal rights under the DGCL and is qualified in its entirety by the full text of Section 262, which is attached to this proxy statement as Annex C and incorporated herein by reference. The following summary does not constitute any legal or other advice and does not constitute a recommendation that record holders or beneficial owners of UserTesting common stock exercise their appraisal rights under Section 262.

Any person contemplating the exercise of such appraisal rights should carefully review the provisions of Section 262, which is attached hereto as Annex C, particularly the procedural steps required to properly demand and perfect such rights. Failure to follow the steps required by Section 262 for demanding and perfecting appraisal rights may result in the loss of such rights. All references in Section 262 and in this summary to a (i) "stockholder" are to the record holder of shares of UserTesting common stock unless otherwise expressly noted herein, (ii) "beneficial owner" are to a person who is the beneficial owner of shares of UserTesting common stock held either in voting trust or by a nominee on behalf of such person, and (iii) "person" are to an individual, corporation, partnership, unincorporated association or other entity.

Under Section 262, if the Merger is completed, UserTesting stockholders and beneficial owners who: (i) properly submit a written demand for appraisal of their shares; (ii) do not submit a proxy or otherwise vote in favor of the adoption of the Merger Agreement; (iii) hold or own such shares upon the making of a demand under clause (i) and continue to hold or own their shares through the Effective Time; (iv) do not thereafter withdraw their demand for appraisal of their shares or otherwise lose their appraisal rights, each in accordance with the DGCL; and (v) otherwise exactly follow the procedures set forth in Section 262, may be entitled to have their shares appraised by the Delaware Court of Chancery and to receive payment in cash of the "fair value" of the shares of UserTesting common stock, exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with interest to be paid on the amount determined to be "fair value," if any, as determined by the court. A beneficial owner may, in such person's name, demand in writing an appraisal of such beneficial owner's shares in accordance with the procedures of subsection (d) (1) of Section 262 summarized above, provided that (i) such beneficial owner continuously owns such shares through the Effective Time and otherwise satisfies the requirements applicable to a stockholder under the first sentence of subsection (a) of Section 262, and (ii) the demand made by such beneficial owner reasonably identifies the holder of record of the shares for which the demand is made, is accompanied by documentary evidence of such beneficial owner's beneficial ownership of stock and a statement that such documentary evidence is a true and correct copy of what it purports to be, and provides an address at which such beneficial owner consents to receive notices given by the Surviving Corporation under Section 262 and to be set forth on the Verified List (defined below). The shares of UserTesting common stock are currently listed on a national securities exchange, and, assuming such shares remain listed on a national securities exchange immediately prior to the Merger (which we expect to be the case), after an appraisal petition has been filed, the Delaware Court of Chancery will dismiss appraisal proceedings as to all persons who have asserted appraisal rights unless (a) the total number of shares entitled to appraisal exceeds 1% of the outstanding shares of UserTesting common stock eligible for appraisal as measured in accordance with subsection (g) of Section 262; or (b) the value of the aggregate Per Share Merger Consideration provided for such total number of shares exceeds $1 million (conditions (a) and (b) referred to as the "ownership thresholds").

Unless the Delaware Court of Chancery, in its discretion, determines otherwise for good cause shown, interest on an appraisal award from the effective date of the Merger through the date of payment of the judgment will compound quarterly and accrue at 5% over the Federal Reserve System (the "Federal Reserve")

TABLE OF CONTENTS

discount rate (including any surcharge) as established from time to time during the period between the Effective Time and the date the judgment is paid. However, at any time before the Delaware Court of Chancery enters judgment in the appraisal proceedings, the Surviving Corporation may voluntarily pay to each person entitled to appraisal an amount in cash pursuant to subsection (h) of Section 262, in which case interest will accrue after the time of such payment as provided herein only on the sum of (i) the difference, if any, between the amount so paid and the "fair value" of the shares as determined by the Delaware Court of Chancery, and (ii) any interest accrued prior to the time of such voluntary cash payment, unless paid at that time. The Surviving Corporation is under no obligation to make such voluntary cash payment prior to such entry of judgment. Persons considering seeking appraisal should be aware that the "fair value" of their shares as determined pursuant to Section 262 of the DGCL could be more than, the same as, or less than the value of the Per Share Merger Consideration that they would receive pursuant to the Merger Agreement if they did not seek appraisal of their shares.

Under Section 262, where a merger agreement is to be submitted for adoption at a meeting of stockholders, the corporation, not less than twenty (20) days prior to the meeting, must notify each of its stockholders who was such on the record date for notice of such meeting with respect to shares for which appraisal rights are available that appraisal rights are available and include in the notice a copy of Section 262 or information directing the stockholders to a publicly available electronic resource at which Section 262 may be accessed without subscription or cost. This proxy statement constitutes UserTesting's notice to our stockholders that appraisal rights are available in connection with the Merger, and the full text of Section 262 is attached to this proxy statement as Annex C. In connection with the Merger, any person who wishes to exercise appraisal rights, or who wishes to preserve his, her or its right to do so, should review Annex C carefully. Failure to strictly comply with the requirements of Section 262 in a timely and proper manner may result in the loss of appraisal rights under the DGCL. A person who loses his, her or its appraisal rights will be entitled to receive the Per Share Merger Consideration described in the Merger Agreement. Moreover, because of the complexity of the procedures for exercising the right to seek appraisal, we believe that if a person considers exercising such rights, that person should seek the advice of legal counsel.

UserTesting stockholders and beneficial owners wishing to exercise the right to seek an appraisal of their shares of UserTesting common stock must do **ALL** of the following:

- the person must not vote in favor of the proposal to approve and adopt the Merger Agreement;

- the person must deliver to us a written demand for appraisal before the vote is taken on the proposal to approve and adopt the Merger Agreement at the Special Meeting;

- the person must continuously hold the shares upon the making of the demand through the Effective Time (a person will lose appraisal rights if the person transfers the shares before the Effective Time); and

- the person or the Surviving Corporation must file a petition in the Delaware Court of Chancery requesting a determination of the "fair value" of the shares within one hundred twenty (120) days after the Effective Time. The Surviving Corporation is under no obligation to file any petition and has no intention of doing so.

In addition, one of the ownership thresholds must be met.

Because a proxy that does not contain voting instructions will, unless timely revoked, be voted in favor of the adoption of the Merger Agreement, a stockholder who votes by proxy and who wishes to exercise appraisal rights should not return a blank proxy, but rather must vote against the adoption of the Merger Agreement, abstain or not vote his, her or its shares. Beneficial owners should consult with their bank, broker or other nominee regarding methods of voting.

*Filing Written Demand*

Any UserTesting stockholder or beneficial owner wishing to exercise appraisal rights must deliver to us, before the vote on the adoption of the Merger Agreement at the Special Meeting at which the proposal to adopt the Merger Agreement will be submitted for stockholder approval, a written demand for the appraisal of such person's shares, and that person must not vote or submit a proxy in favor of the adoption of the Merger Agreement. A person exercising appraisal rights must hold the shares for which they will seek

TABLE OF CONTENTS

appraisal upon the making of the demand for appraisal and must continue to hold the shares through the Effective Time. A proxy that is submitted and does not contain voting instructions will, unless timely revoked, be voted in favor of the adoption of the Merger Agreement and will therefore constitute a waiver of the person's right of appraisal and nullify any previously delivered written demand for appraisal. Therefore, a person who submits a proxy and who wishes to exercise appraisal rights must ensure that the proxy submitted contains instructions to vote against the adoption of the Merger Agreement or to abstain from voting. Neither voting against the adoption of the Merger Agreement nor abstaining from voting on the proposal to adopt the Merger Agreement will, in and of itself, constitute a written demand for appraisal satisfying the requirements of Section 262. The written demand for appraisal must be in addition to and separate from any proxy or vote on the adoption of the Merger Agreement. A stockholder's or beneficial owner's failure to make the written demand prior to the taking of the vote on the adoption of the Merger Agreement at the Special Meeting will constitute a waiver of appraisal rights.

*Record Holders*

A demand for appraisal in respect of shares of UserTesting common stock by a holder of record must be executed by or on behalf of the holder of record, and must reasonably inform us of the identity of the holder and state that the person intends thereby to demand appraisal of the holder's shares in connection with the Merger. If the shares are owned of record in a fiduciary or representative capacity, such as by a trustee, guardian or custodian, such demand must be executed by or on behalf of the record owner, and if the shares are owned of record by more than one (1) person, as in a joint tenancy and tenancy in common, the demand must be executed by or on behalf of all joint owners. An authorized agent, including an authorized agent for two (2) or more joint owners, may execute a demand for appraisal on behalf of a holder of record; however, the agent must identify the record owner or owners and expressly disclose that, in executing the demand, the agent is acting as agent for the record owner or owners. A holder of record, such as a brokerage firm, bank, trust or other nominee, who holds shares of UserTesting common stock as nominee or intermediary for one or more beneficial owners may exercise appraisal rights with respect to shares of UserTesting common stock held for one (1) or more beneficial owners while not exercising appraisal rights for other beneficial owners. In that case, the written demand should state the number of shares of UserTesting common stock as to which appraisal is sought. Where no number of shares of UserTesting common stock is expressly mentioned, the demand will be presumed to cover all shares of UserTesting common stock held in the name of the holder of record.

*Beneficial Owners*

A beneficial owner may, in such person's name, demand in writing an appraisal of such beneficial owner's shares in accordance with the procedures of subsection (d)(1) of Section 262 summarized above, provided that (i) such beneficial owner continuously owns such shares through the Effective Time and otherwise satisfies the requirements applicable to a stockholder under the first sentence of subsection (a) of Section 262, and (ii) the demand made by such beneficial owner reasonably identifies the holder of record of the shares for which the demand is made, is accompanied by documentary evidence of such beneficial owner's beneficial ownership of stock and a statement that such documentary evidence is a true and correct copy of what it purports to be, and provides an address at which such beneficial owner consents to receive notices given by the Surviving Corporation under Section 262 and to be set forth on the Verified List (defined below). Although not expressly required by Section 262, we reserve the right to take the position that we may require the submission of all information required of a beneficial owner under subsection (d)(3) of Section 262 with respect to any person sharing beneficial ownership of the shares for which such demand is submitted.

All written demands for appraisal pursuant to Section 262 should be mailed or delivered to:

UserTesting, Inc.
Attention: Corporate Secretary
144 Townsend Street
San Francisco, California 94107

Any person entitled to appraisal rights who has delivered a written demand to us and who has not commenced an appraisal proceeding or joined that proceeding as a named party may withdraw his, her or

TABLE OF CONTENTS

its demand for appraisal and accept the Per Share Merger Consideration by delivering to us a written withdrawal of the demand for appraisal at any time within sixty (60) days after the Effective Time of the Merger. No appraisal proceeding in the Delaware Court of Chancery will be dismissed as to any person without the approval of the Delaware Court of Chancery, and such approval may be conditioned upon such terms as the Delaware Court of Chancery deems just; provided, however, that this shall not affect the right of any person who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such person's demand for appraisal and to accept the Per Share Merger Consideration within sixty (60) days after the Effective Time. If an appraisal proceeding is commenced, except with respect to any person who withdraws such person's demand in accordance with the proviso in the immediately preceding sentence, if the Delaware Court of Chancery does not approve the dismissal of an appraisal proceeding with respect to a UserTesting stockholder or beneficial owner, such stockholder or beneficial owner will be entitled to receive only the appraised value determined in any such appraisal proceeding, which value could be less than, equal to or more than the Per Share Merger Consideration.

***Notice by the Surviving Corporation***

If the Merger is completed, within ten (10) days after the Effective Time, the Surviving Corporation will notify each UserTesting stockholder who has properly made a written demand for appraisal pursuant to Section 262 and who has not voted in favor of the adoption of the Merger Agreement, and any beneficial owner who has demanded appraisal under subsection (d)(3) of Section 262, of the effective date of the Merger.

***Filing a Petition for Appraisal***

Within one hundred twenty (120) days after the Effective Time, but not thereafter, the Surviving Corporation or any person who has complied with Section 262 and is entitled to seek appraisal under Section 262 (including for this purpose any beneficial owner of the relevant shares) may commence an appraisal proceeding by filing a petition in the Delaware Court of Chancery, with a copy served on the Surviving Corporation in the case of a petition filed by a UserTesting stockholder or beneficial owner, demanding a determination of the "fair value" of the shares held by all such persons. The Surviving Corporation is under no obligation, and has no present intention, to file a petition, and no person should assume that the Surviving Corporation will file a petition or initiate any negotiations with respect to the "fair value" of the shares of UserTesting common stock. Accordingly, any UserTesting stockholders or beneficial owners who desire to have their shares appraised should initiate all necessary action to perfect their appraisal rights in respect of their shares of UserTesting common stock within the time and in the manner prescribed in Section 262. The failure of a record holder or beneficial owner of UserTesting common stock to file such a petition within the period specified in Section 262 could nullify such person's previous written demand for appraisal.

Within one hundred twenty (120) days after the Effective Time, any person who has complied with the requirements of Section 262 and who is entitled to appraisal rights thereunder will be entitled, upon written request, to receive from the Surviving Corporation a statement setting forth the aggregate number of shares not voted in favor of the adoption of the Merger Agreement and with respect to which we have received demands for appraisal, and the aggregate number of stockholders or beneficial owners holding or owning such shares (provided that, where a beneficial owner makes a demand on his, her or its own behalf, the record holder of such shares shall not be considered a separate stockholder holding such shares for purposes of such aggregate number). The Surviving Corporation must mail this statement to the requesting UserTesting stockholder within ten (10) days after receipt by the Surviving Corporation of the written request for such a statement or within ten (10) days after the expiration of the period for delivery of demands for appraisal, whichever is later. A beneficial owner of shares of UserTesting common stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition seeking appraisal or request from the Surviving Corporation the foregoing statements.

If a petition for an appraisal is duly filed by any person other than the Surviving Corporation and a copy thereof is served upon the Surviving Corporation, the Surviving Corporation will then be obligated within twenty (20) days after such service to file with the Delaware Register in Chancery a duly verified list (the "Verified List") containing the names and addresses of all persons who have demanded appraisal for their

62

TABLE OF CONTENTS

shares and with whom agreements as to the value of their shares have not been reached. Upon the filing of any such petition, the Delaware Court of Chancery may order that notice of the time and place fixed for the hearing on the petition be mailed to the Surviving Corporation and all of the persons shown on the Verified List at the addresses stated therein. The form of the notice by mail shall be approved by the Delaware Court of Chancery, and the costs thereof shall be borne by the Surviving Corporation.

After notice to the persons shown on the Verified List as required by the court, the Delaware Court of Chancery is empowered to conduct a hearing on the petition to determine those persons who have complied with Section 262 and who have become entitled to appraisal rights thereunder. The Delaware Court of Chancery may require persons who have demanded an appraisal for their shares and who hold stock represented by certificates (if any) to submit their stock certificates to the Delaware Register in Chancery for notation thereon of the pendency of the appraisal proceedings and, if any person fails to comply with the direction, the Delaware Court of Chancery may dismiss the proceedings as to such person. In addition, assuming the UserTesting common stock remained listed on a national securities exchange immediately prior to the effective time of the Merger, the Delaware Court of Chancery will dismiss appraisal proceedings as to all persons who have asserted appraisal rights if neither of the ownership thresholds is met.

### Determination of "Fair Value"

After determining persons entitled to appraisal and that at least one of the ownership thresholds described above has been satisfied as to the persons seeking appraisal rights, the appraisal proceeding will be conducted in accordance with the rules of the Delaware Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding, the Delaware Court of Chancery will determine the "fair value" of the shares of UserTesting common stock, exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with interest, if any, to be paid upon the amount determined to be the "fair value." In determining "fair value," the Delaware Court of Chancery will take into account all relevant factors. Unless the court in its discretion determines otherwise for good cause shown, interest from the Effective Time through the date of payment of the judgment will compound quarterly and accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the Effective Time and the date the judgment is paid. However, at any time before the Delaware Court of Chancery enters judgment in the appraisal proceedings, the Surviving Corporation may pay to each person entitled to appraisal an amount in cash, in which case such interest will accrue after the time of such payment only on the sum of (i) the difference, if any, between the amount so paid and the "fair value" of the shares as determined by the Delaware Court of Chancery, and (ii) interest accrued prior to the time of such voluntary payment, unless paid at that time.

In *Weinberger* v. *UOP, Inc.*, the Supreme Court of Delaware discussed the factors that could be considered in determining "fair value" in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered, and that "[f]air price obviously requires consideration of all relevant factors involving the value of a company." The Supreme Court of Delaware stated that, in making this determination of "fair value," the court must consider market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts that could be ascertained as of the date of the Merger that throw any light on future prospects of the merged corporation. Section 262 provides that "fair value" is to be "exclusive of any element of value arising from the accomplishment or expectation of the Merger." In *Cede & Co. v. Technicolor, Inc.*, the Supreme Court of Delaware stated that such exclusion is a "narrow exclusion [that] does not encompass known elements of value," but which rather applies only to the speculative elements of value arising from such accomplishment or expectation. In *Weinberger*, the Supreme Court of Delaware also stated that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the Merger and not the product of speculation, may be considered."

Persons considering seeking appraisal should be aware that the "fair value" of their shares as so determined by the Delaware Court of Chancery could be more than, the same as or less than the Per Share Merger Consideration they would receive pursuant to the Merger if they did not seek appraisal of their shares and that an opinion of an investment banking firm as to the fairness from a financial point of view of the Per Share Merger Consideration payable in a Merger is not an opinion as to, and may not in any manner

63

TABLE OF CONTENTS

address, "fair value" under Section 262. **No representation is made as to the outcome of the appraisal of "fair value" as determined by the Delaware Court of Chancery, and persons seeking appraisal should recognize that such an appraisal could result in a determination of a value higher or lower than, or the same as, the Per Share Merger Consideration.** Neither UserTesting nor Parent intends offering more than the Per Share Merger Consideration to any person exercising appraisal rights, and each of UserTesting and Parent reserves the rights to make a voluntary cash payment pursuant to subsection (h) of Section 262 and to assert, in any appraisal proceeding, that for purposes of Section 262, the "fair value" of a share of UserTesting common stock is less than the Per Share Merger Consideration. If a demand for appraisal is duly withdrawn, if a petition for appraisal is not timely filed, if neither of the ownership thresholds described above has been satisfied as to persons seeking appraisal rights (assuming the UserTesting common stock remained listed on a national securities exchange immediately prior to the effective time of the Merger), or other requirements imposed by Section 262 to perfect and seek appraisal are not satisfied, then the right to an appraisal will cease.

Upon application by the Surviving Corporation or by any person entitled to participate in the appraisal proceeding, the Delaware Court of Chancery may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the persons entitled to an appraisal. Any person whose name appears on the Verified List may participate fully in all proceedings until it is finally determined that such person is not entitled to appraisal rights under Section 262.

The Delaware Court of Chancery will direct the payment of the fair value of the shares, together with interest, if any, by the Surviving Corporation to the persons entitled thereto. Payment will be made to each such person upon such terms and conditions as the Delaware Court of Chancery may order. The Delaware Court of Chancery's decree may be enforced as other decrees in such court may be enforced.

The costs of the appraisal proceedings (which do not include attorneys' fees or the fees and expenses of experts) may be determined by the Delaware Court of Chancery and charged upon the parties as the Delaware Court of Chancery deems equitable under the circumstances. Upon application of a person whose name appears on the Verified List who participated in the proceeding and incurred expenses in connection therewith, the Delaware Court of Chancery may also order that all or a portion of such expenses, including, without limitation, reasonable attorneys' fees and the fees and expenses of experts, be charged pro rata against the value of all the shares entitled to appraisal not dismissed pursuant to subsection (k) of Section 262 or subject to such an award pursuant to a reservation of jurisdiction under subsection (k) of Section 262. In the absence of such determination or assessment, each party bears its own expenses.

If any person who demands appraisal of his, her or its shares of UserTesting common stock under Section 262 fails to perfect, or effectively loses or withdraws, such person's right to appraisal, the stockholder's shares of UserTesting common stock will be deemed to have been converted at the Effective Time into the right to receive the Per Share Merger Consideration, without interest. A person will fail to perfect, or effectively lose or withdraw, such person's right to appraisal if no petition for appraisal is filed within one hundred twenty (120) days after the Effective Time, if neither of the ownership thresholds described above has been satisfied as to persons seeking appraisal rights (assuming the UserTesting common stock remained listed on a national securities exchange immediately prior to the effective time of the Merger) or if the person delivers to the Surviving Corporation a written withdrawal of the person's demand for appraisal in accordance with Section 262.

From and after the Effective Time, no person who has demanded appraisal rights with respect to some or all of such person's shares will be entitled to vote such shares of UserTesting common stock for any purpose or to receive payment of dividends or other distributions on such shares, except dividends or other distributions payable to stockholders of record at a date which is prior to the Effective Time. If no petition for an appraisal is filed, if neither of the ownership thresholds described above has been satisfied as to persons seeking appraisal rights (assuming the UserTesting common stock remained listed on a national securities exchange immediately prior to the effective time of the Merger), or if the person delivers to the Surviving Corporation a written withdrawal of the demand for an appraisal in respect of some or all of such person's shares within sixty (60) days after the Effective Time, then the right of such person to an appraisal of the shares subject to the withdrawal will cease. Once a petition for appraisal is filed with the Delaware Court of Chancery, however, the appraisal proceeding may not be dismissed as to any person without the approval of the court, and such approval may be conditioned upon such terms as the court deems just, including without limitation a reservation of jurisdiction for any application to the court made under subsection (j) of

64

TABLE OF CONTENTS

Section 262; provided, however, that the foregoing shall not affect the right of any person who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such person's demand for appraisal and to accept the terms offered upon the Merger within sixty (60) days after the Effective Time.

Failure to comply strictly with all of the procedures set forth in Section 262 may result in the loss of a record holder's or beneficial owner's statutory appraisal rights. Consequently, any stockholder or beneficial owner wishing to exercise appraisal rights is encouraged to consult legal counsel before attempting to exercise those rights.

### Litigation Related to the Merger

Two lawsuits have been filed in federal courts against UserTesting and its directors: *O'Dell v. UserTesting, Inc., et al.*, 1:22-cv-10071 (S.D.N.Y.), and *Glanville v. UserTesting, Inc., et al.*, 3:22-cv-07568 (N.D. Cal.) (collectively, the "Stockholder Litigation"). The complaints name UserTesting and our directors as defendants. The complaints assert claims under Section 14(a) and Section 20(a) of the Exchange Act and Rule 14a-19 promulgated thereunder, and generally allege that the preliminary proxy statement misrepresents and/or omits certain purportedly material information relating to the Merger, including allegations relating to the background of the Merger, financial projections, analyses of our financial advisor and conflicts of interest by company insiders in pursuing the Merger. The complaints seek a variety of equitable and injunctive relief including, among other things, an injunction enjoining the consummation of the Merger, rescission of the Merger Agreement, rescission of the Merger if it is consummated, rescissory damages and costs and attorneys' fees. We have not yet responded to the complaints filed in the Stockholder Litigation.

In addition, three purported stockholders of UserTesting sent demand letters regarding the preliminary proxy statement (the "Demand Letters"). Based on the same core allegations as the Stockholder Litigation, the Demand Letters request that we disseminate corrective disclosures in an amendment or supplement to the preliminary proxy statement.

We believe the Stockholder Litigation and the Demand Letters are without merit, but there can be no assurance that we will ultimately prevail in the Stockholder Litigation or all such lawsuits. Additionally, additional lawsuits may be filed and demand letters may be sent before the Special Meeting and/or the consummation of the Merger.

### Accounting Treatment

The Merger will be accounted for as a "purchase transaction" for financial accounting purposes.

### U.S. Federal Income Tax Consequences of the Merger

The following discussion is a summary of certain U.S. federal income tax consequences of the Merger that may be relevant to our stockholders whose shares are converted into the right to receive cash pursuant to the Merger. This discussion is based upon the Code, Treasury Regulations promulgated under the Code, rulings and other published positions of the Internal Revenue Service (the "IRS") and judicial decisions, all as in effect on the date of this proxy statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Any such change, which may or may not be retroactive, could alter the tax consequences to our stockholders as described herein. This discussion is limited to holders who hold their shares of UserTesting common stock as "capital assets" within the meaning of Section 1221 of the Code (generally, property held for investment purposes). For purposes of this discussion, a "holder" means either a U.S. Holder (as defined below) or a Non-U.S. Holder (as defined below) or both, as the context may require.

This discussion does not address all of the tax consequences that may be relevant to holders in light of their particular facts and circumstances, nor does it address any consequences to holders subject to special rules under the U.S. federal income tax laws, such as:

- banks and other financial institutions;

- insurance companies;

TABLE OF CONTENTS

- dealers in securities;

- traders in securities who elect to apply a mark-to-market method of accounting;

- regulated investment companies;

- real estate investment trusts;

- tax-exempt entities;

- holders who hold their shares of UserTesting common stock as part of a "straddle," hedge, constructive sale, or other integrated transaction or conversion transaction or similar transactions;

- holders whose functional currency is not the U.S. dollar;

- partnerships, other entities classified as partnerships for U.S. federal income tax purposes, "S corporations," or any other pass-through entities for U.S. federal income tax purposes (or investors in such entities);

- controlled foreign corporations or passive foreign investment companies;

- holders who hold their shares of UserTesting common stock as qualified small business stock for purposes of sections 1045 and/or 1202 of the Code;

- persons subject to the alternative minimum tax;

- U.S. expatriates and former citizens or long-term residents of the United States;

- holders that own or have owned (directly, indirectly or constructively) 5% or more of UserTesting common stock (by vote or value) at any point during the five-year period prior to the Merger; and

- holders that received their shares of UserTesting common stock pursuant to the exercise of employee stock options or otherwise as compensation.

This discussion does not address any U.S. federal tax consequences other than those pertaining to the income tax (such as estate, gift or other non-income tax consequences) or any state, local or non-U.S. income or non-income tax consequences, or the consequences of the Medicare tax on net investment income. If a partnership (including an entity or arrangement treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of shares of UserTesting common stock, the U.S. federal income tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships holding shares of UserTesting common stock and partners therein should consult their own tax advisors regarding the consequences of the Merger to their particular circumstances.

No ruling has been or will be sought from the IRS regarding the U.S. federal income tax consequences of the Merger described herein. This summary is not binding on the IRS or a court, and there can be no assurance that the tax consequences described in this summary will not be challenged by the IRS or that they would be sustained by a court if so challenged.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE U.S. FEDERAL INCOME TAX CONSEQUENCES RELATING TO THE MERGER IN LIGHT OF THEIR PARTICULAR CIRCUMSTANCES AND ANY CONSEQUENCES ARISING UNDER ANY STATE, LOCAL, NON-U.S. OR OTHER TAX LAWS.**

### *U.S. Holders*

For purposes of this discussion, a "U.S. Holder" means a beneficial owner of shares of UserTesting common stock that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (i) that is subject to the primary supervision of a court within the United States and the control of one or more United States persons as defined in section 7701(a)(30) of the Code or (ii) that

66

TABLE OF CONTENTS

has a valid election in effect under applicable Treasury Regulations to be treated as a United States person as defined in section 7701(a)(30) of the Code.

The receipt of cash by a U.S. Holder in exchange for shares of UserTesting common stock pursuant to the Merger will be a taxable transaction for U.S. federal income tax purposes. In general, a U.S. Holder will recognize gain or loss in an amount equal to the difference, if any, between the amount of cash received and the U.S. Holder's adjusted tax basis in the shares of UserTesting common stock surrendered pursuant to the Merger. A U.S. Holder's adjusted tax basis generally will equal the amount that such U.S. Holder paid for the shares of UserTesting common stock. Such gain or loss will be capital gain or loss and will be long-term capital gain or loss if such U.S. Holder's holding period in such shares is more than one year at the time of the Merger. A reduced tax rate on capital gain will generally apply to long-term capital gain of a non-corporate U.S. Holder. The deductibility of capital losses is subject to limitations.

*Non-U.S. Holders*

For purposes of this discussion, a "Non-U.S. Holder" means a beneficial owner of shares of UserTesting common stock that is neither a U.S. Holder nor a partnership for U.S. federal income tax purposes.

Any gain realized by a Non-U.S. Holder pursuant to the Merger will generally not be subject to U.S. federal income tax unless:

- the gain is effectively connected with a trade or business of such Non-U.S. Holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States), in which case such gain will generally be subject to U.S. federal income tax at rates generally applicable to a United States person as defined under the Code, and, if the Non-U.S. Holder is a corporation, such gain may also be subject to an additional branch profits tax at a rate of 30% (or a lower rate under an applicable tax treaty); or

- such Non-U.S. Holder is an individual who is present in the United States for one hundred eighty-three (183) days or more in the taxable year of the Merger, and certain other specified conditions are met, in which case such gain will be subject to U.S. federal income tax at a rate of 30% (or a lower rate under an applicable tax treaty).

*Information Reporting and Backup Withholding*

Information reporting and backup withholding (currently, at a rate of 24%) may apply to the proceeds received by a holder pursuant to the Merger. Backup withholding generally will not apply to (i) a U.S. Holder that furnishes a correct taxpayer identification number and certifies that such U.S. Holder is not subject to backup withholding on IRS Form W-9 (or a substitute successor form) or (ii) a Non-U.S. Holder that provides a certification of such Non-U.S. Holder's foreign status on the appropriate series of IRS Form W-8 (or a substitute or successor form) or otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against the holder's U.S. federal income tax liability; provided that the required information is timely furnished to the IRS.

**HOLDERS OF USERTESTING COMMON STOCK SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE MERGER TO THEIR PARTICULAR CIRCUMSTANCES, INCLUDING THE APPLICABILITY OF ANY STATE, LOCAL, NON-U.S. OR OTHER TAX LAWS.**

**Regulatory Approvals Required for the Merger**

*General*

We and Parent have agreed to take all action necessary to comply with all regulatory notification requirements, and, subject to certain limitations, to obtain all regulatory approvals required to consummate the Merger and the other transactions contemplated by the Merger Agreement. These approvals include approval under the HSR Act and any other applicable antitrust laws (whether domestic or foreign).

TABLE OF CONTENTS

### *HSR Act and U.S. Antitrust Matters*

Under the HSR Act and the rules promulgated thereunder, the Merger may not be completed until UserTesting and Thoma Bravo each files a Notification and Report Form with the Antitrust Division of the DOJ and the FTC, and the applicable 30-calendar-day waiting period has expired or been terminated. If the FTC or DOJ issues a request for additional information and documents (which we refer to as a "Second Request") prior to the expiration of the initial waiting period, the parties must observe a second 30-day waiting period, which would begin to run only after both parties have substantially complied with the Second Request, unless earlier terminated or extended by court order.

We and Thoma Bravo each filed a Notification and Report Form under the HSR Act with respect to the Merger with the FTC and DOJ on November 9, 2022.

At any time before or after consummation of the Merger, notwithstanding the termination or expiration of the waiting period under the HSR Act, the FTC, the DOJ or any state attorneys general could take such action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the completion of the Merger, seeking divestiture of substantial assets of the parties, or seeking to require the parties to license or hold separate assets or terminate existing relationships and contractual rights. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. We cannot be certain that a challenge to the Merger will not be made or that, if a challenge is made, we will prevail.

### *Other Regulatory Approvals*

The Merger is also subject to certain regulatory actions by the CMA and ACCC. The relevant regulatory bodies could take action under applicable regulatory laws as they deem necessary or desirable in the public interest, including, without limitation, seeking to enjoin or otherwise prevent the completion of the Merger or permitting completion subject to regulatory conditions. Private parties may also seek to take legal action under regulatory laws under some circumstances. There can be no assurance that a challenge to the Merger on regulatory grounds will not be made or, if such a challenge is made, that it would not be successful.

68

TABLE OF CONTENTS

### PROPOSAL 1: ADOPTION OF THE MERGER AGREEMENT

*The following summary describes the material provisions of the Merger Agreement. The descriptions of the Merger Agreement in this summary and elsewhere in this proxy statement are not complete and are qualified in their entirety by reference to the Merger Agreement, a copy of which is attached to this proxy statement as Annex A and incorporated into this proxy statement by reference. You should carefully read and consider the entire Merger Agreement, which is the legal document that governs the Merger, because this summary may not contain all the information about the Merger Agreement that is important to you.* **The rights and obligations of the parties are governed by the express terms of the Merger Agreement and not by this summary or any other information contained in this proxy statement.**

*The representations, warranties, covenants and agreements described below and included in the Merger Agreement (i) were made only for purposes of the Merger Agreement and as of specific dates; (ii) were made solely for the benefit of the parties to the Merger Agreement; and (iii) may be subject to important qualifications, limitations and supplemental information agreed to by UserTesting, Parent and Merger Sub in connection with negotiating the terms of the Merger Agreement. In addition, the representations and warranties have been included in the Merger Agreement for the purpose of allocating contractual risk between UserTesting, Parent and Merger Sub rather than to establish matters as facts, and may be subject to standards of materiality applicable to such parties that differ from those applicable to investors. Stockholders are not third-party beneficiaries under the Merger Agreement and should not rely on the representations, warranties, covenants and agreements or any descriptions thereof as characterizations of the actual state of facts or condition of UserTesting, Parent or Merger Sub or any of their respective affiliates or businesses. Moreover, information concerning the subject matter of the representations and warranties may change after the date of the Merger Agreement. In addition, you should not rely on the covenants in the Merger Agreement as actual limitations on the respective businesses of UserTesting, Parent and Merger Sub, because the parties may take certain actions that are either expressly permitted in the confidential disclosure letter to the Merger Agreement or as otherwise consented to by the appropriate party, which consent may be given without notice to the public. The Merger Agreement is described below, and included as Annex A, only to provide you with information regarding its terms and conditions, and not to provide any other factual information regarding UserTesting, Parent, Merger Sub or their respective businesses. Accordingly, the representations, warranties, covenants and other agreements in the Merger Agreement should not be read alone, and you should read the information provided elsewhere in this document and in our filings with the SEC regarding UserTesting and our business.*

**Effects of the Merger; Directors and Officers; Certificate of Incorporation; Bylaws**

The Merger Agreement provides that, subject to the terms and conditions of the Merger Agreement, and in accordance with the DGCL, at the Effective Time (as defined in the section of this proxy statement captioned "- Closing and Effective Time"): (i) Merger Sub will be merged with and into UserTesting, with UserTesting becoming a wholly owned subsidiary of Parent; (ii) the separate corporate existence of Merger Sub will thereupon cease; and (iii) UserTesting will continue as the Surviving Corporation. From and after the Effective Time, the Surviving Corporation will possess all properties, rights, privileges, powers and franchises of UserTesting and Merger Sub, and all of the debts, liabilities and duties of UserTesting and Merger Sub will become the debts, liabilities and duties of the Surviving Corporation.

At the Effective Time, the initial directors of the Surviving Corporation will be the directors of Merger Sub as of immediately prior to the Effective Time, each to hold office in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors are duly elected or appointed and qualified. At the Effective Time, the initial officers of the Surviving Corporation will be the officers of UserTesting as of immediately prior to the Effective Time, each to hold office in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors are duly appointed. At the Effective Time, the certificate of incorporation of UserTesting as the Surviving Corporation will be amended and restated in its entirety to read substantially identically to the certificate of incorporation of Merger Sub as in effect immediately prior to the Effective Time, and the bylaws of Merger Sub, as in effect immediately prior to the Effective Time, will become the bylaws of the Surviving Corporation, until thereafter amended.

69

TABLE OF CONTENTS

**Closing and Effective Time**

The closing of the Merger (the "Closing") will take place at 5:00 a.m., Pacific Time, on the second (2nd) business day following the satisfaction or waiver of all conditions to Closing of the Merger (described below under the caption, "- Conditions to the Closing of the Merger") (other than those conditions to be satisfied at the Closing of the Merger) or such other time agreed to in writing by Parent and UserTesting.

On the Closing Date, the parties will file a certificate of merger with the Secretary of State for the State of Delaware as provided under the DGCL. The Effective Time will be the time at which the Merger will become effective.

**Merger Consideration**

*UserTesting Common Stock*

At the Effective Time, each then-outstanding share of UserTesting common stock (other than the Excluded Shares) will be cancelled and automatically converted into the right to receive the Per Share Merger Consideration, less any applicable withholding taxes.

Prior to or at the Effective Time, Parent will deposit (or cause to be deposited) with the Paying Agent an amount of cash sufficient to pay the aggregate Per Share Merger Consideration payable at Closing. For more information, please see the section of this proxy statement captioned "- Exchange and Payment Procedures."

*Treatment of Company Equity Awards*

The Merger Agreement provides that UserTesting's equity awards that are outstanding immediately prior to the Effective Time will be subject to the following treatment as of the Effective Time:

**Company Options**

Each Vested Company Option will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Vested Company Option by (y) the total number of shares of UserTesting common stock underlying such Vested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Vested Company Option is equal to or greater than the Per Share Merger Consideration, such Vested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof.

Each Unvested Company Option will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the excess, if any, of (i) the Per Share Merger Consideration over (ii) the per share exercise price for such Unvested Company Option by (y) the total number of shares of UserTesting common stock underlying such Unvested Company Option, subject to applicable withholding taxes, provided, however, that if the exercise price per share of UserTesting common stock of such Unvested Company Option is equal to or greater than the Per Share Merger Consideration, such Unvested Company Option will be cancelled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company Option Consideration amounts will vest and become payable at the same time as the Unvested Company Option from which such Unvested Company Option Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time with respect to the receipt of the Unvested Company Option Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

70

TABLE OF CONTENTS

**Company RSUs**

Each Vested Company RSU will, automatically and without any required action on the part of the holder thereof, be cancelled and converted into the right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Vested Company RSU by (y) the Per Share Merger Consideration, subject to applicable withholding taxes.

Each Unvested Company RSU will, automatically and without any required action on the part of the holder thereof, be converted into the contingent right to receive an amount in cash, without interest, equal to the product obtained by multiplying (x) the total number of shares of UserTesting common stock underlying such Unvested Company RSU by (y) the Per Share Merger Consideration, subject to applicable withholding taxes. Subject to the holder's continued service with Parent and its affiliates (including the Surviving Corporation and its subsidiaries) through the applicable vesting dates, such Unvested Company RSU Consideration amounts will vest and become payable at the same time as the Unvested Company RSU from which such Unvested Company RSU Consideration was converted would have vested and been payable pursuant to its terms and, subject to certain exceptions, will otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time with respect to the receipt of the Unvested Company RSU Consideration (without limitation to any rights that the holder may have under any agreement with the Company in effect on the date of the Merger Agreement).

**Treatment of Company ESPP**

In accordance with the terms of the Merger Agreement, on October 26, 2022, the Board of Directors adopted resolutions providing that with respect to the Company ESPP, (i) participation in the Company ESPP will be limited to those employees who are participants on the date of the Merger Agreement, (ii) participants may not increase their payroll deduction elections or rate of contributions from those in effect on the date of the Merger Agreement or make any separate non-payroll contributions to the Company ESPP on or following the date of the Merger Agreement, (iii) no offering or purchase period will be commenced after the date of the Merger Agreement, (iv) each then-outstanding purchase right shall be exercised as of the earlier of (A) the end of the offering or purchase period in effect on the date of the Merger Agreement or (B) ten (10) days prior to the date on which the Effective Time occurs, and (v) the Company ESPP will terminate immediately prior to, but contingent upon the occurrence of, the Effective Time, but subsequent to the exercise of purchase rights on such purchase date (in accordance with the terms of the Company ESPP). On such exercise date, we will apply the funds credited as of such date pursuant to the Company ESPP within each participant's payroll withholding account to the purchase of whole shares of UserTesting common stock in accordance with the terms of the Company ESPP and each share purchased thereunder immediately prior to the Effective Time will be canceled at the Effective Time and converted into the right to receive the Per Share Merger Consideration, subject to any applicable withholding taxes. Any accumulated contributions of each participant under the Company ESPP as of immediately prior to the Effective Time will, to the extent not used to purchase shares in accordance with the terms and conditions of the Company ESPP, be refunded to such participant as promptly as practicable following the Effective Time (without interest).

**Exchange and Payment Procedures**

Prior to the Closing of the Merger, Parent will designate the Paying Agent to make payments of the Per Share Merger Consideration to our stockholders. At or prior to the Effective Time, Parent will deposit (or cause to be deposited) with the Paying Agent cash sufficient to pay the aggregate Per Share Merger Consideration to our stockholders.

As soon as reasonably practicable following the Effective Time (and in any event within five (5) business days), the Parent shall cause the Paying Agent to mail to each holder of record (as of immediately prior to the Effective Time) a letter of transmittal in customary form and instructions for use in effecting the surrender of such holder's shares of UserTesting common stock represented by such holder's certificate(s) or book-entry shares in exchange for the Per Share Merger Consideration payable in respect of such shares. The amount of any Per Share Merger Consideration paid to our stockholders may be reduced by applicable withholding taxes.

TABLE OF CONTENTS

**Representations and Warranties**

The Merger Agreement contains representations and warranties of UserTesting, Parent and Merger Sub.

Some of the representations and warranties in the Merger Agreement made by us are qualified as to "materiality" or "Company Material Adverse Effect." For purposes of the Merger Agreement, "Company Material Adverse Effect" means, with respect to UserTesting, any event, change, occurrence, effect or development that (A) individually or taken together with all other events, changes, occurrences, effects or developments that have occurred prior to the date of determination of the occurrence of such an effect would reasonably be expected to have a material adverse effect on the business, operations or financial condition of UserTesting and our subsidiaries, taken as a whole, or (B) would reasonably be expected to prevent, materially impair or materially delay the consummation by UserTesting of the Merger prior to the End Date, but, with respect to clause (A) only, shall not include events, changes, occurrences, effects or developments relating to or resulting from:

- changes in general economic or political conditions or the securities, equity, credit or financial markets in general, or changes in or affecting domestic or foreign interest or exchange rates;

- any decline in the market price or trading volume of our common stock or our preferred stock or any change in our credit rating or any of our securities (except that the facts and circumstances underlying any such decline or change may be taken into account in determining whether a Company Material Adverse Effect has occurred to the extent not otherwise excluded by the definition thereof);

- changes or developments in the industries in which we or our subsidiaries operate;

- (i) changes in laws or the interpretation or enforcement thereof or (ii) any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any similar law, decree, judgment, injunction or other order, directive, guidelines or recommendations by any governmental entity or industry group in connection with or in response to COVID-19, including the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") ("COVID-19 Measures");

- the execution, delivery or performance of the Merger Agreement or the public announcement or pendency or consummation of the Merger or other transactions contemplated thereby, including the impact thereof on the relationships, contractual or otherwise, of us or any of our subsidiaries with employees, partnerships, customers or suppliers or governmental entities (except with respect to any representation or warranty to the extent that such representation or warranty expressly addresses consequences resulting from the execution of the Merger Agreement or the consummation or pendency of the transactions contemplated thereby conflicting with organizational documents or existing material obligations, or contravening with applicable laws);

- the identity of Parent or any of its affiliates as the acquiror of UserTesting;

- compliance with the terms of, or the taking or omission of any action expressly required by, the Merger Agreement or consented to or requested by Parent or any of its representatives (except with respect to any representation or warranty to the extent that such representation or warranty expressly addresses consequences resulting from the execution of the Merger Agreement or the consummation or pendency of the transactions contemplated thereby conflicting with organizational documents or existing material obligations, or contravening with applicable laws or with respect to any covenants relating to our conduct during pendency of the Merger);

- any act of civil unrest, civil disobedience, war, terrorism, cyberterrorism, military activity, sabotage or cybercrime, including an outbreak or escalation of hostilities involving the United States or any other governmental entity or the declaration by the United States or any other governmental entity of a national emergency or war, or any worsening or escalation of any such conditions threatened or existing on the date of Merger Agreement;

- any hurricane, tornado, flood, earthquake, natural disasters, acts of God or other comparable events;

- any pandemic, epidemic or disease outbreak (including COVID-19) or other comparable events;

TABLE OF CONTENTS

- changes in generally accepted accounting principles or the interpretation or enforcement thereof;

- any stockholder litigation relating to or resulting from the Merger Agreement or the transactions contemplated thereby;

- any failure to meet internal or published projections, forecasts, guidance or revenue or earning predictions (except that the facts and circumstances underlying any such failure may be taken into account in determining whether a Company Material Adverse Effect has occurred to the extent not otherwise excluded by the definition thereof);

- any matter set forth in the confidential disclosure letter to the Merger Agreement; or

- the availability of equity, debt or other financing to Parent or Merger Sub (except, that the facts and circumstances underlying any such failure may be taken into account in determining whether a Company Material Adverse Effect has occurred to the extent not otherwise excluded by the definition thereof);

except, with respect to bullets 1, 3-4, and 8-11 above (other than, in the case of bullets 4 or 10, any change, event, effect or circumstance with respect to COVID-19 or the COVID-19 Measures or any escalation or worsening thereof (including any subsequent waves) if the impact thereof is materially and disproportionately adverse to us and our subsidiaries, taken as a whole, relative to the operations of other companies operating in the industries in which we and our subsidiaries operate, the incremental material and disproportionate impact may be taken into account in determining whether there has been a Company Material Adverse Effect.

In the Merger Agreement, we have made customary representations and warranties to Parent and Merger Sub that are subject, in some cases, to specified exceptions and qualifications contained in the Merger Agreement. These representations and warranties relate to, among other things:

- due organization, valid existence and good standing of UserTesting and our subsidiaries;

- our subsidiaries;

- the organizational documents of UserTesting and our subsidiaries;

- our capital structure;

- the absence of any undisclosed exchangeable security, option, convertible security, warrant or other right convertible into UserTesting common stock;

- the absence of any undisclosed contract relating to the voting of, requiring registration of, or granting any preemptive rights, anti-dilutive rights or rights of first refusal or other similar rights with respect to any of our securities;

- our corporate power and authority to enter into and perform the Merger Agreement, the approval of the Board of Directors, the necessary vote of our stockholders in connection with the Merger Agreement, and the enforceability of the Merger Agreement;

- required consents, approvals and regulatory filings in connection with the Merger Agreement and performance thereof;

- the absence of any conflict, violation or material alteration of any organizational documents, existing material contracts, applicable laws to us or the resulting creation of any lien upon our assets (except in limited circumstances) due to the performance of the Merger Agreement;

- the accuracy and required filings of our SEC filings and financial statements;

- our disclosure controls and procedures;

- our internal accounting controls and procedures;

- the absence of specified undisclosed liabilities;

- since June 30, 2022, the absence of certain changes;

- our compliance with laws, standards and requirements and possession of necessary permits;

- export controls matters and compliance with applicable anti-corruption and anti-money laundering laws;

TABLE OF CONTENTS

- litigation and regulatory matters;

- employee benefit plans;

- labor matters;

- tax matters;

- certain real property leased by us and our subsidiaries;

- trademarks, patents, copyrights and other intellectual property matters, including data security requirements and privacy;

- the existence and enforceability of specified categories of our material contracts, and certain limitations with respect thereto, such as restrictions on operations, and any notices with respect to termination or intent not to renew those material contracts therefrom;

- insurance matters;

- the absence of any undisclosed transactions, relations or understandings between us or any of our subsidiaries, on the one hand, and any affiliate or related person thereof, on the other hand;

- this proxy statement;

- the rendering of Morgan Stanley's opinion to the Board of Directors;

- payment of fees to Morgan Stanley in connection with the Merger Agreement and the absence of any other brokers used;

- the inapplicability of anti-takeover statutes to the Merger;

- environmental matters;

- certain indebtedness of UserTesting; and

- the exclusivity and terms of the representations and warranties made by Parent and Merger Sub.

In the Merger Agreement, Parent and Merger Sub have made customary representations and warranties to us that are subject, in some cases, to specified exceptions and qualifications contained in the Merger Agreement. These representations and warranties relate to, among other things:

- due organization, good standing and authority and qualification to conduct business with respect to Parent and Merger Sub and availability of these documents;

- Parent's organizational chart;

- Parent's and Merger Sub's corporate or similar authority to enter into and perform the Merger Agreement, the enforceability of the Merger Agreement and the absence of conflicts with laws, Parent's or Merger Sub's organizational documents and Parent's or Merger Sub's contracts;

- the absence of any conflict, violation or material alteration of any organizational documents, existing contracts, applicable laws or the resulting creation of any lien upon Parent's or Merger Sub's assets due to the performance of the Merger Agreement;

- required consents and regulatory filings in connection with the Merger Agreement;

- delivery and enforceability of each of the Guaranties and Equity Commitment Letters;

- the capital structure of Merger Sub;

- litigation and regulatory matters;

- accuracy of information to be provided for this proxy statement;

- payment of fees to brokers in connection with the Merger Agreement;

- absence of any undisclosed transactions, relations or understandings between Parent or Merger Sub, the Thoma Bravo Funds, the Sunstone Partners Funds or any of their affiliates, on the one hand, and any beneficial owner of five percent or more of the outstanding shares of UserTesting common stock or any member of our management or the Board, on the other hand;

74

TABLE OF CONTENTS

- Parent and Merger Sub not being a "foreign person" within the meaning of title 31 of the Code of Federal Regulations part 800 section 800.224;

- ownership of our capital stock;

- the solvency of Parent and its subsidiaries following the consummation of the Merger and the transactions contemplated by the Merger Agreement; and

- the exclusivity and terms of the representations and warranties made by us.

The representations and warranties contained in the Merger Agreement will not survive the consummation of the Merger.

**Conduct of Business Pending the Merger**

During the period of time between the date of signing of the Merger Agreement and the first to occur of the Effective Time and the termination of the Merger Agreement (the "Interim Period"), except (i) as required by applicable law, (ii) as agreed in writing by Parent (which consent shall not be unreasonably withheld, delayed or conditioned); provided that Parent shall be deemed to have approved in writing if it provides no response within five (5) business days after written request by us for such approval, (iii) as expressly required or permitted by the Merger Agreement or (iv) as disclosed in our disclosure schedules to the Merger Agreement, we will, and will cause our subsidiaries to:

- conduct our business in all material respects in the ordinary course consistent with past practices; and

- use our commercially reasonable efforts to preserve intact in all material respects our business organization and business relationships.

During the Interim Period, except (i) as required by applicable law, (ii) as agreed in writing by Parent (which consent shall not be unreasonably withheld, delayed or conditioned); provided that Parent shall be deemed to have approved in writing if it provides no response within five (5) business days after written request by us for such approval, (iii) as contemplated, required or permitted by the Merger Agreement, (iv) to the extent necessary to comply with the express obligations set forth in any material contract in effect on the date of the Merger Agreement, or (v) as disclosed in our disclosure schedules to the Merger Agreement, we will not, and will not allow our subsidiaries, as applicable to, among other things (and subject to certain exceptions):

- authorize or pay any dividend or other distribution;

- adjust, split, subdivide, combine, or reclassify any of our capital stock;

- other than in the ordinary course of business consistent with past practice, materially increase the compensation or other benefits payable or provided to any director, officer, employee or other service provider of UserTesting or our subsidiaries;

- enter into any employment, consulting, change of control, severance or retention agreement or other compensation or benefit agreement with any current or former independent contractor, director or employee of UserTesting or our subsidiaries (except for employment or consulting agreements entered into in the ordinary course of business or that are terminable on no more than 30 days' notice without penalty or severance unless such severance is in accordance with the Company Severance Plans (as defined below));

- grant new change of control, severance, retention, pension or other cash compensation or benefits in respect of or accelerate the funding, vesting or payment of any compensation or benefit for, any such current or former independent contractor, director or employee;

- grant any new equity or equity-based compensation or benefits in respect of any independent contractor, director or employee;

- except as provided in the Merger Agreement, enter into, adopt, materially amend, terminate or materially increase the coverage or benefits available under any UserTesting benefit plan;

TABLE OF CONTENTS

- other than in the ordinary course of business consistent with past practice, hire or engage any person at the level of Vice President or above or terminate (without cause), furlough, or temporarily layoff any employee or independent contractor at the level of Vice President or above;

- materially change accounting practices;

- amend the organizational documents of UserTesting or our subsidiaries;

- issue, sell, pledge, dispose of or encumber, or authorize the issuance, sale, pledge, disposition or encumbrance of, any shares of our capital stock or other ownership or equity or equity-based interests in UserTesting or our subsidiaries;

- purchase, repurchase, redeem or otherwise acquire any securities of UserTesting, except for transactions solely among UserTesting and our subsidiaries or solely among our subsidiaries;

- incur, assume or guarantee any indebtedness for borrowed money;

- sell, lease, license, transfer, exchange, swap, or subject to any lien (except with regards to certain liens), or otherwise dispose of, any portion of our material properties or assets, in each case, in excess of $25,000 individually or $250,000 in the aggregate, other than in the ordinary course of business;

- enter into, terminate or amend material contracts except in the ordinary course of business;

- settle, pay discharge or satisfy any action, other than any action that involves only the payment of monetary damages not in excess of $150,000 individually or $1,000,000 in the aggregate;

- make or authorize any capital expenditures other than those not in excess of $1,000,000 individually or $2,500,000 in the aggregate in any 12-month period;

- adopt or enter into a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of UserTesting or our subsidiaries;

- undertake certain tax-related actions;

- make any acquisition of or make any investment in any interest in, any corporation, partnership or other business organization or material assets or division thereof, except for (i) purchases of inventory and supplies in the ordinary course of business consistent with past practice or pursuant to an existing contract in effect as of the date of the Merger Agreement or (ii) acquisitions or investments not to exceed $15,000,000 in the aggregate;

- negotiate, enter into, adopt, extend, amend or terminate or agree to any collective bargaining agreement;

- recognize or certify any labor union, labor organization, works council, or group of employees as the bargaining representative for any employees of UserTesting or our subsidiaries;

- effect certain layoffs without complying with applicable laws;

- grant any material refunds, credits, rebates or other allowances to any end user, customer, reseller or distributor;

- enter into a transaction with an affiliate of UserTesting or other person covered by Item 404 of Regulation S-K under the Securities Act that would be required to be disclosed pursuant to Item 404;

- make any loans or advances to any other person or entity;

- sell, assign, transfer, license, abandon, permit to lapse or otherwise dispose of or subject to any lien any intellectual property that is material to the business of UserTesting and our subsidiaries;

- intentionally disclose any trade secrets that are material to the business of UserTesting and our subsidiaries or intentionally disclose, make available, deliver, license or place into escrow any source code owned by UserTesting or any of our subsidiaries with respect to software that is material to the business of UserTesting and our subsidiaries; or

- enter into agreements to do any of the foregoing.

Notwithstanding the restrictions set out above, nothing shall prevent UserTesting or our subsidiaries from taking any action that would otherwise be prohibited reasonably in response to COVID-19 or any

76

TABLE OF CONTENTS

COVID-19 Measures or in response to sanctions imposed in connection with the current conflict between the Russian Federation and Ukraine, so long as, in each case, we consult in good faith with Parent prior to taking such action.

In addition, from the date of the Merger Agreement until the earlier of the date the Merger Agreement is terminated and the expiration or termination of the waiting period under the HSR Act applicable to the Merger and the receipt of the required governmental consents, Parent and Merger Sub have agreed not to, and to not permit the Thoma Bravo Funds and the Sunstone Partners Funds or any of their subsidiaries and affiliates to, acquire or agree to acquire by merger or consolidation with, or by purchasing a material portion of the assets of or equity in, any person (a "Specified Acquisition"), if the entering into a definitive agreement with respect to or the consummation of a Specified Acquisition would reasonably be expected to (i) prevent, materially delay or materially impede the obtaining of the expiration or termination of the waiting period under the HSR Act applicable to the Merger and the receipt of governmental authority consents (or expiration of applicable waiting periods), or (ii) materially increase the risk of any governmental entity seeking or entering an order, ruling, judgment or injunction prohibiting the consummation of the transactions contemplated under the Merger Agreement.

### The Go-Shop Period - Solicitation of Other Offers

Under the Merger Agreement, from the date of the Merger Agreement until 11:59 p.m. Pacific Time on the No-Shop Period Start Date, UserTesting, our subsidiaries and our and their respective representatives have the right to: (i) solicit, initiate, propose, induce the making or submission of, encourage or facilitate in any way any offer or proposal that constitutes, or could reasonably be expected to lead to, an Alternative Acquisition Proposal (as defined in this section of this proxy statement below), including by providing information (including non-public information and data) relating to UserTesting and any of our subsidiaries and affording access to the businesses, properties, assets, books, records or other non-public information, or to any personnel, of UserTesting and our subsidiaries to any third person (and its representatives, including potential financing sources of the third person) that has entered into an Acceptable Confidentiality Agreement; provided that we must provide Parent and Merger Sub (and their representatives, including financing sources) with access to any information or data that is provided to any third person given such access that was not previously made available (whether prior to or after the execution of the Merger Agreement) to Parent or Merger Sub substantially concurrently with the time it is provided to the third person (and in any event within twenty-four (24) hours thereof) and (ii) continue, enter into, engage in or otherwise participate in any discussions or negotiations with any third person (and their respective representatives, including potential financing sources of the third person) regarding any Alternative Acquisition Proposals (or inquiries, offers or proposals or any other effort or attempt that could reasonably be expected to lead to an Alternative Acquisition Proposal), and cooperate with or assist or participate in, or facilitate in any way, any such inquiries, offers, proposals, discussions or negotiations or any effort or attempt to make any Alternative Acquisition Proposals or other proposals that could reasonably be expected to lead to Alternative Acquisition Proposals, including by granting a waiver, amendment or release under any pre-existing "standstill" or other similar provision to the extent necessary to allow for an Alternative Acquisition Proposal or amendment to an Alternative Acquisition Proposal to be made confidentially to us or to the Board of Directors. We must also notify Parent within twenty-four (24) hours of entering into any Acceptable Confidentiality Agreement.

If we terminate the Merger Agreement prior to 11:59 p.m. Pacific Time on December 20, 2022 to enter into a definitive agreement with respect to a Superior Proposal received from an Excluded Party, then we would be required to pay a termination fee of $10,160,000 to Parent. For more information, please see the section of this proxy statement captioned "- The Board of Directors' Recommendation; Change of Recommendation."

For purposes of this proxy statement and the Merger Agreement:

"Acceptable Confidentiality Agreement" means an agreement with us that is either (i) in effect as of the date the Merger Agreement was entered into, or (ii) executed, delivered and effective after the date the Merger Agreement was entered into, in either case containing provisions that require any counterparty thereto (and any of its affiliates and representatives named therein) that receive non-public information of or with respect to UserTesting and/or our subsidiaries to keep such information confidential; provided, however, that,

TABLE OF CONTENTS

with respect to such agreements executed and delivered following the execution and delivery of the Merger Agreement, the provisions contained therein relating to the confidential treatment of information and the use thereof are not materially less restrictive in the aggregate to such counterparty (and any of its affiliates and representatives named therein) than the terms of the non-disclosure letter agreement entered into between us and Thoma Bravo (it being understood that such agreement need not contain any "standstill" or similar provisions or otherwise prohibit the making of any Alternative Acquisition Proposal) and that such agreement does not contain provisions which prohibit us from providing any information to Parent in accordance with the Merger Agreement.

"Alternative Acquisition Proposal" means any offer, proposal or indication of interest by a third person relating to or concerning (i) a merger, reorganization, share exchange, consolidation, tender offer, business combination, recapitalization, liquidation, dissolution or similar transaction involving us, in each case, as a result of which our stockholders immediately prior to such transaction would cease to own at least 75% of the total voting power of UserTesting or the surviving entity (or any direct or indirect parent company thereof), as applicable, immediately following such transaction, (ii) the direct or indirect acquisition by any third person of assets constituting or accounting for more than 25% of the consolidated assets, revenue or net income of UserTesting and our subsidiaries, on a consolidated basis (including equity interests in any subsidiaries), or (iii) the direct or indirect acquisition by any third person of more than 25% of the outstanding shares of UserTesting common stock or securities representing more than 25% of the total voting power of UserTesting.

"Excluded Party" means any third person (i) from whom we received a written Alternative Acquisition Proposal prior to the No-Shop Period Start Date and (ii) whose Alternative Acquisition Proposal the Board of Directors determines in good faith prior to the start of the No-Shop Period Start Date, after consultation with its outside financial advisors and legal counsel, either to be a Superior Proposal or an Alternative Acquisition Proposal that could reasonably be expected to lead to a Superior Proposal; provided, however, that a third person will immediately cease to be an Excluded Party (and the provisions of the Merger Agreement applicable to Excluded Parties will cease to apply with respect to such third person) if (1) the Alternative Acquisition Proposal is withdrawn by the third person or (2) the Alternative Acquisition Proposal, in the good faith determination of the Board of Directors, after consultation with its outside financial advisors and legal counsel, no longer is or could no longer be reasonably expected to lead to a Superior Proposal.

"Superior Proposal" means a written Alternative Acquisition Proposal substituting in the definition thereof "80%" for "25%" and for "75%" in each place each such phrase appears, that (i) was not solicited in violation of the non-solicitation obligations pursuant to the Merger Agreement and (ii) the Board of Directors determines in good faith, after consultation with UserTesting's outside legal counsel and financial advisors, and considering such factors as the Board of Directors considers to be appropriate (including (a) all legal, regulatory and financial aspects of the proposal (including certainty of closing) and the identity of the third person making the Alternative Acquisition Proposal and (b) any revisions to the Merger Agreement made or proposed in writing by Parent prior to the time of such determination in accordance with the change of recommendation provisions of the Merger Agreement), to be more favorable to us and our stockholders than the transactions contemplated by the Merger Agreement.

**The No-Shop Period – No Solicitation of Other Offers**

From the date of the No-Shop Period Start Date until the earlier to occur of the termination of the Merger Agreement and the Effective Time, we have agreed not to, and to cause our subsidiaries and our and their respective representatives not to, directly or indirectly:

- solicit, initiate or knowingly encourage, or knowingly facilitate the making or submission of any offer or proposal that constitutes, or would reasonably be expected to lead to, an Alternative Acquisition Proposal;

- participate in any discussions or negotiations regarding an Alternative Acquisition Proposal with, or furnish any non-public information relating to UserTesting or our subsidiaries for the purpose of facilitating an Alternative Acquisition Proposal to, any third person that has made or, to our knowledge, is considering making an Alternative Acquisition Proposal, or afford any third person

TABLE OF CONTENTS

access to the business, properties, assets, books, records or other non-public information, or to any personnel, of UserTesting or our subsidiaries for the purpose of encouraging, inducing or facilitating an Alternative Acquisition Proposal;

• approve, endorse or recommend any proposal that constitutes, or would reasonably be expected to lead to an Alternative Acquisition Proposal; or

• enter into any letter of intent, agreement in principle, memorandum of understanding, or other acquisition agreement, merger agreement or similar agreement with respect to an Alternative Acquisition Proposal, other than an Acceptable Confidentiality Agreement permitted pursuant to the terms of the Merger Agreement.

In addition, we have agreed to (i) cease and cause to be terminated any discussions or negotiations with any third person and its representatives, (ii) request the prompt return or destruction of all non-public information concerning us and our subsidiaries furnished to any person with whom a confidentiality agreement with respect to an Alternative Acquisition Proposal was entered into at any time during the period between November 16, 2021 and the No-Shop Period Start Date, (iii) cease providing any further such information with respect to us or any Alternative Acquisition Proposal to any such third person or its representatives and (iv) terminate all access granted to any such third person or its representatives to any physical or electronic data room (or any other diligence access) containing any such information.

Notwithstanding these restrictions, we may continue to engage in the activities delineated in the previous two paragraphs with respect to any Excluded Party (but only for so long as such person is and remains an Excluded Party), including with respect to any amended or modified Alternative Acquisition Proposal received from any Excluded Party following the No-Shop Period Start Date.

Additionally, under certain specified circumstances, at any time prior to the adoption of the Merger Agreement by our stockholders, if we receive an Alternative Acquisition Proposal from a third party that was not received in response to, or as a result of, any material breach of our non-solicitation obligations pursuant to the Merger Agreement, (i) we and our representatives may contact the third party making such Alternative Acquisition Proposal solely to clarify the terms and conditions thereof, and (ii) if the Board of Directors determines in good faith, after consultation with outside legal counsel and financial advisors, that such Alternative Acquisition Proposal either constitutes a Superior Proposal or could reasonably be expected to lead to a Superior Proposal and the Board of Directors (or a committee thereof) has determined in good faith (after consultation with its financial advisors and outside legal counsel) that the failure to take the actions in respect of such Alternative Acquisition Proposal would be inconsistent with its fiduciary duties under applicable law, then we may: (A) engage in discussions or negotiations with the third party (including its representatives and potential equity and debt financing sources) with respect to such Alternative Acquisition Proposal, and (B) furnish non-public information to the third party making such Alternative Acquisition Proposal (and its representatives and potential equity and debt financing sources) if, prior to so furnishing such information, the third party has executed an Acceptable Confidentiality Agreement with us; provided that we provide to Parent and Merger Sub (and their respective representatives) any information or data that is provided to such third party that was not previously made available to Parent or Merger Sub prior to or substantially concurrently with the time it is provided to such third party (and in any event within twenty-four (24) hours thereof). We will notify Parent that we have entered into an Acceptable Confidentiality Agreement within twenty-four (24) hours after the execution thereof.

Both during the Go-Shop Period and after the No-Shop Period Start Date but prior to the adoption of the Merger Agreement by our stockholders, we are not entitled to terminate the Merger Agreement for the purpose of entering into an agreement in respect of a Superior Proposal unless we comply with certain procedures in the Merger Agreement, including, but not limited to, negotiating with Parent in good faith over a four (4)-business-day period in an effort to amend the terms and conditions of the Merger Agreement and/or the Equity Commitment Letters, so that such Superior Proposal no longer constitutes a "Superior Proposal" relative to the transactions contemplated by the Merger Agreement, as amended pursuant to such negotiations.

As promptly as reasonably practicable, and in any event within twenty-four (24) hours following the expiration of the Go-Shop Period, we shall deliver to Parent a written notice setting forth: (i) the identity of each Excluded Party from which we have received an Alternative Acquisition Proposal that remains

79

TABLE OF CONTENTS

pending and (ii) the material terms and conditions of any such pending Alternative Acquisition Proposal made by each such Excluded Party. We shall (whether during or after the Go-Shop Period) promptly (and in any event within twenty-four (24) hours) notify Parent of (A) the entry by us or any of our subsidiaries into an Acceptable Confidentiality Agreement with a third party who has made or could make an Alternative Acquisition Proposal (or, if such third party was already party to a confidentiality agreement with us or any of our subsidiaries, then we shall instead notify Parent within twenty-four (24) hours of granting data room access to such third party or its representatives, it being understood that such notification need only be made one time with respect to such third party and its representatives) and (B) any Alternative Acquisition Proposal received by us or any of our subsidiaries or representatives, which notice shall be provided orally and in writing, and which shall identify the material terms and conditions thereof (and, thereafter, any material change to the terms thereof) and (unless expressly prohibited pursuant to a confidentiality agreement in effect as of the date of the Merger Agreement) the person or group making such Alternative Acquisition Proposal and include copies of all documents and other written materials (including any letter of intent, term sheet or draft of definitive agreement) submitted with such Alternative Acquisition Proposal. From and after the expiration of the Go-Shop Period, we shall keep Parent reasonably informed on a reasonably current basis of the status and any material developments (including all amendments or proposed amendments, whether or not in writing) regarding any Alternative Acquisition Proposals or any material change to the terms of any such Alternative Acquisition Proposal, and promptly (and in any event within twenty-four (24) hours) provide Parent with copies of any letter of intent, term sheet, draft or definitive agreement or similar documents relating to any Alternative Acquisition Proposal (including the financing thereof).

The termination of the Merger Agreement by us following the Board of Directors' authorization for us to enter into a definitive agreement to consummate an alternative transaction contemplated by a Superior Proposal will result in the payment by us of a termination fee of either (i) $10,160,000 if the Merger Agreement is terminated before 11:59 p.m. Pacific Time on December 20, 2022 for the purpose of entering into an agreement with respect to a Superior Proposal received from an Excluded Party and we have complied in all material respects with the non-solicitation provisions set forth in the Merger Agreement with respect to such Superior Proposal or (ii) $33,880,000, in the case of any other such termination. For more information, please see the section of this proxy statement captioned "Proposal 1: Adoption of the Merger Agreement - The Board of Directors' Recommendation; Change of Recommendation."

**The Board of Directors' Recommendation; Change of Recommendation**

As described above, and subject to the provisions described below, the Board of Directors has made the recommendation that our stockholders vote "**FOR**" the proposal to adopt the Merger Agreement. The Merger Agreement provides that the Board of Directors will not affect a Change of Recommendation (as defined below) except as described below.

Prior to the adoption of the Merger Agreement by our stockholders, the Board of Directors may not take any action described in the following (any such action, a "Change of Recommendation"):

- withdraw (or qualify or modify in any manner adverse to Parent), or propose publicly to withdraw (or qualify or modify in any manner adverse to Parent), the recommendation of the Board of Directors (it being understood that it shall be considered a modification adverse to Parent if (1) any Alternative Acquisition Proposal structured as a tender or exchange offer is commenced and the Board of Directors fails to publicly recommend against acceptance of such tender or exchange offer by our stockholders within ten (10) business days of commencement thereof pursuant to Rule 14d-2 of the Exchange Act or (2) any Alternative Acquisition Proposal is publicly announced (other than by the commencement of a tender or exchange offer) and the Board of Directors fails to issue a public press release within five (5) business days of such public announcement providing that the Board of Directors reaffirms the recommendation of the Board of Directors);

- approve, recommend or declare advisable any Alternative Acquisition Proposal (or propose to approve, recommend or declare advisable any Alternative Acquisition Proposal);

- fail to publicly reaffirm the recommendation of the Board of Directors within five (5) business days after Parent so requests in writing (it being understood that we will have no obligation to make such reaffirmation on more than three (3) separate occasions); or

TABLE OF CONTENTS

- fail to include the recommendation of the Board of Directors to approve the Merger in this proxy statement.

Nothing contained in the Merger Agreement prohibits us or the Board of Directors from (i) complying with our disclosure obligations under applicable law or rules and policies of the NYSE, as determined in good faith by us, including taking and disclosing to our stockholders a position contemplated by Rule 14d-9 or Rule 14e-2(a) or Item 1012(a) of Regulation M-A under the Exchange Act (or any similar communication to our stockholders) or from issuing a "stop, look and listen" statement pending disclosure of our position thereunder or (ii) making any disclosure to our stockholders if the Board of Directors determines in good faith, after consultation with UserTesting's outside legal counsel, that the failure of the Board of Directors to make such disclosure would reasonably be expected to be inconsistent with the exercise of its fiduciary duties under applicable law; provided that (1) any such statement or disclosure must be subject to the terms and conditions of the Merger Agreement and will not limit or otherwise affect the obligations of UserTesting or the Board of Directors and the rights of Parent under the applicable section of the Merger Agreement, and (2) nothing in the foregoing will be deemed to permit us or the Board of Directors to effect a Change of Recommendation other than in accordance with the applicable section of the Merger Agreement.

Notwithstanding the restrictions described above, prior to the adoption of the Merger Agreement by our stockholders, the Board of Directors may effect a Change of Recommendation if (i) we have received a Superior Proposal or (ii) there has been an Intervening Event (as defined below), in each case, that the Board of Directors has determined in good faith (after consultation with its outside legal counsel and financial advisors) that the failure to effect a Change of Recommendation would reasonably be expected to be inconsistent with its fiduciary duties under applicable law.

The Board of Directors may only effect a Change of Recommendation or authorize us to terminate the Merger Agreement to enter into an agreement with respect to a Superior Proposal substantially concurrently with the termination of the Merger Agreement if:

- the Board of Directors has determined in good faith (after consultation with its outside legal counsel and financial advisors) that the failure to do so would reasonably be expected to be inconsistent with its fiduciary duties under applicable law;

- we have provided prior written notice to Parent at least four (4) business days in advance of our intention to effect a Change of Recommendation or terminate the Merger Agreement in response to such Superior Proposal, which shall include a description of the terms and conditions of the Superior Proposal, the identity of the person or entity making the Superior Proposal and a copy of any proposed definitive agreement(s) relating to such Superior Proposal, including any related financing commitments, if any;

- we have complied in all material respects with its obligations pursuant to the Merger Agreement with respect to such Superior Proposal;

- we have negotiated in good faith with Parent and its representatives (to the extent Parent notifies UserTesting in writing that it desires to negotiate) with respect to the terms and conditions of the Merger Agreement and/or the Equity Commitment Letters so that such Alternative Acquisition Proposal would cease to constitute a Superior Proposal;

- following such four (4)-business-day period, the Board of Directors (after consultation with its financial advisors and outside legal counsel and taking into account Parent's proposed revisions to the terms and conditions of the Merger Agreement that are binding on Parent and Merger Sub and irrevocable by Parent and Merger Sub until the expiration of the foregoing four (4)-business-day period (assuming the execution and delivery by us of the applicable definitive agreement) and any other information provided by Parent) has determined that the failure of the Board of Directors to make such a Change of Recommendation or to terminate the Merger Agreement would reasonably be expected to be inconsistent with its fiduciary duties under applicable law; and

- in the event of a termination of the Merger Agreement in order to cause us to enter into a definitive agreement with respect to such Superior Proposal, we will have validly terminated the Merger Agreement in accordance with the terms of the Merger Agreement, including paying to Parent a

TABLE OF CONTENTS

termination fee of either (i) $10,160,000 if the Merger Agreement is terminated prior to 11:59 p.m. Pacific Time on December 20, 2022 for the purpose of entering into an agreement with respect to a Superior Proposal received from any Excluded Party, or (ii) $33,880,000, in the case of any other such termination.

In the event of any material amendments or modifications to such Alternative Acquisition Proposal, we are required to deliver a new written notice to Parent and to comply with the requirements of the Merger Agreement with respect to such new written notice (it being understood that the four (4)-business-day period shall be three (3) business days with respect to such new written notice, but in no event shorter than four (4) business days following the original written notice).

In addition, the Board of Directors may only effect a Change of Recommendation for an Intervening Event if the Board of Directors determines in good faith, after consultation with the UserTesting's outside legal counsel, that the failure of the Board of Directors to take such action would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law, provided that:

- the Board of Directors has provided prior written notice to Parent at least four (4) business days in advance of our intention to effect a Change of Recommendation in response to such Intervening Event, which notice must specify the basis for such Change of Recommendation, which shall include a description in reasonable detail of the applicable Intervening Event;

- prior to effecting such Change of Recommendation, the Board of Directors have given Parent an opportunity to meet and negotiate with us and our advisors during the foregoing four (4)-business-day period (to the extent that Parent desires to so meet and negotiate) to discuss the foregoing Intervening Event and any adjustments or revisions to the terms of the Merger Agreement proposed by Parent in response thereto to obviate the need to effect a Change of Recommendation; and

- following such four (4)-business-day period, the Board of Directors, after consultation with our outside legal counsel and taking into account Parent's proposed revisions to the terms and conditions of the Merger Agreement, shall have determined that the failure of the Board of Directors to make such a Change of Recommendation in response to such Intervening Event would reasonably be expected to be inconsistent with its fiduciary duties under applicable law; provided that each time any material amendment or modification to the Intervening Event occurs, we shall notify Parent of such amendment or modification in writing and the time period set forth in the preceding second (2nd) bullet shall recommence and be extended for two (2) business days from the day of such notification (provided that the time period shall in no event be shorter than four (4) business days following the original written notice).

For purposes of this proxy statement and the Merger Agreement, an "Intervening Event" means any event, change, occurrence or development that is unknown and not reasonably foreseeable to the Board of Directors as of the date of the Merger Agreement, or if known or reasonably foreseeable to the Board of Directors as of the date of the Merger Agreement, the material consequences of which were not known or reasonably foreseeable to the Board of Directors as of the date of Merger Agreement; provided that (a) the receipt, existence or terms of an Alternative Acquisition Proposal or Superior Proposal, or (b) the mere fact, in and of itself, that we meet or exceed any internal or published projections, forecasts, estimates or predictions of revenue, earnings or other financial or operating metrics for any period ending on or after the date of the Merger Agreement, or changes after the date of the Merger Agreement in the market price or trading volume of our common stock or our credit rating (it being understood that the underlying cause of any of the foregoing in this clause (b) may be considered and taken into account), in each case, shall not be deemed to be an Intervening Event under the Merger Agreement.

**Employee Benefits**

The Merger Agreement provides that from and after the Effective Time, we will honor all UserTesting employee plans in accordance with their terms. Parent acknowledges that a "change in control" (or similar phrase) within the meaning of the Company Benefit Plans (as defined in the Merger Agreement) will occur at the Effective Time.

For a period commencing at the Effective Time and ending on the earlier of (A) the first (1st) anniversary of the Effective Time and (B) the date of termination of the Company Employee (as defined below) (such

TABLE OF CONTENTS

earlier period, the "Continuation Period"), Parent will cause the Surviving Corporation or its affiliates to provide to each current employee of UserTesting and our subsidiaries as of the Effective Time who remains so employed immediately after the Effective Time ("Company Employees") (i) base compensation and target annual or short-term cash incentive opportunities (including target short-term commission-based cash incentive opportunities) that, in each case, are no less favorable than were provided to the Company Employee immediately before the Effective Time, and (ii) employee benefits (excluding equity and equity-based compensation) that are substantially comparable in the aggregate to those that were provided to the Company Employee immediately before the Effective Time, provided, however, that nothing set forth in the Merger Agreement will require Parent to provide compensation in the form of equity or equity-based compensation. Without limiting the generality of the foregoing, Parent shall cause the Surviving Corporation to provide to each Company Employee whose employment terminates during the Continuation Period under circumstances that would give rise to cash severance pay or benefits under the existing terms of the United States Company Benefit Plans set forth in the confidential disclosure letter and designated as a severance plan, policy or practice, and any Company Benefit Plan outside of the United States (the "Company Severance Plans"), cash severance pay equal to the cash severance pay provided under the Company Severance Plans. Notwithstanding anything in the Merger Agreement to the contrary, the terms and conditions of employment of any Company Employee whose terms and conditions of employment are subject to a collective bargaining agreement will be governed by such applicable collective bargaining agreement.

For all purposes of vesting, eligibility to participate and level of benefits under the corresponding employee benefit plans of Parent and its subsidiaries providing benefits to any Company Employees after the Effective Time (the "New Plans"), each Company Employee will be credited with his or her years of service with UserTesting and our subsidiaries and our and their respective predecessors before the Effective Time, to the same extent and for the same purpose as such Company Employee was entitled, before the Effective Time, to credit for such service under any similar Company Benefit Plan in which such Company Employee participated or was eligible to participate immediately prior to the Effective Time. However, the foregoing will not apply with respect to any defined benefit pension benefits or to the extent that its application would result in a duplication of benefits. In addition, and without limiting the generality of the foregoing, (i) each Company Employee will be immediately eligible to participate, without any waiting time, in any New Plans to the extent coverage under such New Plan is comparable to and replaces a Company Benefit Plan in which such Company Employee participated immediately before the Effective Time (such plans, collectively, the "Old Plans"), and (ii) for purposes of each New Plan providing medical, dental, pharmaceutical, and vision insurance benefits to any Company Employee, Parent will use commercially reasonable efforts to cause all preexisting condition exclusions and actively-at-work requirements of such New Plan to be waived for such employee and his or her covered dependents, unless such conditions would not have been waived or satisfied under the comparable plans of UserTesting or our subsidiaries in which such employee participated immediately prior to the Effective Time, and Parent will cause any eligible expenses incurred by such employee and his or her covered dependents during the portion of the plan year of the Old Plans ending on the date such employee's participation in the corresponding New Plan begins to be taken into account under such New Plan for purposes of satisfying the corresponding deductible, coinsurance and maximum out-of-pocket requirements applicable to such employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such New Plan to the extent such amounts were credited to such person for the same purpose under the Old Plan.

With respect to each of our annual cash incentive plans set forth in the confidential disclosure letter or entered into following the date of the Merger Agreement in accordance with the terms of the Merger Agreement (each, a "Company Incentive Plan"), the Surviving Corporation and its subsidiaries will (and Parent will cause the Surviving Corporation and its subsidiaries to) pay to each Company Employee who remains employed with Parent, the Surviving Corporation or their respective subsidiaries (i) in the case of fiscal year 2022, through the end of fiscal year 2022, at the same time or times that we or any of our subsidiaries has historically paid such annual bonuses in respect of the prior fiscal year, but in no event later than March 15 immediately after the end of fiscal year 2022, a bonus for such fiscal year (the "Annual Bonus") that is equal to the Annual Bonus that such Company Employee would have been entitled to receive under the terms and conditions of the applicable Company Incentive Plan for such fiscal year based on actual levels of performance, solely to the extent such Company Employee has not been previously paid such Annual Bonus by us or any of our subsidiaries for such fiscal year, and (ii) in the case of fiscal year 2023,

TABLE OF CONTENTS

through the Effective Time, pay out bonuses in accordance with the terms of the Company Incentive Plan pursuant to its terms and consistent with our past practice for paying bonuses and commissions, and within thirty (30) days of the Effective Time, make a further payment equal to the Annual Bonus that such Company Employee would have been entitled to receive under the terms and conditions of the applicable Company Incentive Plan for fiscal year 2023 based on actual levels of performance, multiplied by a fraction, the numerator of which equals the number of calendar days of fiscal year 2023 that has elapsed prior to the Effective Time, and the denominator of which is 365, solely to the extent such Company Employee has not been previously been paid such portion of the Annual Bonus by us or any of our subsidiaries for such fiscal year.

**Efforts to Close the Merger**

Under the Merger Agreement, and subject to certain exceptions set forth therein, Parent, Merger Sub and UserTesting agreed to promptly take (or cause to be taken) all actions, and promptly do (or cause to be done) and assist and cooperate with the other party or parties in doing (or causing to be done) all things, in each case that are necessary, proper or advisable under applicable laws or otherwise to consummate and make effective the Merger and the other transactions contemplated by the Merger Agreement in the most expeditious manner possible after the date of the Merger Agreement (subject to the terms of the Merger Agreement) and in any event prior to the End Date.

**Cooperation with Debt Financing**

To the extent reasonably requested by Parent in writing and prior to the Closing Date, we shall use our reasonable best efforts to provide, and to cause our subsidiaries (and our and their respective representatives) to use their reasonable best efforts to provide customary cooperation to Parent and Merger Sub, in each case at Parent's sole cost and expense, in connection with the arrangement of the debt financing for the transactions contemplated by the Merger Agreement (the "Debt Financing") (provided, that such requested cooperation does not unreasonably interfere with the ongoing operations of the UserTesting or any of its affiliates), including using its reasonable best efforts to, upon Parent's reasonable request in writing and subject to certain exceptions set forth in the Merger Agreement:

- furnish Parent as promptly as practicable, after written request therefor by Parent, any Required Financial Information (as defined below);

- assist in preparation for and participate in a reasonable number of investor and lender meetings (including a reasonable and limited number of one-on-one meetings and calls that are requested in advance with or by the parties acting as lead arrangers or agents for, and prospective lenders of, the Debt Financing), presentations, road shows, due diligence sessions and sessions with rating agencies and accountants, at reasonable times and with reasonable advance notice (which meetings, presentations, road shows and sessions shall be virtual) and to assist with the marketing or syndication efforts of Parent in connection with the Debt Financing;

- facilitate the pledging of collateral of UserTesting and our subsidiaries effective no earlier than the Closing;

- provide a fully-executed customary payoff letter and lien terminations and instruments of discharge (to the extent applicable) for certain indebtedness for borrowed money and any bank credit facility incurred after October 26, 2022 by us, to be delivered at least one (1) business day prior to Closing, to allow for the payoff, discharge and termination in full on the Closing Date of all such indebtedness and liens (if any), subject to the occurrence of the Closing;

- provide reasonable and customary assistance to Parent and the Debt Financing Source (as defined below) in the preparation of customary offering documents, lender presentations, private placement memoranda, bank information memoranda, syndication memoranda, ratings agency presentations (including providing customary authorization and representation letters authorizing the distribution of information relating to us and our subsidiaries to prospective lenders or investors and containing representations with respect to the presence of or absence of material non-public information relating to us and our subsidiaries and the accuracy of the information relating to us and our subsidiaries contained therein) and other customary marketing material for the Debt Financing;

TABLE OF CONTENTS

- so long as requested by Parent at least eight (8) business days prior to the Closing Date, provide at least four (4) business days prior to the Closing Date, all documentation and other information relating to us or any of our subsidiaries required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, and (y) if UserTesting is a "legal entity" customer under 31 C.F.R. § 1010.230, so long as requested by Parent at least eight (8) business days prior to the Closing Date, provide at least four (4) business days prior to the Closing Date, a certification regarding the beneficial ownership required by 31 C.F.R. § 1010.230 in relation to us;

- subject to certain exceptions, provide reasonable and customary assistance to assist Parent in producing any pro forma financial statements regarding us and our subsidiaries;

- cooperate with Parent to obtain reasonable and customary corporate and facilities credit rating;

- cooperate with the Debt Financing Sources' due diligence, to the extent customary and reasonable;

- assist in the preparation of, and executing and delivering at Closing, the definitive debt agreements, including guarantee and collateral documents and instruments as may be reasonably requested by Parent, customary closing certificates, a customary solvency certificate, perfection certificates and other customary documents and instruments as may be reasonably requested by Parent in writing and, in each case, necessary and customary as may be required by the definitive agreements with respect to the Debt Financing (the "Definitive Debt Agreements"); and

- taking reasonable corporate actions, subject to and only effective upon the occurrence of the Closing (and subject to the Definitive Debt Agreements with respect to subsidiary guarantors), reasonably necessary to permit the consummation of the Debt Financing.

Notwithstanding the foregoing, none of us nor any of our affiliates shall be required to take or permit the taking of any action that would (i) require us or our subsidiaries or any of our or their respective affiliates or any persons who are officers or directors of such entities to pass resolutions or consents to approve or authorize the execution of the Debt Financing, except those which are subject to the occurrence of the Closing passed by directors or officers continuing in their positions following the Closing, (ii) require us or our subsidiaries or any of our or their respective affiliates or any persons who are officers or directors of such entities to enter into, execute or deliver any certificate, document, instrument or agreement or agree to any change or modification of any existing certificate, document, instrument or agreement, in each case, that is not contingent upon the Closing or that would be effective prior to the Closing (other than the execution of customary authorization letters and representation letters referenced above), (iii) require us or any of our affiliates to pay any commitment or other similar fee or incur any other expense, liability or obligation in connection with the Debt Financing prior to the Closing or have any obligation of UserTesting or any of our affiliates under any agreement, certificate, document or instrument be effective prior to the Closing, (iv) cause any director, officer, employee of UserTesting or of a UserTesting stockholder or any of UserTesting's affiliates to incur any personal liability, (v) conflict with the organizational documents of UserTesting or any of our affiliates or any laws, (vi) reasonably be expected to result in a material violation or breach of, or a material default (with or without notice, lapse of time, or both) under, any material contract to which we or any of our affiliates is a party (provided that in the event we do not disclose any such information in reliance on the foregoing subclause (vi), we will inform Parent thereof and of the general nature of the information being withheld), (vii) require us or any of our affiliates to provide access to or disclose information that we or any of our affiliates reasonably determines would jeopardize any attorney-client privilege, (viii) require us or any of our affiliates to provide information for reporting periods other than regular fiscal quarters, or (ix) require us or any of our affiliates to provide information for periods for which information is not yet available following regular quarterly closing processes (provided that we or such subsidiary shall use reasonable best efforts to provide an alternative means of disclosing or providing such information, and in the case of any confidentiality obligation, we will, to the extent permitted by such confidentiality obligations, notify Parent if any such information that Parent, Merger Sub or any Debt Financing Source has specifically identified and requested is being withheld as a result of any such obligation of confidentiality). Neither we nor any of our affiliates shall be required to be an issuer or other obligor with respect to the Debt Financing prior to the Closing.

85

TABLE OF CONTENTS

Parent will (x) promptly, on request by UserTesting, reimburse us or any of our affiliates for all reasonable and documented out-of-pocket costs incurred by us or them or our or their respective representatives in connection with the cooperation of UserTesting and our representatives contemplated by the financing cooperation covenant in the Merger Agreement (it being understood that such reimbursement will not apply to any fees, costs and expenses that are incurred by, or on behalf of, us in connection with our ordinary course financial reporting requirements, including, for the avoidance of doubt, with respect to our fiscal year 2022 audited financial statements); and (y) indemnify and hold harmless UserTesting, our affiliates and our and their respective representatives from and against any and all losses (excluding lost profits and losses from any consequential, indirect, special or punitive damages (other than any such damages awarded to a third party in a final non-appealable judgment of a court of a competent jurisdiction)), suffered or incurred by us or them in connection with the arrangement of the Debt Financing and any action taken by us or them at the request of Parent or its representatives and any information used in connection therewith, except (A) with respect to any losses suffered or incurred as a result of the bad faith, gross negligence or willful misconduct of UserTesting or any of our subsidiaries or (B) to the extent resulting solely from any material misstatement or omission in any written historical financial information relating to us or any of our subsidiaries furnished by or on behalf of UserTesting or any of our subsidiaries specifically for use in connection with the Debt Financing.

"Required Financial Information" means the historical financial statements and historical financial data regarding UserTesting and our subsidiaries to the extent required by the Definitive Debt Agreements and such other financial data and financial information and operating data regarding UserTesting and our subsidiaries (including information regarding the business, operations and financial projections thereof) as may be reasonably requested by Parent.

"Debt Financing Sources" means the financial institutions, agents, arrangers, institutional investors and lenders that at any time have committed to provide or arrange or otherwise enter into agreements in connection with the Debt Financing, including the parties to any debt commitment lender or any joinder agreements, credit agreements or the other definitive documentations relating thereto entered into in connection therewith, together with their respective affiliates and their respective affiliates' officers, directors, general or limited partners, stockholders, members, employees, controlling persons, agents and representatives and their respective permitted successors and assigns.

**Indemnification and Insurance**

Parent, Merger Sub and UserTesting have agreed that all indemnification or other similar agreements between any current or former directors, officers or employees, on the one hand, and UserTesting or any of our subsidiaries, on the other hand, as in effect on the date of the Merger Agreement, will survive the Merger and remain in full force and effect in accordance with their respective terms. For a period of six (6) years after the Effective Time, Parent and the Surviving Corporation will maintain in effect the exculpation, indemnification and advancement of expenses provisions of the certificates of incorporation and bylaws or similar organizational documents of UserTesting and of any subsidiaries as in effect immediately prior to the Effective Time, and will not amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any individuals who at the Effective Time were current or former directors, officers or employees of UserTesting or any of our subsidiaries; provided, however, that all rights to indemnification in respect of any actual or threatened claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative (a "Proceeding"), pending or asserted or any claim made within such period will continue until the final disposition of such Proceeding or resolution of such claim, even if beyond such six (6)-year period. From and after the Effective Time, Parent will assume, be jointly and severally liable for, and honor, guarantee and stand surety for, and will cause the Surviving Corporation and its subsidiaries to honor, in accordance with their respective terms, the indemnification provisions of the Merger Agreement.

Parent and the Surviving Corporation will, to the fullest extent provided in the governing and organizational documents of UserTesting and our subsidiaries as in effect on the date of the Merger Agreement and all indemnification or other similar agreements between any current or former directors, officers or employees, on the one hand, and UserTesting or any of our subsidiaries, on the other hand, in each case in effect as of the date of the Merger Agreement, indemnify and hold harmless each current and

TABLE OF CONTENTS

former director, officer or employee of UserTesting or any of our subsidiaries and any person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request of or for the benefit of UserTesting or our subsidiaries (each, an "Indemnified Party") against any costs or expenses (including advancing reasonable attorneys' fees and expenses in advance of the final disposition of any Proceeding to each Indemnified Party to the fullest extent permitted by law), judgments, fines, losses, claims, damages, obligations, costs, liabilities and amounts paid in settlement in connection with a Proceeding, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred at or prior to the Effective Time (including acts or omissions in connection with such persons serving as an officer, director, employee or other fiduciary of any entity if such service was at the request or for the benefit of UserTesting or our subsidiaries), whether asserted or claimed prior to, at or after the Effective Time, in all cases solely to the extent provided in the governing and organizational documents of UserTesting and our subsidiaries. In the event of any such Proceeding, Parent and the Surviving Corporation will cooperate with the Indemnified Party in the defense of any such Proceeding.

In addition, prior to the Effective Time, we will purchase a six (6)-year "tail" insurance policy on UserTesting's current policies of directors' and officers' liability insurance on terms and conditions providing substantially equivalent benefits as the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by us and our subsidiaries with respect to matters arising on or before the Effective Time, including covering without limitation the transactions contemplated by the Merger Agreement; provided that the aggregate cost of such "tail" policy will not exceed 400% of the last annual premium paid by us, and if the annual premium of such insurance coverage exceeds the maximum amount, UserTesting, Parent, or the Surviving Corporation will only be required to obtain as much coverage as reasonably practicable for such amount. Parent and the Surviving Corporation will cause such policy to be maintained in full force and effect, for its full term, and cause all obligations thereunder to be honored by the Surviving Corporation, and no other party shall have any further obligation to purchase or pay for insurance under the indemnification provisions of the Merger Agreement.

Parent has also agreed to pay all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any Indemnified Party in enforcing the indemnity and other indemnification obligations provided in the Merger Agreement in the event Parent is found to have been in breach.

**Other Covenants**

***Stockholders Meeting***

We have agreed to take all necessary action (in accordance with applicable law and our organizational documents) to establish a record date for, duly give notice of, convene and hold the Special Meeting as soon as reasonably practicable following the date upon which we receive confirmation from the SEC that it will not review, or that it has completed its review of this proxy statement (which confirmation will be deemed to occur if the SEC has not affirmatively notified us prior to the tenth (10th) calendar day after filing this proxy statement that the SEC will or will not be reviewing this proxy statement) and, subject to the terms of the Merger Agreement, in any event, no later than forty-five (45) days following such date.

***Stockholder Litigation***

Each of UserTesting and Parent will keep the other reasonably informed of (including by providing copies of all pleadings), and cooperate with the other party in connection with, any stockholder litigation or claim against such party and/or its directors or officers relating to the Merger or the other transactions contemplated by the Merger Agreement. We will: (i) give Parent a reasonable opportunity to participate in the defense or settlement of any such litigation or claim, (ii) consult in good faith with Parent with respect to the defense, settlement and prosecution of any such litigation or claim and (iii) not compromise or settle, or agree to compromise or settle, any stockholder litigation or claim arising or resulting from the transactions contemplated by the Merger Agreement without the prior written consent of Parent (such consent not to be unreasonably withheld, delayed or conditioned).

TABLE OF CONTENTS

*Other Investors*

Prior to the Effective Time, without the prior written consent of UserTesting, Parent will not permit or agree to permit any third person, other than the Thoma Bravo Funds and Sunstone Partners Funds and their respective affiliates, to obtain any equity interests (or rights to obtain any equity interests) in Parent or Merger Sub if such acquisition of equity interests or rights to obtain such equity interests would reasonably be expected to (i) delay in any material respect the obtaining of, or increase in any material respect the risk of not obtaining, any governmental consents necessary to consummate the transactions contemplated by the Merger Agreement or the expiration or termination of any applicable waiting period, (ii) increase in any material respect the risk of any governmental entity seeking or entering an order prohibiting the consummation of the transactions contemplated by Merger Agreement, or (iii) increase in any material respect the risk of not being able to remove any such order on appeal or otherwise.

**Conditions to the Closing of the Merger**

The obligations of Parent and Merger Sub, on the one hand, and UserTesting, on the other hand, to consummate the Merger are subject to the satisfaction or waiver (where permitted by applicable law) of each of the following conditions:

- the adoption of the Merger Agreement by the requisite affirmative vote of our stockholders;

- the expiration or early termination of the applicable waiting period under the HSR Act and the absence of any agreement with a governmental entity not to close the Merger;

- certain regulatory actions by the CMA and ACCC; and

- the absence of any laws or court orders making the Merger illegal or otherwise prohibiting the Merger.

In addition, the obligations of Parent and Merger Sub to consummate the Merger are subject to the satisfaction or waiver (where permitted by applicable law) of each of the following additional conditions:

- UserTesting having performed and complied in all material respects with all obligations and covenants required by the Merger Agreement to be performed or complied with by UserTesting prior to Closing (UserTesting Covenant Condition");

- (i) the representations and warranties of UserTesting relating to organization, good standing, corporate power, enforceability, board approval, anti-takeover laws, required UserTesting stockholder approval, non-contravention with charter or bylaws, certain aspects of our capitalization, subsidiaries and brokers being generally true and correct in all material respects as of the Closing Date as if made at and as of such time, (ii) the representations and warranties of UserTesting relating to certain aspects of our capitalization being generally true and correct as of the Closing Date, except where the failure to be so true and correct would not reasonably be expected to result in additional cost, expense or liability to UserTesting, Parent and their affiliates, individually or in the aggregate, that is more than $10,000,000, (iii) the representations and warranties of UserTesting relating to the absence of any Company Material Adverse Effect since June 30, 2022, being true and correct in all respects as of the Closing Date, (iv) the other representations and warranties of UserTesting set forth elsewhere in the Merger Agreement being true and correct as of the date on which the Closing occurs as if made at and as of such time, except for such failures to be true and correct that would not have a Company Material Adverse Effect (clauses (i) through (iv), the "UserTesting Representation Condition");

- the receipt by Parent of a certificate of UserTesting, dated as of the Closing Date and signed by our chief executive officer, certifying that the UserTesting Representation Condition and the UserTesting Covenant Condition have been satisfied;

- UserTesting having delivered to Parent, no later than one (1) business day prior to Closing, fully-executed customary payoff letters and lien terminations for all indebtedness and borrowed money as set forth in the confidential disclosure letter; and

- the absence of any Company Material Adverse Effect having occurred after the date of Merger Agreement that is continuing.

TABLE OF CONTENTS

In addition, our obligation to consummate the Merger is subject to the satisfaction or waiver (where permitted by applicable law) of each of the following additional conditions:

- Parent and Merger Sub having performed and complied in all material respects with all obligations and covenants required by the Merger Agreement to be performed or complied with by Parent or Merger Sub prior to Closing (the "Parent and Merger Sub Covenant Condition");

- (i) the representations and warranties of Parent and Merger Sub set forth in the Merger Agreement relating to organization, good standing, corporate power, enforceability, board approval, governmental consents, the Guaranties, voting agreements, ownership of UserTesting common stock and solvency of Parent and Merger Sub being generally true and correct in all material respects as of the Closing Date as if made at and as of such time and (ii) the other representations and warranties of Parent and Merger Sub set forth in the Merger Agreement being true and correct on and as of the date on which the Closing occurs with the same force and effect as if made on and as of such date, except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, prevent or materially delay the consummation of the Merger or materially impair the ability of Parent or Merger Sub to fully perform their respective covenants and obligations pursuant to the Merger Agreement (clauses (i) and (ii), the "Parent and Merger Sub Representation Condition"); and

- the receipt by UserTesting of a certificate of Parent and Merger Sub, dated as of the Closing Date and signed by their respective president or chief executive officer, certifying that the Parent and Merger Sub Representation Condition and the Parent and Merger Sub Covenant Condition have been satisfied.

**Termination of the Merger Agreement**

The Merger Agreement may be terminated at any time prior to the Effective Time, whether before or after the adoption of the Merger Agreement by our stockholders, in the following ways:

- by mutual written agreement of UserTesting and Parent;

- by either UserTesting or Parent if:

  - the Merger has not been consummated by April 26, 2023 (which shall be automatically extended to the First Extended End Date if certain regulatory conditions, including the approval or notification of non-objection to the Merger, notification of no further action, or the expiration or termination of the waiting period as applicable under each of the HSR Act, the Australian Foreign Acquisitions and Takeovers Act 1975 (Cth), and the UK National Security and Investment Act 2021, have not been satisfied, or there are any laws or court orders making the Merger illegal or otherwise prohibiting the Merger, as of the close of business on the date that is two (2) business days immediately prior to the First Extended End Date but all other conditions to the Closing of the Merger set forth in the Merger Agreement have been satisfied or waived (except for those conditions which by their nature are to be satisfied at the Closing, provided that such conditions shall then be capable of being satisfied if the Closing were to take place on such date), which First Extended End Date shall be automatically extended until January 26, 2024 if (i) solely due to review by CMA the aforementioned regulatory conditions in this bullet have not yet been satisfied as of the close of business on the date that is two (2) business days immediately prior to the First Extended End Date, (ii) the CMA has reached Provisional Findings in a Phase II merger review that the Merger is not expected to result in a substantial lessening of competition prior to the close of business on the date that is two (2) business days immediately prior to the First Extended End Date, and (iii) all other conditions to the Closing of the Merger set forth in the Merger Agreement have been satisfied or waived (except for those conditions which by their nature are to be satisfied at the Closing, provided that such conditions shall then be capable of being satisfied if the Closing were to take place on such date);

  - any governmental entity has issued or entered an injunction or similar order permanently enjoining or prohibiting the consummation of the Merger and has become final and non-appealable; or

TABLE OF CONTENTS

- our stockholders fail to adopt the Merger Agreement at the Special Meeting or any adjournment or postponement thereof;

- by UserTesting if:

  - Parent or Merger Sub has breached or failed to perform any of their covenants or other agreements under the Merger Agreement or any of the representations and warranties of Parent and Merger Sub in the Merger Agreement have become inaccurate, in any such case where such breach, failure to perform or inaccuracy (i) would result in, and be the primary cause of, a failure of a condition set forth in the Merger Agreement and (ii) cannot be cured by the End Date or, if curable, is not cured within forty-five (45) business days following our delivery of written notice that we are intending to terminate the Merger Agreement because of such breach, failure to perform or inaccuracy;

  - prior to the Effective Time, (i) the closing obligations of UserTesting have been and continue to be satisfied or waived; (ii) Parent has failed to consummate the Merger under the timing restrictions set forth in the Merger Agreement; (iii) we have, at least three (3) business days prior to seeking to terminate the Merger Agreement, irrevocably confirmed in a written notice delivered to Parent that we are ready, willing and able to consummate the Merger, and Parent and Merger Sub have not consummated the Merger by the end of such three-(3)-business-day period; or

  - at any time prior to the adoption of the Merger Agreement by our stockholders if (i) we have received a Superior Proposal after the date of the Merger Agreement, (ii) the Board of Directors has authorized us to enter into a definitive agreement with respect to that Superior Proposal in accordance with the terms of the Merger Agreement, (iii) we have complied in all material respects with the non-solicitation provisions set forth in the Merger Agreement with respect to such Superior Proposal, and (iv) concurrently with such termination, we pay to Parent a termination fee of either (i) $10,160,000 if the Merger Agreement is terminated prior to 11:59 p.m. Pacific Time on December 20, 2022 for the purpose of entering into an agreement with respect to a Superior Proposal received from an Excluded Party, so long as we have complied in all material respects with the non-solicitation provisions set forth in the Merger Agreement with respect to such Superior Proposal or (ii) $33,880,000, in the case of any other such termination;

- by Parent if:

  - we have breached or failed to perform any of our covenants or other agreements under the Merger Agreement or any of the representations and warranties of UserTesting under the Merger Agreement have become inaccurate, in any such case where such breach, failure to perform or inaccuracy (i) would result in, and be the primary cause of, a failure of a condition set forth in the Merger Agreement and (ii) cannot be cured by the End Date or, if curable, is not cured within forty-five (45) business days following Parent's delivery of written notice to UserTesting stating Parent's intention to terminate the Merger Agreement because of such breach, failure to perform or inaccuracy; or

  - prior to the adoption of the Merger Agreement by our stockholders, the Board of Directors effects a Change of Recommendation (except that such right to terminate will expire at 11:59 p.m. Pacific time on the tenth (10th) business day following the date on which Parent is notified in writing that the Board of Directors has effected a Change of Recommendation).

In the event that the Merger Agreement is terminated pursuant to the termination rights above, the Merger Agreement will be of no further force or effect without liability of any party to the other parties, as applicable, except certain sections of the Merger Agreement will survive the termination of the Merger Agreement in accordance with their respective terms. Notwithstanding the foregoing, nothing in the Merger Agreement will relieve any party from any liability for any fraud or willful and material breach of the Merger Agreement prior to its termination. In addition, no termination of the Merger Agreement will affect the rights or obligations of any party pursuant to the confidentiality agreement between Thoma Bravo and UserTesting or the Guaranties, which rights, obligations and agreements will survive the termination of the Merger Agreement in accordance with their respective terms.

90

TABLE OF CONTENTS

**Termination Fee**

If we terminate the Merger Agreement prior to 11:59 p.m. Pacific Time on December 20, 2022 and at any time prior to receipt of the approval of our stockholders for the purpose of entering into an agreement with respect to a Superior Proposal received from an Excluded Party , we would be required to pay a $10,160,000 termination fee to Parent.

Parent will also be entitled to receive a termination fee of $33,880,000 from us if the Merger Agreement is terminated:

- by Parent, because the Board of Directors has effected a Change of Recommendation (which termination must occur by 11:59 p.m. Pacific time on the tenth (10th) business day following the date on which Parent is notified in writing that the Board of Directors has effected a Change of Recommendation); or

- if (i) after the date of the Merger Agreement, an Alternative Acquisition Proposal (substituting for purposes of the termination in the definition of "Alternative Acquisition Proposal" "50%" for "25%" and for "75%" in each place each such phrase appears) is publicly proposed or publicly disclosed prior to, and not publicly withdrawn, (ii) the Merger Agreement is terminated because (A) our stockholders fail to adopt the Merger Agreement at the Special Meeting or any adjournment or postponement thereof or (B) we have breached or failed to perform any of our covenants or other agreements under the Merger Agreement or any of the representations and warranties of UserTesting under the Merger Agreement have become inaccurate, in any such case where such breach, failure to perform or inaccuracy (1) would result in, and be the primary cause of, a failure of a condition set forth in the Merger Agreement and (2) cannot be cured by the End Date or, if curable, is not cured within forty-five (45) business days following Parent's delivery of written notice that Parent is intending to terminate the Merger Agreement because of such breach, failure to perform or inaccuracy, and (iii) concurrently with or within twelve (12) months after such termination, we have (A) consummated any Alternative Acquisition Proposal or (B) entered into a definitive agreement providing for (and later consummated) such Alternative Acquisition Proposal.

We will be entitled to receive a termination fee of $67,760,000 from Parent (the "Parent Termination Fee") if the Merger Agreement is terminated:

- by us, if Parent or Merger Sub has breached or failed to perform any of their covenants or other agreements under the Merger Agreement or any of the representations and warranties of Parent and Merger Sub in the Merger Agreement have become inaccurate, in any such case where such breach, failure to perform or inaccuracy (i) would result in, and be the primary cause of, a failure of a condition set forth in the Merger Agreement and (ii) cannot be cured by the End Date or, if curable, is not cured within forty-five (45) business days following our delivery of written notice that we are intending to terminate the Merger Agreement because of such breach, failure to perform or inaccuracy;

- by us prior to the Effective Time, if (i) our closing obligations have been and continue to be satisfied or waived; (ii) Parent has failed to consummate the Merger under the timing restrictions set forth in the Merger Agreement; (iii) we have, at least three (3) business days prior to seeking to terminate the Merger Agreement, irrevocably confirmed in a written notice delivered to Parent that we are ready, willing and able to consummate the Merger, and (iv) Parent and Merger Sub have not consummated the Merger by the end of such three-(3)-business-day period; or

- by Parent because the Merger has not been consummated by the End Date, and at such time, we could have terminated pursuant to either of the prior two (2) bullets above.

**Specific Performance**

Parent, Merger Sub and UserTesting agree that irreparable damage would occur in the event that any of the provisions of the Merger Agreement were not performed in accordance with their specific terms or were otherwise breached. Parent, Merger Sub and UserTesting acknowledge and agree that, in the event of any breach or threatened breach by any other party of any covenant or obligation contained in the Merger Agreement: (i) the non-breaching party will be entitled (in addition to any other remedy to which they are entitled at law or in equity, including monetary damages), to obtain (A) a decree or order of specific

TABLE OF CONTENTS

performance to enforce the observance and performance of such covenant or obligation and (B) an injunction restraining such breach or threatened breach and (ii) the fees and expenses provisions of the Merger Agreement are not intended to and would not adequately compensate UserTesting, on the one hand, or Parent and Merger Sub, on the other hand, for the harm that would result from a breach of the Merger Agreement, and will not be construed to diminish or otherwise impair in any respect any party's right to an injunction, specific performance and other equitable relief; and (iii) the right of specific enforcement is an integral part of the Merger and without that right, neither UserTesting nor Parent would have entered into the Merger Agreement.

It is explicitly agreed that, subject to the limitations of the next two sentences, we will have the right to specific performance in connection with enforcing Parent's and Merger Sub's obligations to consummate the Merger and cause the financing to be funded (including to cause Parent to enforce the obligations of the Thoma Bravo Funds and the Sunstone Partners Funds under the Equity Commitment Letters in order to cause the Equity Financing to be timely completed in accordance with and subject to the terms and conditions set forth in the Equity Commitment Letters) subject to the terms and conditions set forth therein and in the Merger Agreement. Notwithstanding anything to the contrary in the Merger Agreement, it is explicitly agreed that our right to seek an injunction, specific performance or other equitable remedies in connection with enforcing Parent's obligation to cause the Equity Financing to be funded to fund a portion of the amount required to consummate the Merger and to make all payments required to be made in connection therewith (but not our right to seek such injunctions, specific performance or other equitable remedies for any other reason) shall be subject to the requirements that (i) all of the (x) joint conditions to Parent's, Merger Sub's and UserTesting's obligations to consummate the Merger and (y) conditions to Parent's and Merger Sub's obligations to consummate the Merger, in each case, have been satisfied (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver (to the extent permitted hereunder) of such conditions), (ii) we have irrevocably confirmed in writing that if the Equity Financing is funded, then we shall take such actions that are required of us by the Merger Agreement to arrange and consummate the Closing of the Merger pursuant to the terms of the Merger Agreement and (iii) Parent and Merger Sub will have failed to consummate the Merger by the time Closing was to occur under the Merger Agreement. Notwithstanding the foregoing and subject to the rights of the parties to the definitive agreements for any financing under the terms thereof, we are not entitled to directly seek the remedy of specific performance of the Merger Agreement against any debt financing source. Additionally, the election to pursue an injunction, specific performance or other equitable relief will not restrict, impair or otherwise limit us from, in the alternative, seeking to terminate the Merger Agreement and collect the Parent Termination Fee; provided that in no event will we be permitted to pursue an injunction, specific performance or other equitable relief or any other remedy under the Merger Agreement or available at law or equity following the payment of the Parent Termination Fee in accordance with the terms of the Merger Agreement.

Parent, Merger Sub and UserTesting agree not to raise any objections to (i) the granting of an injunction, specific performance or other equitable relief to prevent or restrain breaches or threatened breaches of the Merger Agreement by us, on the one hand, or Parent and Merger Sub, on the other hand; and (ii) the specific performance of the terms and provisions of the Merger Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants, obligations and agreements of Parent and Merger Sub pursuant to the Merger Agreement. Any party seeking an injunction or injunctions to prevent breaches of the Merger Agreement and to enforce specifically the terms and provisions of the Merger Agreement will not be required to provide any bond or other security in connection with such injunction or enforcement, and each party irrevocably waives any right that it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

**Limitations of Liability**

The collective monetary damages of Parent, Merger Sub or any of their affiliates for breaches (including any willful and material breach) under the Merger Agreement (taking into account the payment of the Parent Termination Fee pursuant to the Merger Agreement), the Guaranties or the Equity Commitment Letters will not exceed, in the aggregate for all such breaches, an amount equal to $67,760,000 plus certain reimbursement obligations.

TABLE OF CONTENTS

The maximum aggregate monetary damages of UserTesting for breaches (including any willful and material breach) under the Merger Agreement (taking into account the payment of the Company Termination Fee pursuant to the Merger Agreement) will not exceed, in the aggregate for all such breaches, an amount equal to $33,880,000. Notwithstanding such limitations on liability for monetary damages, Parent, Merger Sub and UserTesting may be entitled to an injunction, specific performance or other equitable relief as provided in the Merger Agreement.

### Fees and Expenses

Except in specified circumstances, whether or not the Merger is completed, all costs and expenses incurred in connection with the Merger, the Merger Agreement and the other transactions contemplated by the Merger Agreement will be paid by the party incurring or required to incur such expenses, except that all filing fees paid by any party in respect of any and all filings under the antitrust and foreign investment laws shall be borne by Parent and that generally Parent will pay or cause to be paid all transfer, documentary, sales, use, stamp, registration, real property transfer and other similar taxes and fees imposed with respect to, or as a result of, entering into the Merger Agreement and completing the Merger and that such taxes and fees expressly will not be a liability of our stockholders or holders of our equity awards.

### Amendment

The Merger Agreement may be amended by the parties in an executed written instrument at any time before or after adoption of the Merger Agreement by our stockholders. However, after adoption of the Merger Agreement by our stockholders, no amendment that requires further approval by such UserTesting stockholders pursuant to applicable law or in accordance with the rules and regulations of the NYSE may be made without such approval.

### Governing Law

The Merger Agreement is governed by Delaware law.

### Vote Required and Board of Directors Recommendation

Approval of the adoption of the merger agreement proposal requires the affirmative vote of the holders of a majority of the issued and outstanding shares of UserTesting common stock entitled to vote at the Special Meeting. With respect to such proposal, (i) a failure to vote in person or by proxy at the Special Meeting will have the same effect as a vote "**AGAINST**" on the outcome of the adoption of the merger agreement proposal, (ii) abstentions will be counted as votes "**AGAINST**" on the outcome of the adoption of the merger agreement proposal and (iii) broker "non-votes" (if any) will be counted as votes "**AGAINST**" on the outcome of the adoption of the merger agreement proposal. Shares of UserTesting common stock represented by properly executed, timely received and unrevoked proxies will be voted in accordance with the instructions indicated thereon. If a UserTesting stockholder returns a signed proxy card without indicating voting preferences on such proxy card, the shares of UserTesting common stock represented by that proxy will be counted as present for purposes of determining the presence of a quorum for the Special Meeting and all of such shares will be voted as recommended by the Board of Directors.

**The Board of Directors unanimously recommends that you vote "FOR" this proposal.**

TABLE OF CONTENTS

## PROPOSAL 2: ADJOURNMENT OF THE SPECIAL MEETING

We are asking you to approve a proposal to adjourn the Special Meeting to a later date or dates if necessary or appropriate to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting. If UserTesting stockholders approve the adjournment proposal, we could adjourn the Special Meeting and any adjourned session of the Special Meeting and use the additional time to solicit additional proxies, including soliciting proxies from our stockholders that have previously returned properly executed proxies voting against adoption of the Merger Agreement. Among other things, approval of the adjournment proposal could mean that, even if we had received proxies representing a sufficient number of votes against adoption of the Merger Agreement such that the proposal to adopt the Merger Agreement would be defeated, we could adjourn the Special Meeting without a vote on the adoption of the Merger Agreement and seek to convince the holders of those shares to change their votes to votes in favor of adoption of the Merger Agreement. Additionally, we may seek to adjourn the Special Meeting if a quorum is not present or otherwise at the discretion of the chairperson of the Special Meeting.

### Vote Required and Board of Directors Recommendation

Approval of the adjournment proposal if a quorum is present, requires the affirmative vote of the holders of a majority of the issued and outstanding shares of UserTesting common stock entitled to vote that are present in person or represented by proxy at the Special Meeting and are voted for or against the matter. Assuming a quorum is present, (i) a failure to vote in person or by proxy at the Special Meeting will have no effect on the outcome of the adjournment proposal, (ii) abstentions will have no effect on the outcome of the adjournment proposal and (iii) broker "non-votes" (if any) will have no effect on the outcome of the adjournment proposal. Shares of UserTesting common stock represented by properly executed, timely received and unrevoked proxies will be voted in accordance with the instructions indicated thereon. If a UserTesting stockholder returns a signed proxy card without indicating voting preferences on such proxy card, the shares of UserTesting common stock represented by that proxy will be counted as present for purposes of determining the presence of a quorum for the Special Meeting and all of such shares will be voted as recommended by the Board of Directors.

**The Board of Directors unanimously recommends that you vote "FOR" this proposal.**

94

TABLE OF CONTENTS

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table presents the beneficial ownership of our common stock by holders of more than 5% of our common stock, each of our directors; each of our named executive officers; and all of our directors and executive officers as a group. Except for the information about the greater than 5% stockholders, the following table sets forth certain information with respect to the beneficial ownership of our common stock as of October 31, 2022, by each of our directors; each of our named executive officers; and all of our directors and executive officers as a group.

Percentage ownership of our common stock is based on 145,333,328 shares of UserTesting common stock issued and outstanding on October 31, 2022. We have determined beneficial ownership in accordance with the rules of the SEC, and thus it represents sole or shared voting or investment power with respect to our securities. Unless otherwise indicated below, to our knowledge, the persons and entities named in the table have sole voting and sole investment power with respect to all shares that they beneficially owned, subject to community property laws where applicable. We have deemed shares of our common stock subject to stock options that are currently exercisable or exercisable within sixty (60) days of October 31, 2022, shares of our common stock subject to RSUs that will be released within sixty (60) days of October 31, 2022, and shares of our common stock purchasable under the Company ESPP within sixty (60) days of October 31, 2022, to be outstanding and to be beneficially owned by the person holding the stock option, RSU and purchase rights under the Company ESPP for the purpose of computing the percentage ownership of that person but have not treated them as outstanding for the purpose of computing the percentage ownership of any other person.

Unless otherwise indicated, the address of each of the individuals and entities named below that owns 5% or more of our common stock is c/o UserTesting, Inc., 144 Townsend Street, San Francisco, California 94107.

| Name | Number of Shares Beneficially Owned | Percentage of Shares Beneficially Owned (%) |
|---|---|---|
| **Named Executive Officers and Directors:** | | |
| Andy MacMillan[1] | 6,858,939 | 4.5 |
| Jon Pexton[2] | 749,317 | * |
| David Satterwhite[3] | 1,398,238 | 1.0 |
| Darrell Benatar[4] | 6,176,674 | 4.3 |
| Andrew Braccia[5] | 29,777,251 | 20.5 |
| Tatyana Mamut[6] | 71,376 | * |
| Shannon Nash[7] | 56,932 | * |
| Cynthia Russo[8] | 56,932 | * |
| Alexander Wong[9] | 1,652,107 | 1.1 |
| All executive officers and directors as a group (13 persons)[10] | 50,681,321 | 32.2 |
| **Other 5% Stockholders:** | | |
| Entities affiliated with Accel Growth Fund III LP[11] | 29,760,041 | 20.5 |
| Entities affiliated with Insight Partners (Cayman) XI, L.P.[12] | 22,435,663 | 15.4 |
| Entities affiliated with OpenView Venture Partners IV LP[13] | 9,159,154 | 6.3 |
| Entities affiliated with StepStone Group LP[14] | 22,680,906 | 15.6 |

---

\*      Less than 1%

(1)    Represents (i) 14,350 shares of UserTesting common stock held by Mr. MacMillan, (ii) 87,750 shares of UserTesting common stock issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022, (iii) 6,754,339 shares of UserTesting common stock issuable to Mr. MacMillan upon exercise of stock options within 60 days of October 31, 2022 and (iv) a maximum of 2,500 shares of UserTesting common stock that are issuable under the Company ESPP within 60 days of October 31, 2022.

(2)    Represents (i) 127,313 shares of UserTesting common stock held by Mr. Pexton, (ii) 37,500 shares of UserTesting common stock

TABLE OF CONTENTS

issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022, (iii) 582,004 shares of UserTesting common stock issuable to Mr. Pexton upon exercise of stock options within 60 days of October 31, 2022 and (iv) a maximum of 2,500 shares of UserTesting common stock that are issuable under the Company ESPP within 60 days of October 31, 2022.

(3) Represents (i) 227,218 shares of UserTesting common stock issuable to Mr. Satterwhite, (ii) 40,000 shares of UserTesting common stock issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022, (iii) 1,128,520 shares of UserTesting common stock issuable to Mr. Satterwhite upon exercise of stock options within 60 days of October 31, 2022 and (iv) a maximum of 2,500 shares of UserTesting common stock that are issuable under the Company ESPP within 60 days of October 31, 2022.

(4) Represents 6,176,674 shares of UserTesting common stock held by D&L Benatar 2014 Revocable Trust.

(5) Represents (i) 8,605 shares of UserTesting common stock issuable to Mr. Braccia, (ii) 8,605 shares of UserTesting common stock issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022 and (iii) (a) 26,727,498 shares of UserTesting common stock held by Accel Growth Fund III LP ("Accel III"), (b) 1,261,825 shares of UserTesting common stock held by Accel Growth Fund III Strategic Partners LP ("Accel III Partners") and (c) 1,770,718 shares of UserTesting common stock held by Accel Growth Fund Investors 2014 LLC ("Accel 2014"). Accel Growth Fund III Associates L.L.C. is the general partner of each of Accel III and Accel III Partners. The managing members of Accel Growth Fund III Associates L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong. Accel Growth Fund III Associates L.L.C. has sole voting and dispositive power with regard to the shares held by Accel III and Accel III Partners, and its managing members share such powers. The managing members of Accel 2014 are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong, all of whom share voting and dispositive power with regard to the shares held by Accel 2014.

(6) Represents (i) 8,605 shares of UserTesting common stock issuable to Ms. Mamut, (ii) 8,605 shares of UserTesting common stock issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022 and (iii) 54,166 shares of UserTesting common stock issuable to Ms. Mamut upon exercise of stock options within 60 days of October 31, 2022.

(7) Represents (i) 8,605 shares of UserTesting common stock issuable to Ms. Nash, (ii) 8,605 shares of UserTesting common stock issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022 and (iii) 39,722 shares of UserTesting common stock issuable to Ms. Nash upon exercise of stock options within 60 days of October 31, 2022.

(8) Represents (i) 8,605 shares of UserTesting common stock issuable to Ms. Russo, (ii) 8,605 shares of UserTesting common stock issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022 and (iii) 39,722 shares of UserTesting common stock issuable to Ms. Russo upon exercise of stock options within 60 days of October 31, 2022.

(9) Represents (i) 1,643,502 shares of UserTesting common stock issuable to Mr. Wong and (ii) 8,605 shares of UserTesting common stock issuable upon settlement of RSU awards that vest within 60 days of October 31, 2022.

(10) Represents (i) 38,846,438 shares of UserTesting common stock held by our directors and executive officers as a group, (ii) 349,525 shares of UserTesting common stock issuable to our directors and executive officers as a group upon settlement of RSU awards that vest within 60 days of October 31, 2022, (iii) 11,470,358 shares of UserTesting common stock issuable to our directors and executive officers as a group upon exercise of stock options within 60 days of October 31, 2022 and (iv) a maximum of 15,000 shares of UserTesting common stock issuable to our directors and executive officers as a group under the Company ESPP within 60 days of October 31, 2022.

(11) Represents (i) 26,727,498 shares of UserTesting common stock held by Accel Growth Fund III LP ("Accel III"), (ii) 1,261,825 shares of UserTesting common stock held by Accel Growth Fund III Strategic Partners LP ("Accel III Partners") and (iii) 1,770,718 shares of UserTesting common stock held by Accel Growth Fund Investors 2014 LLC ("Accel 2014"). Accel Growth Fund III Associates L.L.C. is the general partner of each of Accel III and Accel III Partners. The managing members of Accel Growth Fund III Associates L.L.C. are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong. Accel Growth Fund III Associates L.L.C. has sole voting and dispositive power with regard to the shares held by Accel III and Accel III Partners, and its managing members share such powers. The managing members of Accel 2014 are Andrew Braccia, Sameer Gandhi, Ping Li, Tracy Sedlock, Ryan Sweeney, and Richard Wong, all of whom share voting and dispositive power with regard to the shares held by Accel 2014.

(12) Based on the information as of December 31, 2021 contained in the Schedule 13G filed with the SEC on February 10, 2022 by the Insight Holdings Group, LLC ("Holdings"). The Schedule 13G indicates that 9,328,850 shares of UserTesting common stock are held by Insight Partners XI, L.P. ("IP XI"), 155,343 shares of UserTesting common stock are held by Insight Partners XI (Co- Investors), L.P. ("IP Co-Investors"), 214,105 shares of UserTesting common stock are held by Insight Partners XI (Co-Investors) (B), L.P. ("IP Co-Investors B"), 10,220,232 shares of UserTesting common stock are held by Insight Partners (Cayman) XI, L.P. ("IP Cayman"), 1,304,945 shares of UserTesting common stock are held by Insight Partners (Delaware) XI, L.P. ("IP Delaware") and 1,212,188 shares of UserTesting common stock are held by Insight Partners (EU) XI, S.C.Sp. ("IP EU"). Mr. Parekh is a member of the board of managers of Holdings. Holdings is the sole shareholder of Insight Associates XI, Ltd. ("IA XI Ltd"), which in turn is the general partner of Insight Associates XI, L.P. ("IA XI LP"), which in turn is the general partner of each of IP XI, IP Co-Investors, IP Co-Investors B, IP Cayman and IP Delaware (collectively, the "Fund XI Entities", and collectively with IP EU, "Fund XI"). Holdings is the sole shareholder of Insight Associates (EU) XI, S.a.r.l. ("IA EU XI"), which in turn is the general partner of IP EU. Mr. Parekh disclaims beneficial ownership of all shares held by Fund XI, except to the extent of his pecuniary interest therein. The address for each of these entities is c/o Insight Partners, 1114 Avenue of the Americas, 36th Floor, New York, NY 10036.

(13) Based on the information as of December 31, 2021 contained in the Schedule 13G filed with the SEC on February 9, 2022 by the OpenView Management, LLC. The Schedule 13G indicates that 289,952 shares of UserTesting common stock are held by OpenView Affiliates Fund IV, L.P. and 8,869,202 shares of UserTesting common stock are held by OpenView Venture Partners IV,

96

TABLE OF CONTENTS

L.P. The general partner of OpenView Affiliates Fund IV, L.P. and OpenView Venture Partners IV, L.P. is OpenView General Partner IV, L.P. The address for each of these entities is 303 Congress Street, 7th Floor, Boston, MA 02210.

(14) Based on the information as of November 10, 2022 contained in the Schedule 13G filed with the SEC on November 15, 2022 by the StepStone Group LP ("StepStone"). The Schedule 13G indicates that an aggregate of 22,680,906 shares of UserTesting common stock are held by StepStone and its funds, of which 2,860,390 shares of UserTesting common stock are held by StepStone VC Global Partners, VII-A, L.P. ("Global Partners VII-A"), 275,958 shares of UserTesting common stock are held by StepStone VC Global Partners VII-C, L.P. ("Global Partners VII-C"), 4,677,285 shares of UserTesting common stock are held by StepStone VC Opportunities III, L.P. ("Opportunities III"), 5,204,266 shares of UserTesting common stock are held by StepStone VC Secondaries Fund III, L.P. ("Secondaries Fund III"), 8,631,482 shares of UserTesting common stock are held by StepStone VC Secondaries Fund IV, L.P. ("Secondaries Fund IV"), and 1,031,525 shares of UserTesting common stock held by StepStone IL Special II, L.P. ("IL Special"). StepStone VC General Partner VII, L.P. ("Partners VII GP") is the general partner of Global Partners VII-A and Global Partners VII-C. StepStone VC Opportunities General Partner III, L.P. ("Opportunities III GP") is the general partner of StepStone VC Opportunities III, L.P. ("Opportunities III"). StepStone VC Secondaries General Partner III, L.P. ("Secondaries III GP") is the general partner of Secondaries Fund III. StepStone VC Secondaries General Partner IV, L.P. ("Secondaries IV GP") is the general partner of Secondaries Fund IV. IL Special is the general partner of StepStone VC SPV UT, L.P. StepStone is the investment manager of the Funds. StepStone Group Holdings LLC ("StepStone Group Holdings") is the general partner of StepStone, and StepStone Group Inc. is the sole managing member of StepStone Group Holdings. The address for each of these entities is c/o StepStone, 4225 Executive Square, Suite 1600, La Jolla, CA 90237.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16 of the Exchange Act requires our directors, executive officers and any persons who own more than 10% of UserTesting's common stock, to file initial reports of ownership and reports of changes in ownership with the SEC. Such persons are required by SEC regulation to furnish UserTesting with copies of all Section 16(a) forms that they file. Based solely on our review of the copies of such forms furnished to us and written representations from our directors and executive officers, we believe that all Section 16(a) filing requirements were timely met in 2022, except due to administrative error, one late Form 4 filing made on behalf of Sabrina Mekhalfa, dated November 17, 2022, to report three transactions, which occurred on April 4, 2022, August 15, 2022, and August 16, 2022.

TABLE OF CONTENTS

### FUTURE STOCKHOLDER PROPOSALS

We held our annual meeting of stockholders (the "2022 annual meeting") on June 1, 2022. In light of the Special Meeting, we will hold an annual meeting of stockholders in 2023 only if the Merger is not completed and our stockholders will continue to be entitled to attend and participate in such meeting.

As described in our annual proxy statement for the 2022 annual meeting filed on April 20, 2022, our restated bylaws provide that, for stockholder nominations to our Board of Directors or other proposals to be considered at an annual meeting, the stockholder must give timely notice thereof in writing to the attention of the Corporate Secretary at our principal executive offices, the address of which is UserTesting, Inc., 144 Townsend Street, San Francisco, California 94107. To be timely for our 2023 annual meeting of stockholders (if such meeting is held), a stockholder's notice must be delivered to or mailed and received by our Corporate Secretary at our principal executive offices not earlier than 5:00 p.m. Eastern Time on February 1, 2023 and not later than 5:00 p.m. Eastern Time on March 3, 2023. A stockholder's notice to the Corporate Secretary must set forth as to each matter the stockholder proposes to bring before the annual meeting the information required by our restated bylaws.

As described in our annual proxy statement for the 2022 annual meeting filed on April 20, 2022, stockholder proposals submitted pursuant to Rule 14a-8 under the Exchange Act and intended to be presented at our 2023 annual meeting of stockholders (if such meeting is held) must be received by us not later than December 21, 2022 in order to be considered for inclusion in our proxy materials for that meeting. Proposals should be sent to our Corporate Secretary at our principal executive offices, together with proof of ownership of our common stock in accordance with Rule 14a-8 under the Exchange Act. We strongly encourage any stockholder interested in submitting a proposal to contact our Corporate Secretary in advance of this deadline to discuss the proposal.

Pursuant to Rule 14a-19 under the Exchange Act, the deadline for stockholders to deliver notice to us of any dissident nominees such stockholder intends to solicit proxies for at our 2023 annual meeting of stockholders (if such meeting is held) must be received by us not later than April 2, 2023. Notice should be sent to our Corporate Secretary at our principal executives offices in accordance with 14a-19 under the Exchange Act.

TABLE OF CONTENTS

### WHERE YOU CAN FIND MORE INFORMATION

The SEC allows us to "incorporate by reference" information into this proxy statement, which means that we can disclose important information to you by referring you to other documents filed separately with the SEC. The information incorporated by reference is deemed to be part of this proxy statement, except for any information superseded by information in this proxy statement or incorporated by reference subsequent to the date of this proxy statement. This proxy statement incorporates herein by reference the documents set forth below that we have previously filed with the SEC. These documents contain important information about us and our financial condition and are incorporated herein by reference.

The following UserTesting filings with the SEC are incorporated herein by reference:

- Our Annual Report on Form 10-K for the year ended December 31, 2021, filed on March 4, 2022;

- Our Quarterly Reports on Form 10-Q for the quarter ended March 31, 2022, filed on May 4, 2022, for the quarter ended June 30, 2022, filed on August 4, 2022, and for the quarter ended September 30, 2022, filed on October 31, 2022;

- Our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 20, 2022; and

- Our Current Reports on Form 8-K, filed on June 3, 2022 and October 27, 2022.

We also incorporate by reference into this proxy statement additional documents that we may file with the SEC between the date of this proxy statement and the earlier of the date of the Special Meeting or the termination of the Merger Agreement. These documents include periodic reports, such as Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, as well as Current Reports on Form 8-K and proxy soliciting materials. The information provided on our website is not part of this proxy statement, and therefore is not incorporated herein by reference.

Information furnished under Item 2.02 or Item 7.01 of any Current Report on Form 8-K, including related exhibits, is not and will not be incorporated herein by reference.

You may obtain any of the documents we file with the SEC through the SEC's website at *www.sec.gov*, or from our website at *https://ir.usertesting.com/*. The information included on our website is not incorporated herein by reference.

You may also request copies of any of the documents we file with the SEC by requesting in writing or by telephone from us at the following address:

UserTesting, Inc.
Attn: Investor Relations
144 Townsend Street
San Francisco, California 94107
(888) 877-1882

If you would like to request documents from us, please do so as soon as possible, to receive them before the Special Meeting. If you request any documents from us, we will mail them to you by first class mail, or another equally prompt method, within one (1) business day after we receive your request.

If you have any questions concerning the Merger, the Special Meeting or this proxy statement, would like additional copies of this proxy statement or need help voting your shares of UserTesting common stock, please contact our proxy solicitor:

MacKenzie Partners, Inc.
1407 Broadway, 27th Floor
New York, NY 10018
Toll-free: 1-800-322-2885
Email: proxy@mackenziepartners.com

TABLE OF CONTENTS

**MISCELLANEOUS**

We have supplied all information relating to UserTesting, and Parent has supplied, and we have not independently verified, all of the information relating to Parent and Merger Sub contained in this proxy statement.

You should rely only on the information contained in this proxy statement, the annexes to this proxy statement and the documents that we incorporate by reference in this proxy statement in voting on the Merger. We have not authorized anyone to provide you with information that is different from what is contained in this proxy statement. This proxy statement is dated December 6, 2022. You should not assume that the information contained in this proxy statement is accurate as of any date other than that date (or as of an earlier date if so indicated in this proxy statement), and the mailing of this proxy statement to our stockholders does not create any implication to the contrary. This proxy statement does not constitute a solicitation of a proxy in any jurisdiction where, or to or from any person to whom, it is unlawful to make a proxy solicitation.

TABLE OF CONTENTS

USERTESTING, INC.
144 TOWNSEND STREET
SAN FRANCISCO, CA 94107



**SCAN TO**
VIEW MATERIALS & VOTE

**VOTE BY INTERNET**
*Before The Meeting* - Go to **www.proxyvote.com** or scan the QR Barcode above

Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by 11:59 p.m. Eastern Time on January 9, 2023. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

*During The Meeting* - Go to **www.virtualshareholdermeeting.com/USER2023SM**

You may attend the meeting via the Internet and vote during the meeting. Have the information that is printed in the box marked by the arrow available and follow the instructions.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by 11:59 p.m. Eastern Time on January 9, 2023. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

---

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

D93670-S56621   KEEP THIS PORTION FOR YOUR RECORDS
DETACH AND RETURN THIS PORTION ONLY

THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.

**USERTESTING, INC.**

The Board of Directors recommends you vote FOR proposals 1 and 2.

| | | For | Against | Abstain |
|---|---|---|---|---|
| 1. | To adopt the Agreement and Plan of Merger, dated as of October 26, 2022 (the "Merger Agreement"), by and among UserTesting, Inc., a Delaware corporation (the "Company"), Thunder Holdings, LLC, a Delaware limited liability company ("Parent"), and Thunder Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub"), pursuant to which Merger Sub will merge with and into the Company (the "Merger"), with the Company to survive the Merger as a wholly owned subsidiary of Parent. | ☐ | ☐ | ☐ |
| 2. | To approve any proposal to adjourn the Special Meeting to a later date or dates if necessary or appropriate to solicit additional proxies if there are insufficient votes to adopt the Merger Agreement at the time of the Special Meeting. | ☐ | ☐ | ☐ |

**NOTE:** Such other business as may properly come before the meeting or any adjournment thereof.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

| | | | |
|---|---|---|---|
| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |

TABLE OF CONTENTS

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting:**
The Notice and Proxy Statement is available at www.proxyvote.com.

D93671-S56621

**USERTESTING, INC.**
**Special Meeting of Stockholders**
**January 10, 2023 10:00 a.m. Pacific Time**
**This proxy is solicited by the Board of Directors**

The undersigned hereby appoints Andy MacMillan (President and Chief Executive Officer) and Mona Sabet (Chief Corporate Strategy Officer and Corporate Secretary), and each of them, as the true and lawful attorneys of the undersigned, with full power of substitution and revocation, and authorizes each of them, to vote all the shares of capital stock of UserTesting, Inc. that the undersigned is entitled to vote at the Special Meeting of Stockholders to be held at 10:00 a.m. Pacific Time on January 10, 2023, virtually at www.virtualshareholdermeeting.com/USER2023SM, and any adjournment thereof upon the matters specified and upon such other matters as may be properly brought before the meeting or any adjournment thereof, conferring authority upon such true and lawful attorneys to vote in their discretion on such other matters as may properly come before the meeting and revoking any proxy heretofore given.

**WHEN PROPERLY EXECUTED, THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS DIRECTED OR, IF NO DIRECTION IS GIVEN, SHARES WILL BE VOTED FOR PROPOSALS 1 AND 2.**

You are encouraged to specify your choice by marking the appropriate box (SEE REVERSE SIDE) but you need not mark any box if you wish to vote in accordance with the Board of Directors' recommendation. The named proxies cannot vote your shares unless you sign (on the reverse side) and return this card.

**Continued and to be signed on reverse side**